UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ALEXANDER GALLO HOLDINGS, | : | Case No. 11-14220 (ALG) |
| LLC, *et al.*,[1] | : | |
| | : | (Joint Administration Requested) |
| Debtors. | : | |

----------------------------------------------------x

### AFFIDAVIT OF MARC L. PFEFFERLE PURSUANT TO
### LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF FIRST DAY MOTIONS

I, Marc L. Pfefferle, being duly sworn, state that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a Partner with Carl Marks Advisory Group LLC ("CMAG"), the Chief Restructuring Advisor ("CRA")[2] for the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases").

2.      On September 7, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

3.      For the period since August 1, 2011, when CMAG was retained, CMAG has reviewed the Debtors' books and records and worked closely with the Debtors' management. Based on that, I am generally familiar with the day-to-day operations, business and financial

---

[1]      The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Alexander Gallo Holdings, LLC (4040); Set Depo, LLC (4236); AG/Sanction LLC (2187); Unlimited Languages, Inc. (7755); The Hobart West Group, Inc. (9849); Deponet, LLC (0336); Esquire Deposition Services, LLC (9684); Esquire Litigation Solutions, LLC (0947); Esquire Solutions, LLC (9382); Hobart West Solutions, LLC (6005); and D-M Information Systems, Inc. (3504).

[2]      In these cases, the Debtors are seeking to retain and employ the undersigned as Chief Restructuring Officer for the Debtors and, if such motion is approved, the Debtors will no longer employ CMAG in the capacity of Chief Restructuring Advisor.

affairs, and books and records of the Debtors. I submit this Affidavit (the "<u>Affidavit</u>") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>") to assist this Bankruptcy Court and other parties in interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases, and in support of (a) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and (b) relief, in the form of motions and applications, that the Debtors have requested of the Bankruptcy Court on the Petition Date or will be requesting shortly thereafter (the "<u>First Day Motions</u>").

4.     Except as otherwise indicated herein, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with the members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions as qualified previously. If called upon to testify, I would testify to the facts set forth in this Affidavit and that I am authorized to submit this Affidavit on behalf of the Debtors.

5.     This Affidavit is intended to provide a summary overview of the Debtors and these Chapter 11 Cases. Part I of this Affidavit provides an overview of the Debtors' business and corporate history. Part II provides a description of the Debtors' organizational and capital structure. Part III provides a discussion of the events leading to the commencement of these Chapter 11 Cases. Part IV sets forth relevant facts in support of the Debtors' First Day Motions. Part V lists the schedules of information required by Local Rule 1007-2.

**PART I**
**AGH'S BUSINESS AND CORPORATE HISTORY**

6.     Alexander Gallo Holdings, LLC ("<u>AGH</u>") is the largest full service, IT-enabled court reporting and litigation support services company in the United States. AGH offers court reporting, litigation support, trial software and other similar services and has the only true

national footprint in its market, with approximately 55 offices located throughout the United States, and a preferred provider network which serves as an extension of the Debtors' geographic reach. Founded in 1999 by Alexander J. Gallo, a former court reporter, AGH has made 18 acquisitions since 2003. Alexander J. Gallo currently serves as Chief Executive Officer of AGH and, as such, is responsible for the vision, leadership and direction of AGH.

7.      AGH provides deposition services—which includes traditional court reporting services nationwide—and also provides litigation support and consulting services, including document production, expert discovery, deposition transcripts, translation services and transcript processing. In addition, AGH provides litigation solutions to corporations and national law firms, with centralized litigation services and production.

8.      Services offered by AGH may be grouped into the following three lines of business:

        a.      <u>Deposition Services</u> – Includes the scheduling of depositions, the provision of a facility for depositions, the assigning of certified reporters, videotaping of depositions, and the production of transcripts.

        b.      <u>Litigation Services</u> – Includes the provision of electronic and paper-based discovery services.

        c.      <u>Software and Trial Presentation</u> – Includes the provision of software solutions to aid companies in organizing their cases, including giving them the option to add audio. visual effects and trial services to assist clients with case strategy, development, trial presentation and software training.

9.      To date, AGH has over 12,500 local, regional and national law firm clients, as well as national corporate accounts with many Fortune 500 companies and accounts with

insurance companies and governmental entities. Approximately 80% of revenue has been derived from the top 2,500 (or 20% of) accounts.

10. AGH utilizes a fully centralized production and data management model, which uses proprietary, easy-to-use software and systems to provide clients with an integrated system and consistent, premium output of documents and presentations. All of AGH's services are technology driven and integrated. Through AGH's proprietary platform, clients and AGH are able to schedule and assign depositions, manage client accounts, track workflows, invoice jobs, pay court reporters, and review and edit documents.

11. Due to AGH's extensive network of court reporters, as well as its proprietary scheduling and document review platform, AGH is able to leverage several synergies throughout the deposition process. All depositions are processed in centralized facilities, and all scheduling and billing are done through centralized offices.

## PART II
## AGH'S ORGANIZATIONAL AND CAPITAL STRUCTURE

**A.    AGH's Organizational Structure**

12. AGH, a Georgia limited liability company incorporated on January 26, 2006, is wholly-owned by Peachtree Holdings, Inc. AGH is the sole owner of debtor subsidiaries Unlimited Languages, Inc., AG/Sanction LLC and Set Depo, LLC. AGH is also a majority owner of debtor subsidiary Hobart West Group, Inc. ("HWG"). Gallo Acquisition Corp., a nondebtor entity, is minority owner of HWG. Gallo Acquisition Corp. has the right to exchange its ownership interest in HWG for Class C membership interests of AGH. In such event, AGH would own 100% of the ownership interests in HWG.

13. In turn, HWG is the sole owner of debtor subsidiaries Deponet, LLC, Esquire Deposition Services, LLC ("EDS"), Esquire Litigation Solutions, LLC ("ELS"), Esquire

Solutions, LLC, Hobart West Solutions, LLC and D-M Information Systems, Inc. The court reporting and litigation support services are provided by the Debtors primarily through the Esquire trade name, with EDS providing traditional court reporting services nationwide and other Debtor entities providing litigation support and consulting services nationwide.

14.     AGH's board of directors is comprised of four (4) members, two (2) of whom have been designated to serve on the board by the holders of the AKKR Notes (as defined below), as provided in AGH's operating agreement. The other two members of the board of directors consist of the Chief Executive Officer and Chief Financial Officer of AGH.

**B.     AGH's Capital Structure**

       i.     <u>Senior Secured Debt</u>

15.     Prior to the Petition Date, AGH entered into a certain Credit Agreement, dated November 30, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Senior Credit Facility</u>"), with various financial institutions, as lenders, and Wells Fargo Bank, National Association, as administrative agent ("<u>Wells Fargo</u>" or "<u>Administrative Agent</u>"). The Senior Credit Facility provided for certain loans and other financial accommodations to AGH, including (a) a revolving credit facility in an aggregate amount of up to $12 million with a $4 million letter of credit sublimit, (b) a term credit facility in an aggregate amount of up to $36 million, and (c) an uncommitted incremental term credit facility in an aggregate amount of up to $20 million (up to $14 million of which has been funded) (collectively, the "<u>Senior Secured Debt</u>"). The total amount outstanding under the Senior Credit Facility (not including the letter of credit obligations) as of July 31, 2011 was approximately $46,953,193. As of July 31, 2011, the aggregate principal amount outstanding under the Wells Fargo letter of credit was $375,977. In addition, as of July 31, 2011, the Debtors had certain

secondary obligations owing to Wells Fargo in the aggregate amount of approximately $367,095 in connection with certain swap exposure and purchase card liabilities.

16.     The Senior Secured Debt is AGH's senior secured obligation, is secured by substantially all of AGH's assets and is guaranteed by each of its affiliate Debtors.  The affiliate Debtors' guaranty obligations are secured by substantially all of the affiliate Debtors' assets.

ii.     Subordinated Secured Debt

17.     AGH issued senior subordinated secured notes, due March 1, 2013, in favor of VSS Mezzanine Partners, L.P., as agent (the "VSS Agent"), and certain other lender parties, in the approximate aggregate amount of $26,285,518 (the "Subordinated Secured Debt").

18.     Prior to the Petition Date, the VSS Agent and certain other parties assigned and transferred to Grace Bay Holdings II, LLC ("Grace Bay"), an affiliate of Bayside Capital, Inc., as agent, and certain other lender parties (the "Second Lien Noteholders") all of their rights, interests and obligations with respect to the Subordinated Secured Debt and the various agreements and other documents related thereto.

19.     On August 18, 2011, AGH issued to the Second Lien Noteholders an aggregate $7 million in principal amount of additional notes constituting Subordinated Secured Debt in exchange for $5 million in cash.  A principal amount of $2 million of these additional notes were issued to the Second Lien Noteholders as an amendment fee in consideration of the financing being provided to AGH.  The proceeds of this additional note issuance were used as bridge financing to fund the Debtors' business operations leading up to the filing of these Chapter 11 Cases.  As of August 18, 2011, the outstanding aggregate principal amount of the Subordinated Secured Debt was approximately $22,008,918.

20.     The Subordinated Secured Debt is AGH's junior secured obligation and is secured by a second-priority lien on substantially all of AGH's assets and is guaranteed by each

of its affiliate Debtors. The affiliate Debtors' guaranty obligations are secured by substantially all of the affiliate Debtors' assets. AGH's and the affiliate Debtors' obligations in connection with the Subordinated Secured Debt are contractually subordinated to the Senior Secured Debt pursuant to a certain Subordination and Standstill Agreement, dated as of November 30, 2007 (the "Mezzanine Subordination Agreement"), and a certain First Amended and Restated Subordination and Standstill Agreement, dated as of December 22, 2008 (the "Junior Subordination Agreement").

       iii.    Unsecured Debt Obligations

21.    AGH issued a 10% unsecured subordinated note in the original principal amount of $2,150,000, due November 14, 2011, in favor of Legal Reprographics, Inc., the Beaver Family Trust and Steven Beaver (the "Beaver Note"). As of August 12, 2011, the outstanding aggregate principal amount of the Beaver Note was approximately $377,727.25. The Beaver Note is an unsecured obligation of AGH and is not guaranteed by any of its affiliate Debtors.

22.    AGH also issued a junior unsecured subordinated note in the original principal amount of $25,500,000, due November 30, 2013, in favor of Winston Noteholders, LLC (the "WP Note"). As of July 31, 2011, the aggregate amount outstanding under the WP Note was approximately $33,025,426.42. AGH's obligations under the WP Note are guaranteed by each of its affiliate Debtors. The Debtors' obligations in connection with the WP Note are unsecured and contractually subordinated to the Senior Secured Debt and the Subordinated Secured Debt pursuant to the Junior Subordination Agreement.

23.    In addition, AGH issued Tranche A and Tranche B junior unsecured subordinated notes in the original principal amounts of approximately $35,400,000 and $60,600,000, respectively, due November 30, 2013, in favor of Gallo Holdings, LLC, as note holder representative (the "AKKR Notes"). As of July 31, 2011, the outstanding aggregate principal

amount of the Tranche A AKKR Notes was approximately $62,516,076 and the outstanding aggregate principal amount of the Tranche B AKKR Notes was approximately $85,422,258. AGH's obligations under the AKKR Notes are guaranteed by each of its affiliate Debtors. AGH's and the other Debtors' obligations in connection with the AKKR Notes are unsecured and contractually subordinated to the Senior Secured Debt, the Subordinated Secured Debt and the WP Note pursuant to the Junior Subordination Agreement.

**PART III**
**EVENTS LEADING TO THESE CHAPTER 11 CASES**

24.    The Debtors' operating revenues and profitability have declined due to macroeconomic difficulties and the economic downturn encountered over the past few years.  As the number of lawsuit filings and depositions decreased because of the economic downturn, law firms and corporations have scaled back on outsourcing litigation support services, court reporting services, and trial software programs.  As a result, the Debtors have encountered a substantial decrease in cash flow, causing its expenses to outweigh their revenues.  Revenues for the six month period ending June 30, 2011 were down 20.9% as compared to the same period in 2010.

25.    In addition, AGH incurred additional debt obligations in connection with its acquisition of HWG in 2008, which was financed in part by the Senior Credit Facility and the issuance of the WP Note and AKKR Notes.  The Debtors' subsequent decrease in revenues combined with these increased debt obligations significantly impaired the Debtors' financial condition.  The Debtors' impaired financial condition resulted in the occurrence of certain defaults under the Senior Credit Facility.  As a result, the lenders under such facility stopped providing financing to the Debtors thereunder and the parties executed amendments to the Senior

Credit Facility providing for, among other things, the deferment of certain payment obligations and the waiver of certain defaults.

26.     Given their financial situation, the Debtors implemented a number of restructuring initiatives over the last year.  The Debtors pursued growth and revenue enhancement opportunities that required minimal capital investment.  Further, the Debtors implemented a cost cutting regime to reduce corporate overhead and improve operating cash flow and eliminated several operating space leases to reduce fixed overhead.  In addition, prior to the Petition Date, the Debtors consummated a sale of a substantial portion of the assets of Esquire Litigation Solutions, LLC, one of the Debtors in these cases, in order to generate additional funds.

27.     On or around August 18, 2011, AGH issued to the Second Lien Noteholders an aggregate $7 million in principal amount of additional Subordinated Secured Debt.  The Debtors were in a dire cash position prior to the filing of these Chapter 11 Cases and, accordingly, this additional note issuance served as bridge financing that was necessary to fund the Debtors' business operations leading up to the filing of these cases.  The Debtors' obligations in connection with these additional notes are contractually subordinated to the Senior Secured Debt pursuant to the Mezzanine Subordination Agreement and Junior Subordination Agreement.

28.     In addition, effective August 1, 2011, the Debtors retained CMAG as Chief Restructuring Advisor to provide cash management and financial advisory services and to advise the Debtors in connection with their restructuring efforts.  The engagement agreement between the Debtors and CMAG provides for CMAG or an individual employed at CMAG to serve as Chief Restructuring Officer for the Debtors following any chapter 11 bankruptcy filing, subject to Bankruptcy Court approval.

29. Notwithstanding the Debtors' various restructuring efforts (which are ongoing), the Debtors' current financial condition renders them unable to meet their obligations to creditors as they come due. Prior to the Petition Date, the Debtors negotiated with various parties in interest regarding various restructuring options, and determined that the commencement of these cases and a sale of all or substantially all of their assets pursuant to a Bankruptcy Code section 363 sale process will maximize value for the estates and is in the best interest of all parties. An expeditious sale process will avoid further deterioration of the Debtors' business, preserve trading partners, and allow for the assumption and/or assignment of certain executory contracts.

30. Postpetition, the Debtors intend to operate their business in the ordinary course, while pursuing all options for maximizing value. In the various First Day Motions, the Debtors seek relief that will help preserve the value of their assets and permit them to conduct these cases efficiently and economically.

### PART IV
### SUMMARY OF FIRST DAY MOTIONS[3]

31. To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have filed, or will file upon scheduling of a further hearing by this Bankruptcy Court, the First Day Motions described below.

32. In connection with the preparation for these Chapter 11 Cases, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance or the input and assistance of the Debtors' employees and bankruptcy counsel. I believe the information contained in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' reorganization efforts.

---

[3] Capitalized terms used but not defined in this Part IV shall have the meanings ascribed to them in the applicable First Day Motion.

**A.** **Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) Requesting Joint Administration of Chapter 11 Cases**

33. Pursuant to this motion (the "Joint Administration Motion"), the Debtors request that the Bankruptcy Court authorize and direct the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural purposes only pursuant to Bankruptcy Rule 1015. In addition, the Debtors request that the Clerk make an entry on the docket of each of the Debtors' cases, other than the AGH case, stating that an order has been entered directing joint administration of these Chapter 11 Cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the AGH docket.

34. The Debtors are all related entities and are filing petitions in the same Bankruptcy Court. I believe that joint administration will be less costly and burdensome than the separate administration of the estates due to the combined docket and combined notice to creditors and parties in interest. Many applications, motions, orders, hearings and notices will be made in these cases and will affect all of the Debtors. Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.

35. In addition, as the Debtors are only seeking administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

36. I believe that if each Debtor's case were administered independently, there would be a number of duplicative pleadings and overlapping service. This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Bankruptcy Court's resources.

37.     Therefore, I believe that the Chapter 11 Cases should be jointly administered for procedural purposes only and the Joint Administration Motion should be approved.

**B.     Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) File a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors and (II) Mail Initial Notices**

38.     Pursuant to this motion (the "<u>Creditor List Motion</u>"), the Debtors propose to (a) file a consolidated list of the Debtors' thirty (30) largest unsecured creditors, and (b) mail initial notices through their proposed notice and claims agent.

39.     Each Debtor's list of its thirty (30) largest general unsecured creditors has significant overlap with the lists from the other Debtors in these cases and, therefore, the Debtors believe that filing separate lists of the thirty (30) largest general unsecured creditors would be of limited utility.  Also, the exercise of compiling separate lists of the thirty (30) largest general unsecured creditors for each individual Debtor would consume an excessive amount of the Debtors' already scare time and resources.  Therefore, filing a consolidated list of the Debtors' thirty (30) largest unsecured creditors is necessary and appropriate.

40.     In addition, the Debtors propose that Kurtzman Carson Consultants LLC, as proposed claims and noticing agent for the Debtors, undertake all mailings directed by the Bankruptcy Court, the United States Trustee or as required by the Bankruptcy Code, including, without limitation, the notice of commencement of the Chapter 11 Cases to ease administrative burdens that otherwise would fall upon the Bankruptcy Court and the United States Trustee.  Therefore, I believe that the Debtors' Creditor List Motion should be approved.

**C.** **Debtors' Motion Pursuant to 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007(c) Requesting an Extension of the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs**

41.     Pursuant to this motion (the "Schedules Extension Motion"), the Debtors seek entry of an order extending the time within which they must file schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") through the date that is the forty-fifth (45th) day after the Petition Date.

42.     Given the size and complexity of their business and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' financial accounting systems, the Debtors have not had the opportunity to gather the necessary information to prepare and file the Schedules and Statements.

43.     In addition, due to the voluminous books and records and a complex system of accounting, collection of the information necessary to complete the Schedules and Statements will require substantial time and effort on the part of the Debtors and their employees.  As a result, the Debtors will not be able to satisfactorily prepare accurate Schedules and Statements within fourteen days of the Petition Date as outlined in Bankruptcy Rule 1007(c) and Local Rule 1007-1(b).

44.     At this juncture, I believe that an extension through the date that is the forty-fifth (45th) day after the Petition Date will provide sufficient time to prepare and file the Schedules and Statements.  Therefore, the Schedules Extension Motion should be approved.

**D.** **Debtors' Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures**

45.     By the above motion (the "Case Management Motion"), the Debtors request that the Bankruptcy Court enter an order providing for certain notice, case management and

administrative procedures in these Chapter 11 Cases. Given the number of parties in interest in these Chapter 11 Cases, requiring that service be made upon each of these parties would waste the Debtors' limited resources. Thus, the Debtors believe that requiring paper service of certain pleadings only upon the main parties in interest, as well as authorizing service on all parties by e-mail, will be efficient and save the estates significant time and expense. Additionally, due to the likely volume of motions and other pleadings that will be filed in these cases, the Debtors have proposed that such special hearing procedures be created, including the creation of regularly scheduled omnibus hearings at which the Bankruptcy Court, the Debtors and other parties in interest can address several motions at once, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter.

46.     I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

**E.     Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Bankruptcy Rule 5075-1 Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent to the Debtors and Debtors in Possession**

47.     Pursuant to this application (the "KCC Retention Application"), the Debtors seek authorization to retain Kurtzman Carson Consultants LLC ("KCC") as their claims and noticing agent ("Agent"). Upon information and belief, KCC is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe KCC is well qualified to serve as Agent in these Chapter 11 Cases. The employment of KCC will also provide with efficient

management of the claims and noticing processes in these cases, thereby leaving the Debtors' management and advisors to focus on the Debtors' reorganization efforts.

48.     In addition, in compliance with the S.D.N.Y. Protocol For The Employment of Claims Agents, the Debtors obtained and reviewed engagement proposals from three court-approved notice and claims agents.  The Debtors reviewed these proposals and selected KCC to serve as the Agent based on its superior capability and price terms.  Therefore, I respectfully submit that the KCC Retention Application should be approved.

**F.     Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Entry of an Order Authorizing the Debtors to (A) Retain Carl Marks Advisory Group LLC to Provide the Debtors a Chief Restructuring Officer and Additional Personnel, and (B)  Appoint the Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Date**

49.     By this motion (the "CRO Retention Motion"), the Debtors request authorization to employ and retain Marc L. Pfefferle as the Chief Restructuring Officer (the "CRO") along with such personnel of CMAG as are necessary to assist the CRO in the performance of his duties, and appointing the CRO *nunc pro tunc* to the Petition Date.  Prior to the Petition Date, the Debtors retained CMAG as Chief Restructuring Advisors to, among other things, assist the Debtors with their reorganization and restructuring efforts.  In such capacity, CMAG became familiar with the Debtors' business operations, financial affairs, and capital structure.

50.     The Debtors believe that the terms of CMAG's retention are fair and reasonable and that CMAG is both well qualified and uniquely suited to deal effectively and efficiently with matters that may arise in the context of these chapter 11 cases.  I believe that the relief requested in the CRO Retention Motion is essential, appropriate, and in the best interest of the Debtors' estates and creditors, and therefore, should be approved.

**G. Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to (I) Maintain and Use Existing Bank Accounts and Business Forms, and (II) Maintain and Use Existing Cash Management System**

51.     By this motion (the "Cash Management Motion"), the Debtors request authorization to (a) maintain and use their existing cash bank accounts and business forms, and (b) maintain and use their existing cash management system.  The Debtors utilize an integrated, centralized cash management system, in the ordinary course of business, to collect, transfer, and disburse funds generated by their operations (the "Cash Management System").

52.     The Cash Management System is comprised of approximately five (5) bank accounts at Wells Fargo Bank, National Association (in its original capacity and in its capacity as successor by merger to Wachovia Bank National Association) and three (3) lockboxes located in Atlanta, New York, and Los Angeles (collectively, the "Bank Accounts").  The Bank Accounts are maintained as, among other things, deposit accounts, operating accounts and payroll accounts.  The Debtors employ various methods to deposit, withdraw, and otherwise transfer funds to, from and between the Bank Accounts, including checks, automated clearing house transactions, direct deposits and electronic funds transfers.  It is critical that the Cash Management System remain intact to ensure seamless operations and continued collection of revenues for the Debtors' estates.  Any disruption in the Debtors' Cash Management System could, among other things, impair the Debtors' ability to timely satisfy postpetition obligations, including obligations to employees and independent contractors, which would jeopardize the Debtors' continued business operations and reorganization efforts.

53.     I believe that by using the existing Bank Accounts, the Debtors will avoid unnecessary expense and delay, which would disrupt the ordinary financial affairs and business

operations of the Debtors, delay the administration of their estates, and increase the costs to their estates.  Therefore, I respectfully submit that the Cash Management Motion should be approved.

**H.    Motion of Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices, (II) Determining That the Utilities are Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

54.    By this motion (the "Utilities Motion"), the Debtors seek entry of interim and final orders (a) prohibiting utilities from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition invoices, (b) determining that the utilities are adequately assured of future payment, and (c) establishing procedures for determining adequate assurance of payment.

55.    In connection with their business operations, the Debtors receive electric, internet, telephone, national data and voice networking, and other similar services (collectively, the "Utility Services") under approximately ninety (90) separate accounts provided by approximately thirty-nine (39) different utility companies (the "Utility Companies").  The Debtors propose to provide "assurance of payment" to Utility Companies by, within twenty (20) days after the Petition Date, placing an adequate assurance deposit equal to the cost of Utility Services for a period of two weeks, calculated based on the historical weekly average costs, into a newly-created, segregated account (the "Utility Deposit Account"), for the benefit of any Utility Company, unless any such Utility Company agrees in writing to a lesser amount, is paid in advance for Utility Services, or already holds a deposit equal to or greater than two weeks of Utility Services.  The Debtors estimate that the total amount of such deposit would be approximately $210,000.  The Debtors also propose to establish certain procedures to address any request made by Utility Companies for additional adequate assurance of payment.

56.     The relief requested in this motion is essential to avoid interruptions in Utility Services which would be disruptive to the Debtors' business operations during the Debtors' reorganization.  Should the Utility Companies refuse or discontinue Utility Services, even for a brief period, the Debtors' operations would be significantly harmed.  Continued service by the Utility Companies is necessary to ensure that the Debtors' facilities remain operational.

57.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this Utilities Motion is in the best interests of the Debtors, their estates, and their creditors and therefore should be approved.

**I.      Motion for Entry of an Order Pursuant to Sections 105(a), 363, and 503(b)(1) of the Bankruptcy Code (I) Authorizing the Debtors to Honor Certain Prepetition Customer Obligations and to Continue Their Customer Program and Practices Postpetition, and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

58.     By this Motion (the "Customer Program Motion"), the Debtors request, pursuant to Bankruptcy Code sections 105(a), 363, and 503(b)(1), authority to honor certain prepetition customer obligations and to continue customer programs and practices postpetition, and authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing.

59.     In the ordinary course of their business, the Debtors have maintained a certain refund policy with their customers (the "Customer Program"), pursuant to which certain customers may from time to time be entitled to a complete or partial refund with respect to work products and/or services provided to them by the Debtors, primarily relating to billing errors. Once an appropriate amount of the refund is determined, such refund may be addressed by the parties in a number of ways, including:  (a) discounts on future work products and services provided to the customer by the Debtors, (b) a credit against future invoices sent by the Debtors

to the customer, or (c) a payment made by the Debtors directly to the customer for the amount of the refund.

60.     It is essential to the Debtors' continued relationships with their customers—and therefore essential to the Debtors' continued business operations—that the Debtors continue their Customer Program and honor prepetition obligations under it.  Failure to do so would likely lead to many customers taking their business to the Debtors' competitors and would impair the Debtors' ability to attract new customers, thus damaging the Debtors' ability to continue to operate and jeopardizing the Debtors' reorganization efforts.  It is critical that the Debtors maintain good relationships with these customers to ensure continued business relationships and future revenue to support their operations.

61.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this Customer Program Motion is in the best interests of the Debtors, their estates, and their creditors and therefore should be approved.

**J.      Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors and Service Providers and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

62.     By this motion (the "Critical Vendor Motion"), the Debtors request, pursuant to Bankruptcy Code sections 105(a) and 363, authority to pay certain undisputed prepetition obligations of its vendors, suppliers, service providers and similar entities (the "Critical Vendors") that the Debtors deem critical to maintaining the going concern value of their business, and authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing.

63.     These Critical Vendors are generally comprised of certain members of the Debtors' "Preferred Provider Network" who do not have contracts with the Debtors, which

consists of various companies that provide essential court reporting, litigation support, and other similar services to the Debtors and who cannot be replaced.

64.     Many of these Preferred Provider Network members provide services in territories where the Debtors do not have locations, employees or independent contractors, and collectively give the Debtors the ability to provide national coverage in the most cost efficient manner.  This national coverage is essential to the Debtors' ability to acquire and to service clients who are an essential part of the Debtors' business.  Therefore, these services are absolutely essential to the Debtors' ability to reorganize.

65.     These Preferred Provider Network members, together with the Debtors' employees and independent contractors, are the lifeblood of the Debtors' business, without whom the Debtor would not be able to operate.  Services provided by the Preferred Provider Network members include, among other things, court reporting services, videography services, interpreting services, scoping and proofreading services.  Any disruption to the Debtors' relationship with these members would be disastrous to the Debtors' business and would cause irreparable harm to the Debtors' reputation due to the resulting inability to meet customer needs. In addition, loss of members in the Preferred Provider Network would significantly jeopardize the Debtors' ability to reorganize.

66.     In addition, there are a limited number of trade vendors whose services cannot be readily replaced and whose failure to continue to supply services to the Debtors could have significant negative impact on the Debtors' operations.

67.     It is therefore essential for the Debtors to continue their relationships with the Critical Vendors to ensure that the business remains stable.  The Critical Vendors possess prepetition claims against the Debtors on account of goods and/or services provided to the

Debtors prior to the Petition Date (collectively, the "Critical Vendor Claims"). Absent payment of the Critical Vendor Claims, the Debtors believe the Critical Vendors will cease to provide the critical goods or cease to perform the essential services required by the Debtors postpetition, and may even take it upon themselves to bill the Debtors' clients for their work product, which will cause substantial damage to the Debtors' business operations and ability to reorganize. The failure of the Debtors to continue to obtain the benefit of the critical goods and services postpetition could have an immediate and adverse impact upon the Debtors' operations.

68. The Debtors propose to condition payment to Critical Vendors upon agreement to continue supplying goods and services to the Debtors on terms, including pricing, that are acceptable to the Debtors in light of historical practices between the parties ("Customary Trade Terms"), and will negotiate individually with each Critical Vendor to ensure that the Critical Vendors agree to Customary Trade Terms, and that the Debtors do not pay any larger portion of a Critical Vendor's prepetition claim than is absolutely necessary to induce such Critical Vendor to continue providing essential goods and services to the Debtors postpetition.

69. The Debtors' failure to pay Critical Vendor Claims pursuant to the terms and conditions set forth in the Critical Vendor Motion would result in immediate and irreparable harm because the refusal of any one of the Critical Vendors to continue transacting with the Debtors could significantly harm the Debtors' business operations and, thus, clearly jeopardize the value of the estates. Therefore, I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses.

**K.** **Motion for Entry of Interim and Final Order to Sections 105(a), 363, and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Pay Claims for Certain Works in Process and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

70. By this Motion (the "WIP Motion"), the Debtors are requesting entry of interim and final orders authorizing them to pay certain claims for goods and services ordered by the Debtors prior to the Petition Date that have not yet been fully completed and which will not be invoiced until after the Petition Date (collectively, the "Works in Process"), and authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing.

71. In the ordinary course of their business, the Debtors utilize the services of various third parties comprised of the Debtors' independent contractors and Preferred Provider Network members (the "Third Party Providers") to provide court reporting, litigation support, deposition, and other related services, and to provide completed work products, such as transcripts, to the Debtors or the Debtors' clients. Once a Third Party Provider performs the requested services for an ordered work product, the Third Party Provider will submit the work product to an online portal maintained by the Debtors. After the work product is submitted in the portal, the Debtors will continue to work with the Third Party Provider in order to finalize it for distribution to the customer. Only after the product is completed and distributed is an invoice sent out for the work performed. It is these work products—ones that have been submitted to the Debtors' portal, but for which additional works needs to be performed by the Debtors working together with the Third Party Providers— that the Debtors are considering Works in Process for purposes of the WIP Motion.

72. As discussed in the WIP Motion, the Debtors believe that the WIP Claims constitute postpetition administrative expenses claims. However, the Debtors are seeking the

relief requested therein out of an abundance of caution and to provide assurance of payment to the Third Party Providers. If the Third Party Providers do not receive assurance that the WIP Claims will be paid timely, there is a significant risk that the Third Party Providers (a) will refuse to continue to provide the necessary cooperation and services in order for the Works in Process to be finalized and delivered, (b) may take it upon themselves to produce, distribute, and bill the Debtors' clients, and (c) may refuse to continue to transact with the Debtors, all of which will cause substantial damage to the Debtors' business operations and ability to reorganize. The Debtors' business is dependent upon the timely delivery of quality work product to their customers. If they are unable to satisfy customer needs, the Debtors' relationship with these customers could be irreparably damaged and their ability to generate new business may be jeopardized.

73.      Therefore, I believe that the relief requested in the WIP Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses.

**L.      Motion for Entry of Interim and Final Order Pursuant to Sections 105(a), 363, 507(a)(8), and 541 of the Bankruptcy Code (I) Authorizing the Debtors to Pay Prepetition Taxes and Fees and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

74.      By this motion (the "Taxes and Fees Motion"), the Debtors request the entry of interim and final orders authorizing, but not directing, the Debtors to remit and pay certain sales, use, property, income, and other similar taxes and fees, as well as fees for licenses and permits (collectively, the "Taxes and Fees"). Specifically, the Debtors request authority, but not direction to remit and pay the Taxes and Fees. The Debtors estimate that the total amount of Taxes and Fees owing does not exceed $120,000.

75.     The Debtors remit the Taxes and Fees to various federal, state and local taxing, licensing and other governmental authorities (collectively, the "Authorities"). The Debtors pay the Taxes and Fees monthly, quarterly, semi-annually, or annually to the respective Authorities, in accordance with any applicable laws and regulations. The Debtors believe that many of the Taxes and Fees collected prepetition are not property of the Debtors' estates, but are rather held in trust and must, for that reason, be turned over to the Authorities. To the extent that such funds are not actually property held in trust for the Authorities, they may well give rise to priority claims that must be paid in full eventually.

76.     Moreover, the Debtors also seek to pay certain prepetition Taxes and Fees in order to forestall Authorities from taking actions that might interfere with the Debtors' successful reorganization, which may include bringing personal liability actions against directors, officers and other key employees, whose full-time attention to the Debtors' reorganization efforts is required to avoid business disruptions. Any business disruptions resulting from such lawsuits could negatively impact the Debtors' restructuring prospects. Accordingly, I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest.

**M.    Motion of Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363(b), and 507(a) of the Bankruptcy Code and Fed. R. Bankr. P. 6003 (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Compensation, and Employee Benefits, and (B) Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing**

77.     By this motion (the "Wage Motion"), the Debtors seek authority, pursuant to Bankruptcy Code sections 105(a), 363(b) and 507 and Bankruptcy Rule 6003, (i) authorizing, but not directing, the Debtors to (a) pay certain prepetition claims relating to Unpaid Compensation, Employment and Withholding Taxes, Miscellaneous Payroll Deductions, Vacation, Sick Leave,

Paid Time Off, Reimbursable Business Expenses, Health and Welfare Programs, Retirement Savings Plans, Miscellaneous Programs, Processor Obligations, and to pay Independent Contractors (collectively, the "<u>Employee Obligations</u>"), and (b) maintain, honor and continue postpetition payment of wages, compensation, and employee benefits in the ordinary course of business, and (ii) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing. This relief is critical to the Debtors' business and reorganization efforts.

78.     I believe that any delay in paying the Employee Obligations will adversely impact the Debtors' relationship with their Employees and Independent Contractors and will irreparably impair the Employees' and Independent Contractors' morale, dedication, confidence and cooperation in the chapter 11 process. At this early stage in these Chapter 11 Cases, the Debtors cannot risk the substantial damage to their business that would inevitably result from a decline in the Employees' and Independent Contractors' morale and cooperation attributable to the Debtors' failure to pay the Employee Obligations. In addition, without the requested relief, the Debtors' viability as a going concern would be undermined by a potential threat of the Employees and Independent Contractors seeking other employment. Further, the Debtors are not seeking to make any payment to an individual Employee or Independent Contractor on account of prepetition Employee Obligations in excess of the $11,725 statutory cap on priority claims pursuant to Bankruptcy Code section 507(a)(4).

79.     Therefore, the Debtors believe, and I agree, that the requested relief in the Wage Motion is in the best interest of the Debtors, their estates and creditors, and I respectfully request that the Wage Motion be approved.

**N.     Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 365(a) and Fed. R. Bankr. P. 6006 for Entry of an Order Authorizing the Debtors to Assume Certain Preferred Provider Network Agreements**

80.     By this Motion (the "PPN Assumption Motion"), the Debtors seek entry of an order, pursuant to Bankruptcy Code sections 105(a) and 365(a) and Bankruptcy Rule 6006 authorizing the Debtors to assume certain executory contracts with providers of key services for the Debtors entered into by and between one or more of the Debtors and the various service providers (the "PPN Members").

81.     The PPN Members, together with the Debtors' employees and independent contractors, are the lifeblood of the Debtors' business, without whom the Debtors would not be able to operate.  Services provided by the PPN Members include, among other things, court reporting services, videography services, interpreting services, scoping and proofreading services.

82.     The PPN Members generally provide services in territories where the Debtors do not have locations, employees or independent contractors, and collectively give the Debtors the ability to provide national coverage in the most cost efficient manner.  This national coverage is essential to the Debtors' ability to acquire and to service clients who are an essential part of the Debtors' business.  Therefore, these services are absolutely essential to the Debtors' ability to reorganize.  Simply put, without the PPN Members, the Debtors' business would not be able to survive.

83.     The Debtors have entered into contracts with various PPN Members (the "PPN Agreements") setting forth the terms and conditions of the parties' working relationship, including payment terms.  The Debtors, in the exercise of their sound business judgment, have determined that the assumption of the PPN Agreements is essential to their continued business operations and any chance at a successful reorganization in these chapter 11 cases.

84. Therefore, the Debtors believe, and I agree, that the assumption of the PPN Agreements as requested in the PPN Assumption Motion is in the best interest of the Debtors, their estates and creditors, and I respectfully request that the PPN Assumption Motion be approved.

O. **Debtors' First Omnibus Motion Pursuant to 11 U.S.C. § 365(a) and Fed. R. Bankr. P. 6006 and 9014 for Approval of Rejection of Certain Unexpired Leases of Nonresidential Real Property and Any Agreements Related Thereto as of the Petition Date**

85. By this motion (the "Lease Rejection Motion"), the Debtors seek entry of an order, pursuant to Bankruptcy Code section 365(a) and Bankruptcy Rules 6006 and 9014, approving the Debtors' rejection of certain unexpired leases of nonresidential real property, together with any agreements related thereto, effective as of the Petition Date.

86. Prior to the Petition Date, the Debtors reviewed and analyzed their lease portfolio and their operations at each of the leased locations. In connection therewith, the Debtors determined, in their business judgment, that it was no longer in their best interest to continue operations at certain leased premises and, therefore, vacated those premises prior to the Petition Date. Accordingly, the Debtors are seeking to reject the Leases and related agreements described in the Lease Rejection Motion. Because the Debtors no longer occupy the leased premises with respect to the Leases, continued compliance with the terms of the Leases and any accompanying agreements would be burdensome and would provide no corresponding benefit to the Debtors or the stakeholders in these Chapter 11 Cases. Accordingly, I believe that the relief requested in the Lease Rejection Motion is in the best interests of the Debtors and their estates.

**P.  Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2001, 4001, and 6004, and Local Rule 4001-2 (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Super-Priority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief**

87.     By this Motion (the "Bayside DIP Motion"), the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) enter into a financing arrangement with the DIP Lenders as provided for in the Bayside DIP Agreement, and (b) use Cash Collateral, (ii) granting liens and providing super-priority administrative expense status, (iii) granting adequate protection to prepetition secured parties, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting related relief.

88.     In connection with the Debtors' restructuring efforts, the Debtors and their advisors contacted approximately thirty-seven (37) institutions to determine whether they were interested in providing financing to the Debtors. Approximately thirty-one (31) of those institutions received an information memorandum and/or nondisclosure agreement from the Debtors, and approximately twenty-four (24) executed a nondisclosure agreement and received an information package regarding the Debtors.

89.     Of the thirty-seven institutions that were contacted, five (5) submitted term sheets to the Debtors and their advisors regarding financing and/or an investment in the Debtors, including the DIP Lenders. The Debtors and their advisors reviewed these term sheets and engaged in extensive negotiations with these parties in an effort to obtain financing on the best possible terms.

90.     After careful consideration, the Debtors ultimately decided that the proposal for debtor in possession financing advanced by the DIP Lenders was the best available under the circumstances and adequately addressed the Debtors' reasonably foreseeable working capital

needs.  In addition, the Debtors' obligations under the Bayside DIP Facility will be subordinate to the Debtors' obligations under the Senior Credit Facility.

91.     The Bayside DIP Facility consists of a revolving credit facility in an amount not to exceed $20,000,000 at any one time outstanding, and will be secured by (a) a first priority lien, subject to the Carve-Out, on all property of the Debtors not subject to any valid, perfected, and non-avoidable liens, and (b) a second priority security interest, subject to the Carve-Out, certain permitted liens, and the first priority liens of the First Lien Secured Parties under the Senior Credit Facility, on substantially all of the Debtors' assets (other than assets described in clause (a) above).

92.     The funds provided by the Bayside DIP Facility are essential to enable the Debtors to continue to operate during the course of these Chapter 11 Cases while working towards a sale of their assets pursuant to Bankruptcy Code section 363.  Indeed, failure to obtain approval of the Bayside DIP Facility will cause a cessation of the Debtors' business operations which, in turn, will adversely affect Debtors' reorganization efforts and the value ultimately received by stakeholders.

93.     The Debtors have exercised sound business judgment in determining the appropriateness of the Bayside DIP Facility, and such facility was negotiated with the DIP Lenders at arms'-length and in good faith.

94.     In addition, the Debtors require the use of the cash collateral to, among other things, maintain their ongoing business operations and to pay the costs and expenses associated with the administration of these Chapter 11 Cases.

95.    Therefore, the Debtors believe, and I agree, that the requested relief in the Bayside DIP Motion is in the best interest of the Debtors, their estates and creditors, and I respectfully request that the Bayside DIP Motion be approved.

## PART V
## INFORMATION REQUIRED BY LOCAL RULE 1007-2

96.    Local Rule 1007-2 requires that certain information about the Debtors be provided in this Affidavit.  To the extent not already provided herein, this required information is provided in the schedules attached as <u>Exhibit A</u> to this Affidavit.  Specifically, the schedules attached as <u>Exhibit A</u> contain the following information with respect to the Debtors.[4]

97.    In accordance with Local Rule 1007-2(a)(4), Schedule 1 hereto provides a list of the names, addresses, and, where available, telephone numbers of the creditors holding the thirty (30) largest unsecured claims (excluding insiders) against the Debtors, on a consolidated basis. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured subject, however, to the reservations of rights stated on Schedule 2 regarding, among other things, the actual validity of any such claims.

98.    In accordance with Local Rule 1007-2(a)(5), Schedule 2 hereto is a list of the name and address of the holders of the five largest secured claims against the Debtors.  Such list

---

[4]    The information contained in the schedules attached to <u>Exhibit A</u> of this Affidavit shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  Unless otherwise indicated, the financial information contained in the schedules is unaudited.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  Capitalized terms used in the schedules that are not otherwise defined therein shall have the meanings given to them in the preceding paragraphs of this Affidavit.

includes the amount of the claim, an estimate of the value of the collateral, and whether the claim or lien is disputed, subject, however, to the reservations of rights stated on Schedule 3.

99.     In accordance with Local Rule 1007-2(a)(6), Schedule 3 hereto provides a summary of the Debtors' assets and liabilities.

100.    In accordance with Local Rule 1007-2(a)(8), Schedule 4 hereto is a list of the Debtors' property not in the Debtors' possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

101.    In accordance with Local Rule 1007-2(a)(9), Schedule 5 hereto is a list of the premises owned, leased, or held under other arrangement, from which the Debtors operate their business.

102.    In accordance with Local Rule 1007-2(a)(10), Schedule 6 hereto provides the location of the Debtors' substantial assets and the location of their books and records. The Debtors do not hold any assets outside the territorial limits of the United States.

103.    In accordance with Local Rule 1007-2(a)(11), Schedule 7 hereto is a list of litigation commenced against the Debtors.

104.    In accordance with Local Rule 1007-2(a)(12), Schedule 8 hereto contains the names of the individuals who comprise AGH's existing senior management, their tenure with AGH, and a brief summary of their relevant responsibilities and experience.

105.    The Debtors intend to continue to operate as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

106.    In accordance with Local Rule 1007-2(b)(1),(2), Schedule 9 hereto is the estimated amount of: (a) the weekly payroll to Employees and Independent Contractors of the

Debtors for the 30-day period following the filing of these Chapter 11 Cases; and (b) payments to officers, directors, and financial and business consultants for the 30-day period following the commencement of these Chapter 11 Cases.

107.    In accordance with Local Rule 1007-2(b)(3), Schedule 10 hereto contains the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the commencement of these Chapter 11 Cases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Name: Marc L. Pfefferle
Title: Chief Restructuring Advisor

Sworn to before me this
_____ day of _September_ , 2011

Notary Public

**EVELYN RODRIGUEZ**
**Notary** Public, State of New York
No. 01RO6244308
Qualified in Queens County
**Commission** Expires 07/05/2015

-33-

<u>**Schedule 1**</u>

**Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors**

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' thirty (30) largest unsecured creditors, excluding claims of insiders as defined in 11 U.S.C. § 101:

| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
|---|---|---|---|---|---|
| | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 1. | Gallo Holdings, LLC, as Note Holder Representative[1] | Accel-KKR Company, LLC 2500 Sand Hill Road, Suite 300 Menlo Park, CA 94025 Attn: Ben Bisconti Phone: (650) 289-2473<br><br>Accel-KKR Company, LLC 2500 Sand Hill Road, Suite 300 Menlo Park, CA 94025 Attn: Jason Michael Klein Phone: (650) 289-2481 General Phone: (650) 289-2460 General Fax: (540) 687-5879 | Promissory note | | $147,938,333.25 |
| 2. | Winston Noteholders, LLC | Harvest Equity Partners, LLC P.O. Box 1960 3 E. Marshall Street Middleburg, VA 20118 Attn: Kevin L. Passarello Phone: (540) 687-5584 | Promissory note | | $33,025,426.42 |

---

[1]     The Debtors believe that this unsecured creditor may constitute an "insider" of the Debtors within the meaning of 11 U.S.C. § 101(31).

| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
|---|---|---|---|---|---|
| | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 3. | Aptara, Inc. | 3110 Fairview Park Dr., Ste 900<br>Falls Church, VA 22042-4534<br>Attn: Gearoid Moore<br>Phone: (703) 352-0001 Ext. 2112 | Trade debt | | $994,959.63 |
| 4. | UPS | P.O. Box 7247-0244<br>Philadelphia, PA 19170-0001<br>Attn: Judy Andreas<br>Phone: (559) 651-7690 x7545 | Trade debt | | $733,246.12 |
| 5. | Kirkland & Ellis | 300 North LaSalle<br>Chicago, IL 60654<br>Phone: (312) 862-2000<br>Fax: (312) 862-2200<br>Attn: Garry W. Jaunal | Professional fees | | $558,947.77 |
| 6. | Atlanta Centennial, LLC | c/o Jackson Oats Shaw Corporate Property Management<br>Suite 3325<br>Centennial Tower<br>101 Marietta Street<br>Atlanta, GA 30303<br><br>Jackson Oats Shaw Corporate Property Management – Operations Office<br>145 Technology Parkway<br>Norcross, GA 30092<br>Attn: Kevin Oats<br>Phone: (404) 751-3221 | Real property lease | | $530,890.51 |

| | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 7. | One Penn Plaza LLC | c/o Vornado Realty Trust<br>888 Seventh Avenue<br>New York, NY 10019<br>Attn: David R. Greenbaum<br>Phone: (212) 894-7000 | Real property lease | May be subject to partial setoff | $524,699.39 |
| 8. | Accel-KKR Company, LLC[2] | Accel-KKR Company, LLC<br>2500 Sand Hill Road, Suite 300<br>Menlo Park, CA 94025<br>Attn: Ben Bisconti<br>Phone: (650) 289-2473<br><br>Accel-KKR Company, LLC<br>2500 Sand Hill Road, Suite 300<br>Menlo Park, CA 94025<br>Attn: Jason Michael Klein<br>Phone: (650) 289-2481<br>General Phone: (650) 289-2460<br>General Fax: (540) 687-5879 | Advance | | $416,832.88 |
| 9. | Live Nation Worldwide, Inc. | Live Nation<br>2000 West Loop South<br>Houston, TX 77207<br>Attn: James Tucker, Esq., Senior Counsel<br>Phone: (713) 693-2738 | Real property lease | May be subject to partial setoff | $411,509.22 |

---

[2]    The Debtors believe that this unsecured creditor may constitute an "insider" of the Debtors within the meaning of 11 U.S.C. § 101(31).

| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
|---|---|---|---|---|---|
| | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 10. | AT&T | P.O. Box 5094 Carol Stream, IL 60197-5094 Phone: (619) 237-2050 | Utility | May be subject to partial setoff | $406,757.25 |
| 11. | Legal Reprographics, Inc., on behalf of itself and the Beaver Family Trust and Steven Beaver | 13151 Stone Cannon Road Poway, CA 92064 Attn: Steven Beaver Phone: (858) 673-1970 | Promissory note | | $377,727.25 |
| 12. | Receivable Management Services | P.O. Box 8500-55028 Philadelphia, PA 19178-5028 Phone: (800) 823-8028 Attn: Diane Citino | Trade debt | | $367,808.32 |
| 13. | Catalyst Repository Systems, Inc. | 1860 Blake Street, Ste 700 Denver, CO 80202 Phone: (303) 824-0850 Attn: Tony Hilliker | Trade debt | | $364,531.58 |
| 14. | 311 West Monroe -VEF VI, LLC | c/o VEF Advisors, LLC 3340 Peachtree Road, NE TP 100, Suite 1600 Atlanta, GA 30326 Attn: B. Stanton Breon Fax: (678) 538-1916 | Real property lease | May be subject to partial setoff | $336,485.10 |

| | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 15. | Banc of America Leasing | c/o Swanson Martin & Bell, LLP 330 N. Wabash, Suite 3300 Chicago, Illinois 60611 Phone: (312) 321-8442 Fax: (312) 321-0990 Attn: Joseph P. Kincaid | Equipment lease | May be subject to partial setoff | $270,000.00 |
| 16. | Chippewa Enterprises, Inc. | P.O. Box 6011 Sherman Oaks, CA 91423-6011 Phone: (818) 905-1200 Attn: Don Parker | Real property lease | | $196,326.59 |
| 17. | Exact Software North America, Inc. | 1136 Paysphere Circle Chicago, IL 60674 Phone: (800) 468-0834 Fax: (866) 544-5456 Attn: Mitchell Alcon | Trade debt | | $193,324.37 |
| 18. | GE Capital | P.O. Box 740425 Atlanta, GA 30374-0425 Phone: (650)526-0600 Fax: (650) 526-0699  901 Main Avenue Norwalk, CT 06851-1168 Phone: (203) 840-6300  Attn: Customer Care Phone: (888) 652-2279 | Equipment lease | May be subject to partial setoff | $176,719.36 |

| | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 19. | Yes Video | 3281 Scott Blvd<br>Santa Clara, CA 95054<br>Phone: (408) 907-7600<br>Attn: Amela Corhodzic | Trade debt | | $168,063.84 |
| 20. | Aetna | P.O. Box 532422<br>Atlanta, GA 30353-2422<br>Phone: (800) 936-2603<br>Fax: (888) 247-5721<br>Attn: Carol Cusack | Trade debt | | $167,537.00 |
| 21. | McKenna Long & Aldridge | P.O. Box 116573<br>Atlanta, GA 30368<br>Phone: (404) 527-4000<br>Attn: Howard Janis<br><br>303 Peachtree St. NE, Ste 5300<br>Atlanta, GA 30308-3265<br>Attn: Howard Janis | Professional fees | | $163,024.71 |
| 22. | SohoFile | 155 Chestnut Street<br>Florence, MA 01062<br>Phone: (413) 320-8935 | Trade debt | | $161,541.18 |
| 23. | Chamber Building L.P. | PO Box 79609<br>City of Industry, CA 91716-9609 | Real property lease | May be subject to partial setoff | $161,115.92 |

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
|  | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 24. | Softchoice Corporation | 16609 Collections Center Drive<br>Chicago, IL 60693<br>Phone:  (888) 549-7638<br>Fax:  (888) 549-7639<br>Attn: David MacDonald | Trade debt |  | $140,759.70 |
| 25. | Network Deposition Services | 2936 McNeal Road<br>Allison Park, PA 15101<br>Phone:  (866) 565-1929<br>Attn: Terri Urbash | Reporting Services |  | $131,859.82 |
| 26. | Xerox Corporation | P.O. Box 7413<br>Pasadena, CA 91109-7413<br>Phone: (800) 822-2200 | Equipment lease | May be subject to partial setoff | $130,457.19 |
| 27. | 523 Pacific Center Associates | 523 Pacific Center Associates<br>Management Office<br>523 West 6th Street<br>Suite 1050<br>Los Angeles, CA 90014<br><br>c/o Alliance Commercial Partners<br>165 South Union Blvd.<br>Suite 510<br>Lakewood, Colorado 80228<br>Attn: Doug McCormick | Real property lease |  | $120,732.23 |

| | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| | *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim [if secured also state value of security]* |
| 28. | Bennett Thrasher PC | One Overton Park<br>3625 Cumberland Blvd St 1000<br>Atlanta, GA 30339<br>Phone: (770) 396-2200<br>Fax: (770) 390-0394<br>Attn: Thomas Burns<br><br>Thomas E. Raines, PC<br>3740 Davinci Court, Suite 430<br>Norcross, GA 30092<br>Phone: (770) 263-0093<br>Fax: (770) 407-5874<br>Attn: Thomas E. Raines | Professional fees | | $115,046.67 |
| 29. | Miller Heiman | P.O. Box 41081<br>Reno, NV 59504-5081<br>Phone: (775) 827-4411<br>Attn: Kirk Lord<br><br>1595 Meadow Wood Lane<br>Reno, NV 890502-8526<br>Phone: (775) 827-4411<br>Attn: Kirk Lord | Consulting services | | $111,822.10 |
| 30. | Ajilon Finance | Dept Ch. 4031<br>Palatine, IL 60055-4031 | Staffing services | | $ 104,314.8 |

## Schedule 2

### Consolidated List of the Debtors' Five Largest Secured Creditors

Pursuant to Local Rule 1007-2(a)(5), the following lists the holders of the noncontingent secured claims against the Debtors, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Creditor | Address | Amount of Claim | Nature of Claim | Type of Collateral | Value of Collateral |
|---|---|---|---|---|---|
| Well Fargo Bank, N.A., as Administrative Agent | Wells Fargo Bank, N.A Credit Resolution Group 171 17th Street. N.W. MAC G00128-030, Atlanta, GA 30363<br><br>Wells Fargo Bank, N.A. 301 South College Street, 15th Floor MAC D1053-151, Charlotte, N.C. 28288 | $47,329,170 | Senior secured credit facility | All assets | Unknown |
| Grace Bay Holdings II, LLC | Grace Bay Holdings II, LLC c/o Bayside Capital, Inc. 1450 Brickell Avenue, 31st Floor Miami, FL 33131 | $22,008,918 | Subordinated secured notes | All assets | Unknown |
| Banc of America Leasing | c/o Swanson Martin & Bell, LLP 330 N. Wabash, Suite 3300 Chicago, Illinois 60611 Phone: (312) 321-8442 Fax: (312) 321-0990 Attn: Joseph P. Kincaid | $270,000.00 | Equipment lease | Equipment | Unknown |
| GE Capital | GE Capital P.O. Box 740425 Atlanta, GA 30374 | $159,559.69 | Equipment lease | Equipment | Unknown |

| Xerox Corporation | Xerox Corporation<br>P.O. Box 7413<br>Pasadena, CA 91109 | $130,258.63 | Equipment lease | Equipment | Unknown |

## Schedule 3

### Summary of Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), below is an estimate of the Debtors' assets and liabilities on a consolidated basis as of the Petition Date.

| Assets and Liabilities | Amount |
|---|---|
| Total assets | $208 million |
| Total liabilities | $258 million |

As of June 30, 2011

(dollars in millions)
Unaudited

Total Assets: $207,518,000 million
Total Liabilities: $258,002,000 million

## Schedule 4

Pursuant to Local Rule 1007-2(a)(8), the following lists all property of the Debtors in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity:

| Property | Deposit Amount |
|---|---|
| Security deposits (leased premises) | $1,684,960.46 |
| Utility deposits | $8,542.78 |
| Other deposits | $276,000 |

Wells Fargo Bank, N.A., as administrative agent, is also in possession of certain stock certificates of Unlimited Languages, Inc., The Hobart West Group, Inc., and D-M Information Systems, Inc., and a certain intercompany promissory note.

## Schedule 5

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors' operate their business.

| Debtor | Leased Premises |
| --- | --- |
| Alexander Gallo Holdings, LLC | 101 Marietta Street<br>Suite 2700 & 2800<br>Atlanta, GA 303030 |
| Alexander Gallo Holdings, LLC | 2300 West Sahara<br>Suites 700, 740 & 770<br>Las Vegas, NV 89102 |
| Alexander Gallo Holdings, LLC | 3800 North Central Avenue<br>Suite 1700<br>Phoenix, AZ 85012 |
| Alexander Gallo Holdings, LLC | 3801 University Ave<br>Suite 640<br>Riverside, CA 92501 |
| Alexander Gallo Holdings, LLC | 40880 County Center Dr<br>Suite F<br>Temecula, CA 92591 |
| Alexander Gallo Holdings, LLC | 44 Montgomery Street<br>Suite 1100<br>San Francisco, CA 94104 |
| Alexander Gallo Holdings, LLC | 2151 River Plaza Drive<br>Suite 300<br>Sacramento, CA 95833 |
| Alexander Gallo Holdings, LLC | 535 Anton Blvd<br>Suite 400<br>Costa Mesa, CA 92626 |
| Alexander Gallo Holdings, LLC | 1875 Century Park East<br>Suite 500<br>Los Angeles, CA 90067 |
| Alexander Gallo Holdings, LLC | 1301 Riverplace Blvd<br>Suite 1609<br>Jacksonville, FL 32207 |
| Alexander Gallo Holdings, LLC | 513 Ellis Street<br>Augusta, GA 30901 |
| Alexander Gallo Holdings, LLC | 100 Franklin Street<br>Boston, MA 02110 |
| Esquire Deposition Services, LLC | 3101 Bee Caves Road<br>Suite 220<br>Austin, TX 78746 |

| Debtor | Leased Premises |
|---|---|
| Esquire Deposition Services, LLC | 701 Fourth Ave S.<br>Suite 500<br>Minneapolis, MN 55415 |
| Esquire Deposition Services, LLC | 707 Grant Street,<br>Suite 1825<br>Pittsburg, PA 15219 |
| Esquire Deposition Services, LLC | Sarasota City Ctr at 1819 Main Street<br>Suite 250<br>Sarasota, FL 34236 |
| Esquire Deposition Services, LLC | 1221 Locust Street<br>Suite 1001<br>St. Louis, MO 63102 |
| Esquire Deposition Services, LLC | 303 E. 17th Avenue<br>Suite 565<br>Denver, CO 80209 |
| Esquire Deposition Services, LLC | 1700 Pacific Ave<br>Suite 4750<br>Dallas, TX 75201 |
| Esquire Deposition Services, LLC | 900 E. Ocean Blvd.<br>Suite 130-D, Offices 30 and 31<br>Stuart, FL 34994 |
| Esquire Deposition Services, LLC | 515 Las Olas Blvd<br>Suite 1300<br>Ft. Lauderdale, FL 33301 |
| Esquire Deposition Services, LLC | 101 NE Third Ave<br>Suite 1200<br>Fort Lauderdale, FL 33309 |
| Esquire Deposition Services, LLC | Executive Suites Imperial Plaza<br>6767 N Wickham Road<br>Suites 4486 & 4451/54<br>Melbourne, FL 32940 |
| Esquire Deposition Services, LLC | 9901 IH-10 West<br>Suite 800<br>San Antonio, TX 78230 |
| Esquire Deposition Services, LLC | 701 Fifth Ave<br>Suite 4200<br>Seattle, WA 98104 |
| Esquire Deposition Services, LLC | 1001 McKinney Bldg<br>Suite 805<br>Houston, TX 70002 |

| Debtor | Leased Premises |
|---|---|
| Esquire Deposition Services, LLC | 700 W. Hillsboro Blvd.<br>Building 3<br>Suite 112<br>Deerfield Beach, FL 33441 |
| Esquire Deposition Services, LLC | 125 Summer Street<br>Suite 1660A<br>Boston, MA 02110 |
| Esquire Deposition Services, LLC | 650 Poydras Ave<br>Suite 1515<br>New Orleans, LA 70130 |
| Esquire Deposition Services, LLC | 5410 NW 33rd Ave<br>Suite 100<br>Fort Lauderdale, FL 33309 |
| Esquire Deposition Services, LLC | 90 Woodbridge Center Drive<br>Suite 340<br>Woodbridge, NJ 07095 |
| Esquire Deposition Services, LLC | 2301 W. Big Beaver Road<br>Suite 925<br>Troy, MI 48084 |
| Esquire Deposition Services, LLC | 44 W. Flagler Street<br>Suite 750<br>Miami, FL 33130 |
| Esquire Deposition Services, LLC | 1430 Truxtun Ave<br>Suite 777<br>Bakersfield, CA 93301 |
| Esquire Deposition Services, LLC | 200 East Robinson Street<br>Suite 725<br>Orlando, FL 32801 |
| Esquire Deposition Services, LLC | 89-00 Sutphin Blvd<br>Suite 303<br>Jamaica, NY 11435 |
| Esquire Deposition Services, LLC | 101 E. Kennedy Blvd<br>Suite 3350<br>Tampa, FL 33602 |
| Esquire Deposition Services, LLC | 901 E. Byrd Street, West Tower<br>Suite 1130<br>Richmond, VA 23219 |
| Esquire Deposition Services, LLC | 1600 JFK Blvd<br>Suite 1210<br>Philadelphia, PA 19103 |
| Esquire Deposition Services, LLC | 311 West Monroe Street<br>Suite 1200<br>Chicago, IL 60606 |

| Debtor | Leased Premises |
|---|---|
| Esquire Deposition Services, LLC | 220 W 42nd Street, 13th Floor<br>New York, NY 10036 |
| Esquire Deposition Services, LLC | One Penn Plaza<br>Suite 4715<br>New York, NY 10119 |
| Esquire Deposition Services, LLC | 523 West 6th Street<br>Suite 1050<br>Los Angeles, CA 90014 |
| Esquire Deposition Services, LLC | 16 Court Street<br>North Corner of Suite 1902<br>Brooklyn, NY 11241 |
| Esquire Deposition Services, LLC | 444 Seabreeze Blvd<br>Suite 740<br>Daytona Beach, FL 32118 |
| Esquire Deposition Services, LLC | 515 N. Flagler Drive<br>Suite 1701<br>West Palm Beach, FL 33401 |
| Esquire Deposition Services, LLC | 4927 Southfork Drive<br>Lakeland, FL 33813 |
| Esquire Deposition Services, LLC | 2385 Executive Center Drive<br>Suite 120<br>Boca Raton, FL 33431 |
| Esquire Deposition Services, LLC | 110 West C Street<br>Suite 1600 (4)<br>San Diego, CA 92101 |
| Esquire Deposition Services, LLC | 155 E. Shaw Avenue<br>Suite 201<br>Fresno, CA 97310 |
| Esquire Deposition Services, LLC | 402 West Broadway<br>Emerald Plaza<br>San Diego, CA 92101 |
| Esquire Deposition Services, LLC | 20801 Biscayne Blvd<br>Suite 202<br>Aventura, FL 33180 |
| Esquire Deposition Services, LLC | 1225 Franklin Avenue<br>Suite 325<br>Garden City, NY 11530 |
| Esquire Deposition Services, LLC | 33 College Hill Road # 29<br>Warwick, RI 02886 |
| Esquire Deposition Services, LLC | 152 North Third Street<br>Suite 708<br>San Jose, CA 95112 |
| Esquire Deposition Services, LLC | 188 Fries Mill Road<br>Turnersville, NJ 08012 |

| Debtor | Leased Premises |
|---|---|
| Esquire Deposition Services, LLC | 1425 K Street, N.W.<br>Suite 350<br>Washington, D.C. 20005 |

<u>**Schedule 6**</u>

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtors' substantial assets and the location of their books and records. The Debtors do not hold any assets outside the territorial limits of the United States.

| Debtor | Chief Executive Office; Principal Place of Business; Records Location | Other Places of Business |
|---|---|---|
| Alexander Gallo Holdings, LLC | Centennial Tower Suites 2700 and 2800 101 Marietta Street Atlanta, GA 30303 | 2300 West Sahara Avenue, Suites 700, 740 and 770, Las Vegas, NV, 89102 |
| | | 110 West "C" Street Suite 1600 San Diego, CA 92101 |
| | | 535 Anton Blvd. Suite 400 Costa Mesa, CA 92626 |
| | | One Penn Plaza, Suite 4715 New York, NY 10119 |
| | | 125 Summer Street, Suite 1660A Boston, MA 02110 |
| | | 3801 University Avenue Suite 640 Riverside, CA 92501 |
| | | 3800 North Central Avenue Suite 1700 Phoenix, AZ 85012 |
| | | 2151 River Plaza Drive Suite 300 Sacramento, CA 95833 |
| | | 44 Montgomery Street Suite 1100 San Francisco, CA 94104 |

| | | 40880 County Center Drive<br>Suite F<br>Temecula, CA 92591 |
|---|---|---|
| | | 1875 Century Park East<br>Suite 500<br>Los Angeles, CA 90067 |
| | | 2385  Executive Center Drive, Suite 120<br>Boca Raton, FL 33431 |
| | | 1301 Riverplace Blvd., Suite 1609, Jacksonville, FL 32207 |
| | | 513 Ellis Street Augusta, GA 30901 |
| Set Depo, LLC | Centennial Tower Suites 2700 and 2800<br>101 Marietta Street Atlanta, GA 30303 | 5410 NW 33rd Avenue, Suite 100 Ft. Lauderdale, FL 33309 |
| The Hobart West Group, Inc. | Centennial Tower Suites 2700 and 2800<br>101 Marietta Street Atlanta, GA 30303 | N/A |
| Deponet, LLC | Centennial Tower Suites 2700 and 2800<br>101 Marietta Street Atlanta, GA 30303 | 5410 NW 33rd Avenue, Suite 100 Ft. Lauderdale, FL 33309 |
| D-M Information Systems, Inc. | Centennial Tower Suites 2700 and 2800<br>101 Marietta Street Atlanta, GA 30303 | N/A |
| Esquire Deposition Services, LLC (f/k/a Hobart Legal Services, LLC) | Centennial Tower Suites 2700 and 2800<br>101 Marietta Street | 3800 North Central Avenue<br>Suite 1700<br>Phoenix, AZ 85012 |

| | Atlanta, GA 30303 | 1875 Century Park East<br>Suite 500<br>Los Angeles, CA 90067 |
|---|---|---|
| | | 2151 River Plaza Drive<br>Suite 300<br>Sacramento, CA 95833 |
| | | 44 Montgomery Street<br>Suite 1100<br>San Francisco, CA 94104 |
| | | 303 East 17th Avenue<br>Suite 565<br>Denver, CO  80209 |
| | | 444 Seabreeze Blvd.,<br>Suite 740<br>Daytona, FL  32118 |
| | | 700 West Hillsboro Blvd.<br>Building 3, Suite 112<br>Deerfield Beach, FL 33441 |
| | | 515 Las Olas Blvd.,<br>Suite 1300<br>Ft. Lauderdale, FL 33301 |
| | | 5410 NW 33rd Ave.,<br>Suite 100<br>Ft. Lauderdale, FL 33309 |
| | | 1301 Riverplace Blvd., Suite 1609<br>Jacksonville, FL 32207 |
| | | 4927 Southfork Drive<br>Lakeland, FL  33813 |

| | | |
|---|---|---|
| | | Executive Suites Imperial Plaza 6767 North Wickham Rd., Suites 4486 and 4451/4454 Melbourne, FL 32940 |
| | | 44 West Flagler Street, Suite 750 Miami, FL 33130 |
| | | 1430 Truxtun Avenue, Ste. 777 Bakersfield, CA 99301 |
| | | 200 East Robinson Street Suite 725 Orlando, FL 32801 |
| | | Sarasota City Ctr. 1819 Main Street Suite 250 Sarasota, FL 34236 |
| | | 900 East Ocean Blvd. Building D, Suite 130, Offices 30 & 31 Stuart, FL 34994 |
| | | 101 East Kennedy Blvd. Suite 3350 Tampa, FL 33602 |
| | | 515 North Flagler Dr. Suite 1701 West Palm Beach, FL 33401 |
| | | 311 West Monroe Street, Suite 1200 Chicago, IL 60606 |
| | | 650 Poydras Ave., Suite 1515 New Orleans, LA 70130 |
| | | 125 Summer St., Suite 1660A Boston, MA 02110 |

| | | |
|---|---|---|
| | | 2301 West Big Beaver, Rd., Suite 925 Troy, MI 48084 |
| | | 701 Fourth Ave. S Suite 500 Minneapolis, MN 55415 |
| | | 1221 Locust Street, Suite 1001 St. Louis, MO 63102 |
| | | 90 Woodbridge Center Dr. Suite 340 Woodbridge, NJ 07095 |
| | | 2300 West Sahara Ave Suites 700, 740 and 770 Las Vegas, NV, 89102 |
| | | 16 Court Street, Suite 1902 Brooklyn, NY 11241 |
| | | 89-00 Sutphin Blvd, Ste. 303 Jamaica, NY 11435 |
| | | One Penn Plaza, Suite 4715 New York, NY 10119 |
| | | 1600 JFK Blvd. Suite 1210 Philadelphia, PA 19103 |
| | | 3101 Bee Caves Rd. Suite 220 Austin, TX 78746 |
| | | 1700 Pacific Ave. Suite 4750 Dallas, TX 75201 |
| | | 1001 McKinney Bldg. Suite 805 Houston, TX 70002 |

| | | |
|---|---|---|
| | | 9901 IH-10 West, Suite 800 San Antonio, TX 78230 |
| | | 701 5th Avenue Suite 6630 Seattle, WA 98104 |
| | | 110 West "C" Street Suite 1600 San Diego, CA 92101 |
| | | 535 Anton Blvd. Suite 400 Costa Mesa, CA 92626 |
| | | 523 West 6th Street, Suite 1050 Los Angeles, CA 90014 |
| | | 2385 Executive Center, Suite 120 Boca Raton, FL 33431 |
| | | 155 E. Shaw Avenue, Suite 201, Fresno, CA 97310 |
| | | 402 West Broadway, Emerald Plaza, San Diego, CA 92101 |
| | | 20801 Biscayne Boulevard, Suite 202, Aventura, FL 33180 |
| | | 1225 Franklin Ave., Ste 325, Garden City, NY 11530 |
| | | 33 College Hill Road, #29, Warwick, RI 02886 |
| | | 188 Fries Mill Road Turnersville, NJ 08012 |
| | | 1425 K Street N.W. Washington, D.C. 20005 |

| | | |
|---|---|---|
| | | 1618 Comerway Blvd. San Antonio, TX 78219 |
| | | 5910 Mission Blvd. Riverside, CA 92509 |
| | | 11433 Woodside Ave. Santee, CA 92071 |
| Esquire Litigation Solutions, LLC | Centennial Tower Suites 2700 and 2800 101 Marietta Street Atlanta, GA 30303 | 535 Anton Blvd. Suite 400 Costa Mesa, CA 92626 |
| | | 110 West "C" Street Suite, 1600 San Diego, CA 92101 |
| Esquire Solutions, LLC | Centennial Tower Suites 2700 and 2800 101 Marietta Street Atlanta, GA 30303 | N/A |
| Hobart West Solutions, LLC | Centennial Tower Suites 2700 and 2800 101 Marietta Street Atlanta, GA 30303 | N/A |
| AG/Sanction LLC | Centennial Tower Suites 2700 and 2800 101 Marietta Street Atlanta, GA 30303 | 3800 North Central Avenue Suite 1700 Phoenix, AZ   85012 |
| Unlimited Languages, Inc. | Centennial Tower Suites 2700 and 2800 101 Marietta Street Atlanta, GA 30303 | N/A |

## <u>Schedule 7</u>

Pursuant to Local Rule 1007-2(a)(11), the following lists the nature and present status of litigation against the Debtors and their property:

| Debtor | Counterparty | Nature of Action | Status |
|---|---|---|---|
| Esquire Deposition Services, LLC | Joanne Redican Kohn | Breach of contract | Pending |
| Esquire Deposition Services, LLC | Glenn Webber P.A. | State Deceptive Trade Practices Act | Pending |
| Esquire Deposition Services, LLC | Anderson Law Office, LLC | State Deceptive Trade Practices Act | Pending |
| Esquire Deposition Services, LLC | Colapinto, *et al.* | State Deceptive Trade Practices Act | Pending |
| Esquire Deposition Services, LLC | Law Offices of Joseph R. Manning | State Deceptive Trade Practices Act | Pending |
| Alexander Gallo Holdings, LLC | Melanie Robertson | Employment | Pending |
| Esquire Deposition Services, LLC | Janice Classen | Employment | Pending |
| Esquire Deposition Services, LLC | Ann Marie Holland | Employment | Pending |
| Esquire Deposition Services, LLC | Neng Pro Yang | N/A | Pending |
| Alexander Gallo Holdings, LLC | Gate Riverplace Company | Debt Collection (Past Due Rent) | Pending |
| Esquire Deposition Services, LLC | Liberty Property L.P. | Debt Collection (Past Due Rent) | Pending |
| Alexander Gallo Holdings, LLC | PRMD | Debt Collection (Past Due Rent) | Pending |
| Esquire Deposition Services, LLC | Kan Am Grund Kapitalanlagegesellschaft mbh | Debt Collection (Past Due Rent) | Pending |
| The Hobart West Group, Inc. | Live Nation Worldwide, Inc. f/k/a SFX Entertainment Inc. | Debt Collection (Past Due Rent) | Pending |
| Esquire Deposition Services, LLC | 520 Capital Mall, Inc. | Debt Collection (Past Due Rent) | Pending |
| Alexander Gallo Holdings, LLC | 1875/1925 Century Park East Company | Notice to Quit (Past Due Rent) | Pending |
| Esquire Deposition Services, LLC | 110 Gulf Associates, L.P. | Debt Collection (Past Due Rent) | Pending |
| Alexander Gallo Holdings, LLC | Exact Software North America, Inc. | Debt Collection (Past Due Invoices) | Pending |
| Esquire Deposition Services, LLC | GE Capital | Debt Collection (Past Due Invoices) | Pending |

| | | | |
|---|---|---|---|
| Esquire Deposition Services, LLC | Phoenix Plaza Point, LLC | Debt Collection (Past Due Invoices) | Pending |
| Esquire Deposition Services, LLC | OTR, as Nominee of the State Teachers Retirement Board of Ohio | Debt Collection (Past Due Rent) | Pending |
| The Hobart West Group, Inc. | CIT Financial Services, Inc. | Debt Collection (Past Due Invoices) | Pending |
| Esquire Deposition Services, LLC | Courthouse Tower Associates, LLC | Debt Collection (Past Due Rent) | Pending |
| Esquire Litigation Services, LLC | K-Cura | Debt Collection (Past Due Invoices) | Pending |
| AG/Northeast, LLC | 1336 Venture LLC | Debt Collection (Past Due Rent) | Pending |
| Esquire Deposition Services, LLC | Chippewa Enterprises, Inc. | Debt Collection (Past Due Rent) | Pending |
| Alexander Gallo Holdings, LLC; Esquire Deposition Services, LLC; Esquire Litigation Solutions, LLC; Esquire Solutions, LLC and Set Depo, LLC | Merrill Corporation | Debt Collection (Past Due Invoices) | Pending |
| Esquire Deposition Services, LLC and Esquire Litigation Solutions, LLC | Cenwood Associates | Debt Collection (Past Due Rent) | Pending |
| Alexander Gallo Holdings, LLC and Esquire Solutions, Inc. | Miller Heiman, Inc. | Breach of contract | Pending |
| Alexander Gallo Holdings, LLC | Atlanta Sand & Supply Co. | Debt Collection (Past Due Rent) | Pending |
| Esquire Deposition Services, LLC | Sterwick Development Corp. | Debt Collection (Past Due Rent) | Pending |
| Alexander Gallo & Associates, Inc. | Atlanta Centennial, LLC | Debt Collection (Past Due Rent) | Pending |
| Esquire Deposition Services, LLC | Highwoods DLF EOLA, LLC | Debt Collection (Past Due Rent) | Pending |
| Alexander Gallo Holdings, LLC | Chamber Building, LP | Debt Collection (Past Due Rent) | Pending |
| Esquire Litigation Solutions, LLC | Alpha Reporting Services, Inc. | Debt Collection (Past Due Invoices) | Pending |
| Set Depo, LLC | Alpha Reporting Services, Inc. | Debt Collection (Past Due Invoices) | Pending |
| Alexander Gallo Holdings, LLC | TigerDirect, Inc. | Debt Collection (Past Due Invoices) | Pending |

## Schedule 8

Pursuant to Local Rule 1007-2(a)(12), the following lists the names of individuals who comprise the AGH's existing senior management, their tenure with AGH, and a brief summary of their responsibilities and experience.

| Name/Position | Prior Experience/Responsibilities |
|---|---|
| Alexander Gallo<br>(Chief Executive Officer) | Mr. Gallo began his career as a court reporter in 1989 and founded AGH's predecessor, Alexander Gallo & Associates, a deposition services firm, in 1999. As AGH's chief executive officer, Mr. Gallo is responsible for the vision, leadership and direction of the company. |
| Andrew Sims<br>(Chief Financial Officer) | Mr. Sims has served as AGH's chief financial officer since 2006 and is responsible for the day-to-day financial management of the organization, as well as improving the internal systems that provide high-quality financial information. Prior to joining AGH, Mr. Sims served as a partner at the accounting firm Weiser LLP. Mr. Sims is a Chartered Accountant and a Certified Public Accountant. |
| Lisa Censullo<br>(Chief Operating Officer) | Before assuming the chief operating officer position, Ms. Censullo served as chief information officer for AGH from October 2007 through February 2009. In these roles, Ms. Censullo has been responsible for managing the organization's strategies for technology, internal operations and client-facing initiatives, as well as for developing and executing the company's integration strategy for mergers and acquisitions. Prior to joining AGH, Ms. Censullo served as the Chief Technology Officer of WorldWave and assisted Merrill Corp. in integrating WorldWave into its operations. Ms. Censullo has more than ten years of experience in court reporting and litigation support. |

| | |
|---|---|
| Domenick DiCicco<br>(General Counsel) | Mr. DiCicco joined AGH in 2009 and serves as the company's chief legal officer, overseeing the legal department and all compliance and regulatory affairs of the company. Mr. DiCicco has more than twenty years of experience practicing law. Prior to joining the company, Mr. DiCicco served as the chief legal officer for Zurich Insurance Group and was a partner at the law firm Edelstein, Martin, Nelson, & DiCicco. |

## Schedule 9

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following list provides the estimated amount of weekly payroll to the Debtors' employees (including Independent Contractors), and the estimated amount to be paid to officers, directors, stockholders, and financial or business consultants retained by the Debtors, for the 30-day period following the filing of these chapter 11 cases:

| Payments to Employees | Payments to Officers and Directors | Payments to Business and Financial Consultants |
|---|---|---|
| $5,512,000 ($1,378,000/week) | None | $550,000 |
| | | |

## Schedule 10

Pursuant to Local Rule 1007-2(b)(3), the list provides, for the thirty 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|---|---|
| Cash Receipts | $11,772,000 |
| Cash Disbursements | $15,985,000 |
| Net Cash Gain/Loss | ($4,213,000) |
| Unpaid Obligations | N/A |
| Unpaid Receivables | N/A |