Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 11-14220(ALG)

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  ALEXANDER GALLO HOLDINGS, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              October 5, 2011

19              10:43 AM

20

21  B E F O R E:

22  HON. ALLAN L. GROPPER

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1    HEARING re Motion filed by debtors for an order authorizing and

2    approving the sale of substantially all of the debtors' assets

3    free and clear of all liens, claims, encumbrances and other

4    interests, approving auction and bidding procedures in

5    connection with the sale of substantially all of the debtors'

6    assets, authorizing entry into a stalking-horse agreement and

7    approving stalking-horse protections, approving procedures

8    related to the assumption and assignment of executory contracts

9    and unexpired leases.

10

11   FINAL HEARING re:  Motion filed by debtors for entry of interim

12   and final orders (I) authorizing the debtors to obtain

13   postpetition financing; (II) authorizing the use of cash

14   collateral, (III) granting liens and providing superpriority

15   administrative expense status, (IV) granting adequate

16   protection, (V) scheduling a final hearing, and (VI) granting

17   related relief.

18

19   HEARING re Objection filed by the official committee of

20   unsecured creditors to motion of the debtors for final orders

21   (I) authorizing the debtors to obtain postpetition financing;

22   (II) authorizing the use of cash collateral, (III) granting

23   liens and providing superpriority administrative expense

24   status, (IV) granting adequate protection, (V) scheduling a

25   final hearing, and (VI) granting related relief.

1

2    HEARING re Objection filed by the official committee of

3    unsecured creditors to the motion of the debtors for an order

4    authorizing and approving the sale of substantially all of the

5    debtors' assets free and clear of all liens, claims,

6    encumbrances and other interests, approving auction and bidding

7    procedures in connection with the sale of substantially all of

8    the debtors' assets, authorizing entry into a stalking-horse

9    agreement and approving stalking-horse protections, approving

10   procedures related to the assumption and assignment of

11   executory contracts and unexpired leases.

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Penina Wolicki

Page 4

```
 1
 2   A P P E A R A N C E S :
 3   DLA PIPER LLP (US)
 4          Attorneys for Debtors
 5          1251 Avenue of the Americas
 6          New York, NY 10020
 7
 8   BY:   THOMAS R. CALIFANO, ESQ.
 9          JEREMY R. JOHNSON, ESQ.
10          DANIEL G. EGAN, ESQ.
11
12   U.S. DEPARTMENT OF JUSTICE
13          Office of the U.S. Trustee
14          33 Whitehall Street
15          21st Floor
16          New York, NY 10004
17
18   BY:   NAZAR KHODOROVSKY, ESQ.
19
20   DECHERT LLP
21          Attorneys for Bayside Capital
22          1095 Avenue of the Americas
23          New York, NY 10036
24
25   BY:   MICHAEL J. SAGE, ESQ.
```

1

2    DECHERT LLP

3          Attorneys for Bayside Capital

4          2929 Arch Street

5          Philadelphia, PA 19104

6

7    BY:   MEGAN HORWITZ, ESQ.

8

9    DECHERT LLP

10         Attorneys for Bayside Capital

11         90 State House Square

12         Hartford, CT 06103

13

14   BY:   MICHAEL BROWN, ESQ.

15

16

17   COOLEY LLP

18         Proposed Committee Counsel

19         1114 Avenue of the Americas

20         New York, NY 10036

21

22   BY:   CATHY HERSHCOPF, ESQ.

23         JEFFREY COHEN, ESQ.

24         ALEX VELINSKY, ESQ.

25

Page 6

1

2   FAEGRE & BENSON LLP

3        Attorneys for Wells Fargo Bank, N.A.

4        2200 Wells Fargo Center

5        90 South Seventh Street

6        Minneapolis, MN 55402

7

8   BY:   MICHAEL R. STEWART, ESQ.

9        COLIN F. DOUGHERTY, ESQ. (TELEPHONICALLY)

10

11  ALSO PRESENT:

12        DOMENICK DICICCO, ESQ., General Counsel

13        REGGIE DAWSON, Wells Fargo Bank (TELEPHONICALLY)

14        TRENT BRENDON, Wells Fargo Bank (TELEPHONICALLY)

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Then Alexander Holdings, LLC, et al.

3      (Pause)

4          THE COURT:  May I have appearances, please?

5          MR. CALIFANO:  Yes, Your Honor.  Tom Califano, DLA

6  Piper, on behalf of the debtors.  With me in the court today is

7  my partner Jeremy Johnson, associate Dan Egan, and also Dom

8  DiCicco, who is the general counsel of the debtors.

9          MR. KHODOROVSKY:  May it please the Court, Nazar

10  Khodorovsky for the U.S. Trustee.

11          MS. HERSHCOPF:  Cathy Hershcopf, Cooley LLP, proposed

12  counsel for the committee.  I have with me here in court, Your

13  Honor, Jeffrey Cohen and Alex Velinsky.

14          MR. SAGE:  Michael Sage, Your Honor; Dechert; on

15  behalf of Bayside.  Michael Brown is in court with me today,

16  and also Megan Horwitz and Tim Compilkit (ph.).

17          MR. STEWART:  Michael Stewart of Faegre & Benson on

18  behalf of Wells Fargo Bank as administrative agent.  I also

19  should have on the line with me today just listening, not

20  participating, my colleague Colin Dougherty, and then Reggie

21  Dawson and Trent Brendon of Wells Fargo.

22          THE COURT:  All right.  Anyone else wish to note an

23  appearance?  Anyone on the telephone who wishes to note an

24  appearance for the record?

25          All right.  Mr. Califano?

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

1          MR. CALIFANO:  Yes.  Yes, Your Honor.

2          THE COURT:  Where would you like to start?

3          MR. CALIFANO:  Well, maybe a brief status.

4          THE COURT:  Very good.

5          MR. CALIFANO:  As Your Honor may recall, last week we

6     worked out an agreement with our DIP lender and the committee

7     to put these motions off for eight days so the committee could

8     see if they could find a replacement for either or both of the

9     DIP and the stalking horse.

10          We're here now without a replacement, and it still

11     remains the only DIP in prospect is from Bayside and its

12     affiliates.  We have spent time during the past week working on

13     some issues; we made changes to both the DIP and the bid

14     procedures in response to some comments from the committee.

15     And despite the fact that we had agreed that there wouldn't be

16     any changes, that we would just go forward, Bayside has agreed

17     to the changes that the committee has asked for, some of them

18     at least.

19          As late as last night we were on a conference call.

20     And I believe now that both the form of DIP order and the bid

21     procedures are agreed to by all the parties.

22          THE COURT:  All right.  Now, you filed on the docket

23     some black-lined copies of both the sale order, the sale

24     procedures, the DIP order, the DIP agreement.  And those have

25     been available to interested parties.

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 9 of 64

Page 9

1              MR. CALIFANO:  Yes, Your Honor.

2              THE COURT:  Are there any further changes that are not

3    reflected on the documents that had been filed publicly, or --

4    and/or does any party present wish to have any explication of

5    the changes that have been made from the prior versions of the

6    relevant orders and agreements?  Because I think it's important

7    that all parties understand what changes have been made and

8    exactly where we are.

9              MR. CALIFANO:  Your Honor, we can walk though the

10   changes.  I think they're fairly simple.  But I would say

11   there's just one change to the APA that we were not able to

12   make last night, but it's fairly simple.  It's just that the

13   purchaser has asked for the right to review the debtors' tax

14   returns.  So that change will be made and will be filed in the

15   executed APA and the black-line after this hearing.

16              But it may make sense --

17              THE COURT:  All right.  Well, before you do that,

18   perhaps I should hear any preliminary comments that any other

19   party wishes to make.

20              MR. KHODOROVSKY:  Your Honor, Nazar Khodorovsky for

21   the U.S. Trustee.  I'll be extremely brief, Your Honor.  I just

22   wanted to note that the -- in line with the request from the

23   U.S. Trustee's Office, the debtor-in-possession financing order

24   has been revised to indicate that the carve-out for a Chapter 7

25   trustee's expenses -- a hypothetical Chapter 7 trustee's

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 10 of 64

Page 10

1    expenses, has been increased from 25,000 to 50,000.

2              THE COURT:  All right.

3              MR. KHODOROVSKY:  And with that revision, Your Honor,

4    which I wanted to note on the record -- and this is in the

5    filed documents, Your Honor -- the U.S. Trustee has no further

6    objections to the DIP financing.  Thank you, Your Honor.

7              THE COURT:  Thank you.

8              MS. HERSHCOPF:  Your Honor, Cathy Hershcopf.  I think

9    we'll reserve most of our comments till we hear the changes on

10   the record.  But I did want to say that the debtor worked hard

11   over the last week with the committee to have two other parties

12   look at the assets and look at the asset pool.  They've both

13   been in the data room.  It took one party a much longer time to

14   get into the data room and pass the NDA stage than any of us

15   would have liked, especially given the holiday weekend.  But

16   they are in and they are looking, and we hope they both get to

17   the auction.  Veritext, which we talked about when we were here

18   last week, had a complete-day management present at the

19   company.  And the other party is moving a little bit more

20   slowly.

21             Some of the changes to the bid procedures that Bayside

22   graciously -- with a little arm-turning -- agreed to, despite

23   our agreement in court that we would come and just take them as

24   is, were changes that were prompted by discussions with those

25   two parties and the kinds of different structures that they're

1    considering.

2            Both the debtor and the committee felt fairly strongly

3    that the bid procedures as drafted by the debtor, gave a great

4    deal of flexibility to the debtor to make changes, to come to

5    Your Honor if we needed them.  But sometimes, as Your Honor

6    said on the last calendar, appearances are more important than

7    reality.  And we felt that the changes, the actual changes to

8    the bid procedures, would show good faith to these potential

9    purchasers.

10            There's a big overbid that needs to be overcome for

11    anyone to come, given that we're not arguing today about any of

12    the fees.  But Bayside has stepped up to the table and we

13    commend the debtor for getting this accomplished, for not only

14    a payment of Wells and a payment of itself and all of its fees

15    and a payment of the DIP, but the administrative expenses in

16    this case, as Carl Marks expects them to be, the priority

17    claims in this case and the wind-down expenses in this case.

18            So we're hopeful that when we get to the auction,

19    despite these big fees, everything that happens at the auction

20    will be for the benefit of general unsecured creditors.  And we

21    believe we're in a better place this week than we were last

22    week, and we'd like to thank Your Honor for the chambers

23    conference and the delay of the eight days.

24            THE COURT:  Well, you certainly don't need to thank

25    me.  Do you think we need any further record on the issue that

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 12

1    administrative expenses are expected to be covered?  We could

2    save that for the sale hearing, because today I'm only setting

3    up an auction.  I'm not approving the sale.

4            MS. HERSHCOPF:  Your Honor, to us it's --

5            THE COURT:  And I think that should be very clear.

6            MS. HERSHCOPF:  -- and I think to the debtor, and I'm

7    sure it will be part of their presentation -- it is a critical

8    part of the stalking-horse bid.  And we'd like there to be a

9    record of it today.

10           As we said, there's millions and millions of dollars'

11   worth of fees that are being approved today.  And in

12   consideration for those fees, we think that Bayside really

13   stepped up to the table to cover those expenses.  And that's

14   part of the quid pro quo.

15           THE COURT:  All right.

16           MR. CALIFANO:  What do you want --

17           THE COURT:  Anyone else?

18           All right, Mr. Califano --

19           MR. CALIFANO:  Yes --

20           THE COURT:  -- the ball's in your court.

21           MR. CALIFANO:  -- yes.  Well, what I anticipated of

22   course -- and subject to Your Honor -- but what I anticipated

23   at today's hearing, we'd walk through the changes and then I

24   have Peter Kaufman from the Gordian Group, our investment

25   banker, who can talk about the status of the bidding process,

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

1    because people are already in the due diligence room.  And he

2    can also walk Your Honor through the components of the purchase

3    price.

4          And then also in court today is Marc Pfefferle, from

5    the Carl Marks Advisory Group, who is our CRO, and he's

6    prepared to testify to Your Honor to the investigation to date

7    on the priority, admin and wind-down expenses, which Bayside

8    has agreed to make part of their purchase price, so we all know

9    this case has a soft landing, and will not be administratively

10   insolvent.  And Mr. Pfefferle could not only walk through those

11   components, but also give Your Honor assurance that --

12          THE COURT:  All right.

13          MR. CALIFANO:  -- their investigation --

14          THE COURT:  All right.  That sounds -- unless anyone

15   wishes to be heard, that sounds like a good plan.

16          MR. CALIFANO:  Okay.  Thank you, Your Honor.  So with

17   Your Honor's permission, I would just walk through the changes

18   in the bid procedures first.  Does Your Honor have a black-line

19   copy of the bid procedures?

20          THE COURT:  I think so.  But I have to be certain I

21   have the latest black-line copy.  I think I do; 46833566.1?

22   No.

23          MR. CALIFANO:  No.  Let me -- Your Honor may I hand

24   this up?

25          THE COURT:  Yes.  All right.  This is 469139 -- no,

1    this is an entirely different number.  All right.

2            MR. CALIFANO:  Your Honor, that is the bid procedures

3    that we agreed to late last evening.

4            THE COURT:  But it's not black -- it is black-lined.

5            MR. CALIFANO:  Yes, Your Honor.

6            THE COURT:  All right.  Go ahead.

7            MR. CALIFANO:  Okay.  The first change that we see is

8    on the third page.  There's a definition of a minimum topping

9    bid, which includes the purchase price under the stalking-horse

10   agreement.  And there's a new definition.  And it also provides

11   the flexibility for bidders to, after they meet the minimum

12   topping bid, to bid in noncash consideration, if they want to

13   bid in notes or securities or the like.  Obviously, that's

14   subject to the debtors' analysis of higher and better.  And the

15   bid has -- always must include cash to pass the minimum topping

16   bid.

17           THE COURT:  All right.  Now, one question I have is

18   why you need a topping increment for the first initial bid from

19   a third party in addition to a bid that would cover the very

20   substantial breakup fee and expense reimbursement?

21           MR. CALIFANO:  Yes, Your Honor.  I believe it's

22   customary to have a minimum topping bid, in a topping bid --

23           THE COURT:  It is.  But you already have a minimum

24   topping bid.  You have how much in expense reimbursement, up to

25   a million dollars --

1          MR. CALIFANO:  A million dollars.

2          THE COURT:  -- and 3.75, which is a very hefty breakup

3    fee.

4          MR. CALIFANO:  Yes, Your Honor.  But the million-250,

5    we believe, will show a seriousness by the bidder.  And I think

6    we'd like to see the maximum number here.  I think under this

7    scenario as it's written and this deal, that million-250 will

8    go straight to the general unsecured creditors.  And it was our

9    belief, in negotiation with the stalking horse, that this was

10   an appropriate number to get the process rolling.

11         THE COURT:  All right.

12         MR. CALIFANO:  And I believe, on the scope of the

13   purchase prices, a 1,250,000 should have enough of that scale

14   so we could --

15         THE COURT:  It is a small percentage.

16         MR. CALIFANO:  That is correct.

17         Your Honor, the other change we made was on the next

18   page that requires any qualified bidder to disclose whether

19   there is an agreement that exists or is proposed with

20   management, or also, if there is any agreement between that

21   bidder and any other party-in-interest.

22         THE COURT:  And this would be an obligation of Bayside

23   as well?

24         MR. CALIFANO:  Yes, Your Honor.  Of every bidder.

25         And then the next change we made, Your Honor, was on

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 16

1    the next page, that we agreed to provide copies of all the

2    qualified bids to all the qualified bidders, so everyone would

3    have a level playing field and know what in fact they were

4    bidding against.

5              THE COURT:  All right.

6              MR. CALIFANO:  Your Honor, with those changes, we

7    would ask the Court to approve our bidding procedures.

8              THE COURT:  All right.  Let's go on.  Let's get all

9    the changes, and then consider where things stand.

10             MR. CALIFANO:  Okay.  There are -- in addition to the

11   change, Your Honor, that did not make it to the document, there

12   was a change in the purchase price payment.  And I'm turning

13   now to the asset purchase agreement.

14             THE COURT:  All right.  Give me one second.

15        (Pause)

16             THE COURT:  All right.  Okay.  I have a document

17   numbered 46833561.1.

18             MR. CALIFANO:  Your Honor, I'm sorry.

19             THE COURT:  That's not it.  Okay.

20             All right, this is document 46908500.1.

21             MR. CALIFANO:  That is correct, Your Honor.  And --

22             THE COURT:  That's the next version?

23             MR. CALIFANO:  Yes.

24             THE COURT:  All right.  Okay.

25             MR. CALIFANO:  Your Honor, there were changes made to

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 17

1    reflect the fact that the purchase price now is picking up

2    those admin and priority expenses which Mr. Pfefferle will

3    support.  And it really just provides for a process that

4    determines some of those items and their inclusion in the

5    purchase price.  And that is the change on page 8 of the black-

6    line, "1.2 Purchase Price".

7              THE COURT:  I see that.  You've reduced the purchase

8    price but then you've added a number of other items

9    specifically later in the clause?

10             MR. CALIFANO:  Yes, Your Honor.

11             THE COURT:  All right.  Now, while we're on page --

12   before we get to page 8, first, there's reference in here to

13   assumption of contracts.  If I understand the document, you've

14   given the buyer more time to decide whether to assume or

15   reject?

16             MR. CALIFANO:  Yes, Your Honor.

17             THE COURT:  Some of those deadlines appear to be

18   somewhat open-ended.  It seems to me that at least the parties

19   should understand that this has to be -- there has to be a

20   decision by -- or before confirmation of any plan.

21             MR. CALIFANO:  That is correct.

22             THE COURT:  That's the deadline for assuming or

23   rejecting.  And we can't have an open-ended situation that

24   extends indefinitely.

25             MR. CALIFANO:  Right.  Parties understand that's --

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 18 of 64

Page 18

1        THE COURT:  I would expect so.  But that's an issue

2    that parties don't really focus in on.  They often use

3    effective date as the date for assuming or rejecting.  And I

4    can tell you from hard experience, it doesn't work.  But that's

5    a specific.

6        Also, when I looked at the prior version of this, on

7    page 6 -- and I think it would be -- would show up here on page

8    7, I saw subsection (vi) as a -- as including avoidance or

9    preference action -- "Except for avoidance or preference

10    actions set forth on Schedule 1.1(a)(9)."  Are you selling to

11    the buyer, transferring to the buyer, any avoidance or

12    preference actions?

13        MR. CALIFANO:  Well, Your Honor, the concept is that

14    prior to the closing, we'll be able to designate avoidance

15    actions with key customers that they don't want to be sued

16    post-closing because it would have a negative impact on the

17    business.

18        THE COURT:  That's different from transferring the

19    action to the buyer.  I would simply request that if there is a

20    good business reason that is material to the purchase price

21    that certain customers be free of preference concerns --

22    preference liability, and the buyer wishes to extinguish that

23    liability, that's one thing.  But for the causes of action to

24    be transferred to the buyer is something else, and I think has

25    much less business justification.

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 19

1            Mr. Sage, why don't you come to the table.  You bought

2      a seat at the table.  Or take Mr. Califano's seat.

3            MR. SAGE:  I will, thank you.  Thank you, Judge.

4            I just wanted to add, a) I agree with that.  That's --

5      the intent was not to purchase the actions, it was that they

6      not be brought.  So we can make changes to it.

7            THE COURT:  That -- assuming that that is reasonable

8      in terms of the purchase price, and I hear no objection from

9      the committee, then I understand that.

10            MR. SAGE:  I just wanted to clarify, that wasn't --

11      it's not only actions against customers who are important or

12      parties who are important; it's also actions against parties

13      who the buyer would have an indemnification obligation with

14      respect to.  So that if the CEO -- or pick a person -- pick

15      anyone who there might be an indemnification obligation of the

16      buyer on a going-forward basis, the concept was, that was

17      another subset of people that would be -- of possible

18      defendants.

19            THE COURT:  Well, I'm not trying to micromanage the

20      situation now.  I don't know what indemnification obligations

21      the buyer would have with regard to somebody in management.

22      But that's perhaps for further negotiation.

23            MR. SAGE:  I just didn't want it to be unsaid.

24            THE COURT:  That's fine.  That's fine.  All right.

25            Please go ahead.

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 20 of 64

Page 20

1          MR. CALIFANO:  Okay, Your Honor.  The next change in

2     the APA that I wanted to bring Your Honor's attention to is on

3     page 12 of the black-line, 4.4(c) "Further Assurances".  This

4     is a provision to allow the debtors' professionals, post-

5     closing, to have access to books and records --

6          THE COURT:  Sure.

7          MR. CALIFANO:  -- that would be necessary to

8     administer the estate.

9          And the next one I'd like to bring Your Honor's

10    attention to is 4.7 on page 15.  And that is a provision that

11    allows the buyer, to the extent that they have not made a

12    determination to assume or reject a particular lease or

13    contract, to have a period of time prior to confirmation that

14    the buyer has agreed to pick up the administrative expenses

15    related both to the continuance of that contract and any cure

16    in terms of --

17         THE COURT:  That was the provision I was referring to

18    a few minutes ago.  I understand that provision, so long as

19    there's some outside date.

20         MR. CALIFANO:  Your Honor, those are the changes --

21         THE COURT:  Reasonable outside date.

22         MR. CALIFANO:  And since we anticipate confirming the

23    plan shortly before closing --

24         THE COURT:  All right.

25         MR. CALIFANO:  -- these contract parties will not be

1    hung up indefinitely.

2            THE COURT:  All right.

3            MR. CALIFANO:  All right.  So that would cover, Your

4    Honor, the bid procedures and the APA.

5            I guess, Your Honor, we could turn to the final DIP

6    order.

7            THE COURT:  Anything in the sale order?  Any -- I

8    don't think there were any changes --

9            MR. CALIFANO:  There weren't.

10            THE COURT:  -- to the sale order.

11            MR. CALIFANO:  And I assume the sale order will

12    probably change between now and the sale hearing.

13            THE COURT:  Well, no I don't mean the sale order.  I

14    mean the order approving the bidding procedures.

15            MR. CALIFANO:  No, there haven't been any changes.

16            THE COURT:  All right.  Let me look at that one.  One

17    second.

18            All right, with regard to that one, I think my only --

19    well, first, I think that the heading on page 1 is a little bit

20    misleading.  We're not authorizing and approving the sale;

21    we're just approving auction and bidding procedures.  So I

22    think we need to take out (I) in the heading on page 1, so it's

23    not misleading.

24            There's a finding:  "The debtors have demonstrated

25    compelling and sound business justification," and I assume

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 22

1     there'll be some testimony --

2          MR. CALIFANO:  Yes, Your Honor.

3          THE COURT:  -- on that?

4          The fees.  The committee has informed me that they're

5     not challenging the expense reimbursement or the breakup fee.

6     It is on the high side, but I have no objection.  And as I said

7     earlier in another case today, it's not my money.  And it

8     cert -- I don't believe it to be outside the scope of

9     reasonableness in similar cases.  This is a situation which is

10    unusual, in my experience, because the second lien lender is

11    paying the first lien lender a very large amount of cash and

12    also has apparently agreed to provisions that appear to cover

13    administrative expenses in the case.  Those are very important

14    concessions -- not concessions, but those are very important

15    elements of the transaction.

16         All right.  So I just have that change of form for the

17    order.

18         MS. HERSHCOPF:  Your Honor, I had just two more points

19    as we were going through the APA and the clarifications that

20    Mr. Sage made on the record.

21         With respect to the avoidance actions and preferences

22    that Your Honor pointed out to under the excluded assets,

23    that's supposed to be scheduled.  And there was no discussion

24    about when that schedule is going to be provided.  So I just

25    asked offline to Mr. Sage when we're going to see that

1    schedule.

2          Your Honor has been in another case with me where the

3    insider deals with management were disclosed, really fairly

4    late in the game.  And so we'd like to make sure that that does

5    not happen here.  Bayside is currently having discussions with

6    management.  And I think those were the things that Mr. Sage

7    was referring to on the record about indemnification.

8          They're represented separately by counsel.  I don't

9    see Mr. Gallo's counsel in the courtroom today.  So frankly, I

10   don't want to go too far into those conversations.  But we'd

11   like to know what and where, sooner than later.  We don't want

12   to show up to the auction without knowing what it is, a) that

13   Bayside has offered to management, so that we can know when

14   we're comparing the bids, what management is going to get out

15   of the Bayside bid.  And we'd like to know if there are

16   specific causes of action or releases that management is

17   getting as part of the Bayside deal.

18          I think that Mr. Sage said he thinks -- he obviously

19   had not spoken to his client about that, but that from a legal

20   perspective, is was something that he would recommend.  We

21   would recommend that we have five days prior to the auction to

22   be able to review that schedule at the very latest.

23          With respect to any deal that does include management,

24   the debtor and the committee had detailed conversations in

25   advance of today's hearing that management would not

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 24 of 64

Page 24

1    participate in evaluating the bids or any other third parties

2    that are a participant in a bid.  That will just wall those

3    people off.  The debtor has a very able CRO in this case, who

4    we've worked with before, Marc Pfefferle from Carl Marks.  The

5    bidders seem to have a great deal of confidence in them.  The

6    committee has a great deal of confidence in Carl Marks for

7    being able to a) get the information and evaluate the bids, and

8    help counsel and the investment banker to get there.

9          But we think that it's important, especially if

10   management is tied to a specific bidder, that they not be part

11   of those evaluations.

12          THE COURT:  I would second that.  I don't think

13   there's any question that any involvement of management is a

14   matter of great sensitivity and has to be handled with great

15   care.

16          MR. CALIFANO:  And we're aware of that, Your Honor.

17   And also, the committee has asked for a mirror sort of ethical

18   wall to the extent one or more committee members joins with the

19   bidder.  That may happen.

20          We're very aware of that issue, Your Honor.  It's an

21   important issue for us, and we agree with the committee that it

22   needs to be handled correctly.

23          THE COURT:  All right.

24          MR. CALIFANO:  Your Honor, if we could just turn to

25   the black-line of the final DIP order.  And I have two for Your

1    Honor.  One is against the interim.

2            THE COURT:  I think you have to repeat that for the

3    record.  One is against the interim and one is against the --

4            MR. CALIFANO:  One is against the interim and one is

5    against the one --

6            THE COURT:  That was filed --

7            MR. CALIFANO:  -- that was filed.

8            THE COURT:  -- previously.  And I think I may have

9    them both.  Let me see.

10           MR. CALIFANO:  I just wanted to make sure.

11           THE COURT:  Well, I had one other question regarding

12   the sale -- well have we been over the sale agreement?

13           MR. CALIFANO:  Yes, Your Honor.

14           THE COURT:  We have.  The sale agreement appears to

15   give the breakup fee a superpriority.  I can understand the

16   breakup fee getting an administrative priority, but I don't

17   understand the breakup fee, as opposed to the DIP fees and the

18   like, getting a superpriority.  What justification is there for

19   a superpriority to a breakup fee?

20           MR. CALIFANO:  Well, Your Honor, because it was

21   negotiated.

22           THE COURT:  I'm looking -- I understand certain things

23   can be negotiated, but I'm applying the Bankruptcy Code as it

24   was written by Congress.  And I don't see any leeway for any

25   superpriorities, simply because some party wants it.

1          MR. CALIFANO:  Well, Your Honor, you could look at it

2     as, you know, an additional extension of credit.

3          THE COURT:  It's not.  It's not.

4          MR. CALIFANO:  Yes, Your Honor.

5          THE COURT:  I don't see any basis for a superpriority

6     for a breakup fee.  I suppose that since the purchase -- any

7     alternative purchaser has to cover the breakup fee, that

8     perhaps you could give the initial bidder an interest in that

9     higher bid, set aside that portion of the higher bid.  Maybe

10    that would get you very close -- that would get you to the same

11    place really.  But I don't see the statutory basis for a

12    superpriority for the breakup fee.

13         MS. HERSHCOPF:  Your Honor --

14         THE COURT:  That's 7.3 of the sale agreement.

15         MS. HERSHCOPF:  -- Your Honor, it's interesting; the

16    whole concept of superpriority in this particular case is one

17    that's had a little academic interest among the parties.

18         Given this -- the job actually that the debtors did in

19    getting all the admins and priorities covered by the stalking-

20    horse bid itself, the committee has less concern than it would

21    otherwise about that language floating around.  We think it's

22    very -- it's unnecessary for the DIP lender here, because their

23    own stalking-horse bid, as you said, covers all those expenses

24    and gets all the admins paid.  So the reason why you would need

25    a superpriority claim is if you were concerned that admins

1    weren't going to be paid, right, and so you'd be in a worse

2    position.  You want to put yourself in a better position than

3    all the other administrative creditors.

4           But when you've put forward a stalking-horse bid that

5    covers all administrative expenses, and in fact, the class

6    behind administrative expenses, you -- I think, as the DIP

7    lender, maybe Wells wouldn't give it up, but as the DIP lender

8    you should be less concerned and --

9           THE COURT:  All right.

10          MS. HERSHCOPF:  -- we would -- so we're less concerned

11   about the --

12          THE COURT:  I'm only thinking about the situation

13   where the best laid plans get sent off track without any --

14          MS. HERSHCOPF:  And that we have --

15          THE COURT:  -- without anybody's fault.

16          MS. HERSHCOPF:  --- and that we haven't estimated the

17   administrative claims correctly.  You know, we could all be

18   sitting here and try to be estimating the administrative

19   claims, and we could be wrong.  I think it is a place where the

20   DIP lender, as you said, could have some real comfort in us

21   putting aside proceeds for them.

22          THE COURT:  All right.

23          All right, Mr. Califano.  Now, you've given me --

24   proceeding to the DIP order.

25          MR. CALIFANO:  Yes, Your Honor.

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GORDON HOLDINGS, LLC, ET AL.
Pg 28 of 64

Page 28

1           THE COURT:  You've given me one version that I had and

2     a second version -- you gave me two -- oh, I see.  You gave me

3     two.  One's black-lined and one isn't.  Okay.

4           MR. CALIFANO:  Well, one is -- you should have gotten

5     one black-lined against the one that's filed and one black-

6     lined against the interim order.

7           THE COURT:  I don't think I do.  But I have one that's

8     black-lined against the interim.  And that's 46837098.1.

9           MR. CALIFANO:  Well, let me just hand it up to you.

10          THE COURT:  Do you have an extra one?  All right.

11    This is against the interim; 46918802.1.

12          MR. CALIFANO:  Yes, Your Honor.

13          THE COURT:  That's the other -- I have that one.

14          MR. CALIFANO:  Oh, okay.

15          THE COURT:  Oh, I beg your pardon.  No, it's a

16    different one, but it's black-lined against the -- all right.

17    Well, let's -- shall we go through that one first?  How do you

18    want to proceed?

19          MR. CALIFANO:  I think it's probably easiest to go

20    against the one that shows the changes from the interim order.

21          THE COURT:  All right, let's.

22          MR. CALIFANO:  The first one, two, three pages --

23    fourth page just shows the changes from interim to final and

24    the fact that that the hearings are being held today.

25          THE COURT:  Right.

1              MR. CALIFANO:  And on page 5, we recite the

2       appointment of the committee and its members.

3              THE COURT:  Yep.

4              MR. CALIFANO:  Then on page 11, 6(a) we recite that

5       the DIP agreement has been revised as following the motion, and

6       that a black-line was filed prior to this hearing.  We also

7       changed the amount of -- the line from three and a half million

8       to twenty million.

9              THE COURT:  Right.

10             MR. CALIFANO:  This is in the final order.  Then we've

11      added, at the request of the committee, on page 12, the court's

12      jurisdiction to determine any dispute concerning the secured

13      DIP lender's fees.  And that's also put in (f) on page 14.

14             THE COURT:  I see that, yes.

15             MR. CALIFANO:  Okay.  Then on page 16, you'll see the

16      lender's superpriority claim applies to the avoidance actions,

17      yet collateral is not included in the avoidance actions.  So

18      they would have a superpriority claim to the avoidance actions,

19      yet not a security interest in the avoidance actions.

20             THE COURT:  Yes, I see that.

21             MR. CALIFANO:  Okay.  And then page 17, the committee

22      was added to the fee provision.  Reasonableness was added to

23      the fee provision.  And then reasonable expenses incurred by

24      members of the committee in furtherance of their committee

25      duties was also added.

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 30 of 64

Page 30

1            As the U.S. Trustee stated, the Chapter 7 trustee

2    carve-out was increased from 25- to 50,000.  Okay.  Then in

3    paragraph 19 -- I'm sorry, on page 19, paragraph 10, there

4    was -- at the committee's request, they are granted standing to

5    object to -- actually to raise any objection or complaint on

6    behalf of the debtors' estate, without having to seek authority

7    to do so.

8            THE COURT:  Okay.  No, I think my version had most of

9    this already.

10           MR. CALIFANO:  Okay.

11           THE COURT:  Or all of it.  Okay.

12           MR. CALIFANO:  Then on page 20, Your Honor, the

13   defaults and the exercise of remedies that were referenced

14   previously -- referenced in Article 7 of the DIP agreement --

15   they're put in here and in the order.

16           THE COURT:  Right.  We need to go over these, but we

17   could do that in the next version, perhaps, since a couple of

18   changes were made.  Or we can -- the changes in the next

19   version, I guess, are fairly immaterial.  Well, it depends

20   which version we're using.

21           But it seems to me that we cannot prejudice the sale

22   or tilt the playing field by provisions in this order.

23           MR. CALIFANO:  That's correct.

24           THE COURT:  And I think everybody would agree to that

25   in principle.

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 31

1        Having in terrorem dates in the DIP order that can't

2   be varied by a single day, seems to me, prejudicial.  I can't

3   require a DIP lender to lend for any length of time beyond

4   which they have agreed to lend.  But it seems to me that we

5   need to extend the DIP to a reasonable period after the

6   proposed sale hearing so as not to prejudice any other party in

7   getting its money on the table and taking out the DIP loan,

8   which I gather is one of the requirements of any alternative

9   bid.

10        MR. CALIFANO:  Yes, Your Honor.

11        THE COURT:  So these in terrorem dates which provide,

12   for example, that if I take off the afternoon and don't enter

13   the orders today, everything collapses, I think, not only are

14   inappropriate, but provide the wrong message in terms of what

15   the parties are trying to do in this case.

16        As I said, I can't tell the DIP lender to lend, but I

17   can tell the DIP lender that if they want to have a sale in

18   November, there has to be some reasonable leeway beyond the

19   date of the auction or beyond the date of the sale hearing.

20        Further, the provisions that we have in here that

21   appear to tie the debtors' hands are entirely inappropriate.

22   I'm not just talking about a fiduciary out; we're talking about

23   the fact that the language I see in this paragraph 11 would

24   appear to prevent the debtor from cooperating with any

25   alternative bidder, from providing information, from doing

1    exactly what you tell me you're doing:  opening a room with

2    documents; giving information to other parties; having a fair

3    and reasonable auction.

4            So this language has got to be changed or simply taken

5    out.  If the debtors can be told that they can't bring in any

6    other financing, they can't do any of the typical things; but

7    there's language in here that goes beyond that.  For example --

8    and maybe I'm in the wrong version, but I'm looking at -- maybe

9    I'm looking at a prior version.  Let's see what -- here it is.

10           Page 22, subsection (iii):  "The debtors shall take

11   any action directly or indirectly for the purpose of, that

12   results in delaying, preventing, frustrating, or approval of

13   the Bayside sale."  That's absolutely inappropriate.

14           MR. CALIFANO:  Well, Your Honor --

15           THE COURT:  Mr. Sage wants to be heard.  But the

16   debtors have an absolute right to bring in alternative buyers

17   and to cooperate in providing information to alternative

18   buyers.

19           MR. SAGE:  Your Honor, agree a hundred percent.

20           THE COURT:  All right.  Well --

21           MR. SAGE:  But the reason why I think this still

22   works, respectfully, is at the last few words of (iii), is the

23   reference to inconsistency with the bid process is meant -- and

24   maybe we can fix those words, but the intention --

25           THE COURT:  I think you can fix -- you can't -- and I

Page 33

1    know that we're dealing with sophisticated lawyers who know how

2    to draft.

3            MR. SAGE:  Right.

4            THE COURT:  But we're also dealing with people who may

5    read this and misunderstand the import of the --

6            MR. SAGE:  We can clarify to make the reference --

7            THE COURT:  I think --

8            MR. SAGE:  -- at the end --

9            THE COURT:  -- no, I think you need --

10           MR. SAGE:  -- apply to the whole thing and make it

11   clear --

12           THE COURT:  -- we need to --

13           MR. SAGE:  -- that it does.

14           THE COURT:  -- we need to put an exception in up front

15   and express language that this shall not prevent the debtors

16   from holding a fair and open auction.  And I think that --

17           MR. SAGE:  That was the parties' intention --

18           THE COURT:  -- there's no doubt that you can find

19   language --

20           MR. SAGE:  Yep.

21           THE COURT:  -- that is not in terrorem and

22   prejudicial, but that still protects your client.  Because you

23   have -- the stalking horse deal is on the table.

24           MR. SAGE:  Right.

25           THE COURT:  But I think tying them together is

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 34 of 64

Page 34

1    inappropriate.

2          MR. SAGE:  Your Honor, I mean, a) I understand and

3    agree, and we will fix the language.

4          THE COURT:  And I think b) -- I think little (iv),

5    (v), (vi) and (vii) shouldn't be in here.  There can be an

6    outside date.  You can certainly have a date in which the

7    financing terminates.  But I realize that there are cases in

8    which these sale dates appear in the financing, but there has

9    to be some leeway.

10          MR. SAGE:  Your Honor, one, the in terrorem dates or

11    the interim dates are actually critical and part and parcel of

12    the deal that was struck between Bayside and the debtors and

13    Bayside and the committee, frankly, when we agreed to put off

14    the hearing with the committee -- with the court's offices.  I

15    hear what the Court is saying.

16          So from my perspective, having the interim dates is

17    critical and part of our deal, and I have no authority to now

18    agree to that.  I have a client I can call.  But I think what

19    I'm hearing the Court to say is your concern is not so much the

20    interim dates but rather if we miss a date by a day or the

21    Court is unavailable, because the Court has hearings that day,

22    those kind of things.

23          THE COURT:  Well, I'm certainly not available on

24    November 10th or November 9th.  But I am available in November,

25    and I'm not talking about material differences.  But I do -- I

Page 35

1    think there has to be some leeway, and there has to be some

2    appearance that modifies the tie-in between these two orders.

3    Because we're going to maintain an even playing field.

4         I'm looking at (xi), the last paragraph:  "Debtors

5    shall otherwise seek approval of any sale other than the

6    Bayside sale."  That language doesn't -- it's inconsistent with

7    everything we're doing in the sale order.

8         MR. SAGE:  We will, again, mod -- we'll cross-

9    reference and modify and fix that.

10         THE COURT:  All right.

11         MR. SAGE:  I understand your point.

12         THE COURT:  All right.  Why don't we put the date

13    issue aside for the moment and then we'll fix a date.  We'll

14    see what date works for the parties, what date I can be

15    available --

16         MR. SAGE:  Yes.

17         THE COURT:  -- and see if that date works.  And then

18    we can give a leeway of a few days one way or another --

19         MR. SAGE:  Fine.

20         THE COURT:  -- see if your client -- I hear you.  You

21    want a sale by -- in November -- middle of November, by the

22    middle of November.  And I hear the committee that in this

23    case, under all of the circumstances, that's reasonable.  And

24    I'll hear some testimony on that point.

25         MR. SAGE:  Thank you, Your Honor.

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 36

1           THE COURT:  Thank you.  All right.

2           MR. CALIFANO:  Okay, Your Honor.  There were some

3    minor changes to the DIP agreement --

4           MR. SAGE:  Actually, Mr. Califano, before you get

5    there, I just want to clarify one thing on the record for the

6    Court's benefit.  There's a typographical error, probably my

7    error, on page 4.  The date will change from the 27th to

8    today's date, October 5th, the final hearing.  I just wanted to

9    say that before we left the order.

10           THE COURT:  All right.

11           MR. SAGE:  Minor point.

12           THE COURT:  All right.

13           MR. CALIFANO:  There were some very minor changes,

14    Your Honor, to the DIP agreement.

15           MR. COHEN:  Actually, Your Honor, if we can just make

16    a brief statement before we switch from the order to the

17    agreement.  Jeffrey Cohen from Cooley, on behalf of the

18    committee.

19           I just wanted to echo Ms. Hershcopf's statement from

20    earlier that some of the provisions that appear in the order

21    are necessarily acceptable to the committee solely because of

22    the circumstances of this case.  For one example, Your Honor,

23    the superpriority claim including the proceeds in any avoidance

24    actions is not something the committee or Cooley as counsel

25    ordinarily consents to.  But given the nature of the stalking-

```
 1    horse bid and that it covers the first lien DIP and second

 2    lien, we think it's relatively moot in this circumstance.

 3            And then there's one change that we agreed to last

 4    evening that I don't know if it made any of the final red-

 5    lines.  And it's paragraph 21, the "Notice of Professional

 6    Fees".  The paragraph requires us to provide an estimate of our

 7    fees from the prior month by no later than the 5th day of the

 8    following month, despite the interim compensation order, et

 9    cetera.  We just agreed to change that to the 10th day of the

10    month.  And it's a nonbinding estimate.

11            Thank you, Your Honor.

12            THE COURT:  All right.  On the superpriority, and I

13    only say this because I've said it in open court before, I

14    realize that superpriority gets a DIP lender very close to the

15    same place that the DIP lender would be with a lien on the

16    avoidance actions.  But the statute provides for a

17    superpriority claim for a DIP lender.  And it doesn't except

18    out proceeds of avoidance actions or other recoveries.

19            So there is a very strong statutory basis.  Certainly

20    a DIP loan is more attractive to a debtor and would trump

21    another loan, if there were a contest, if the lender agreed

22    that its superpriority claim wouldn't extend to avoidance

23    action proceeds.  And many lenders have agreed to that.

24            But I go back to the statute -- in my thinking, I go

25    back to the statute.  It provides for a superpriority claim to
```

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 38 of 64

Page 38

1    someone who's provided a legitimate and needed DIP loan.  But

2    that's -- we'll -- there'll be another phase, perhaps, in which

3    the issue will be more pressing.

4            All right, Mr. Califano.

5            MR. CALIFANO:  Yes, Your Honor.  The changes to the

6    DIP agreement -- I don't know if Your Honor would like to go

7    through them or just take a moment to look at them.

8            THE COURT:  If there are any that are material, you

9    might state them for the record and --

10           MR. CALIFANO:  There are none, that are material.

11           THE COURT:  --- very well.

12           MR. CALIFANO:  There's a change in recording periods

13   and the like.

14           THE COURT:  I would assume that any dates that we deal

15   with today in the order, if we do -- if we do -- would be dealt

16   with in the agreement as well.

17           MR. CALIFANO:  Yes, Your Honor.

18           MR. SAGE:  And in the APA as well.

19           THE COURT:  Yes.

20           MR. SAGE:  It will roll through that too.

21           MR. CALIFANO:  Yes.  Your Honor, those are the changes

22   on the documents.  And what I would suggest is we take a very

23   brief five-minute break --

24           THE COURT:  That's fine.

25           MR. CALIFANO:  -- and I could have Mr. Kaufman and Mr.

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 39

```
1    Pfefferle testify very briefly.

2              THE COURT:  That's fine.  Anything else from any party

3    before we take a brief recess?

4              All right.  Thank you.

5              MR. CALIFANO:  Thank you, Your Honor.

6         (Recess from 11:37 a.m. until 12:06 p.m.)

7              THE CLERK:  All rise.

8              THE COURT:  Please be seated.  We're back on the

9    record in Alexander Gallo.  Mr. Califano?

10             MR. CALIFANO:  Thank you, Your Honor.  Your Honor, we

11   would like to call Peter Kaufman from the Gordian Group to the

12   stand to briefly describe the marketing process and the

13   components of the stalking-horse agreement.

14             THE COURT:  Very good.

15             Please state your name for the record.

16             THE WITNESS:  Peter S. Kaufman.

17        (Witness sworn)

18             THE COURT:  Please be seated.

19   DIRECT EXAMINATION

20   BY MR. CALIFANO:

21   Q.   Mr. Kaufman, can you tell us how you are employed?

22   A.   I'm the president of Gordian Group.  It's an investment

23   bank.

24   Q.   And what is Gordian Group's relationship to the debtors in

25   these cases?
```

1    A.    We're the debtors' investment banker.

2    Q.    Okay.  And when was Gordian Group retained?

3    A.    I think May of this year.

4    Q.    And post-petition, what is Gordian Group's role in these

5    Chapter 11 cases, as investment banker?

6    A.    Well, a significant component of the role is to run a

7    market test to see if there's a higher or better bid compared

8    to the stalking horse.

9    Q.    And what is Gordian Group doing to run that market test?

10   A.    Well, pre-petition we had been out to about thirty-seven

11   or thirty-eight parties, all of whom were financial in nature.

12   Post-petition, we've added to that.  So we resolicited those

13   thirty-seven.  We added a significant amount of strategics and

14   quasi-strategics.  So I think we've been out, post-petition, to

15   a total of seventy-two entities.

16        We've prepared a confidential information memorandum, an

17   NDA, and we have, I think, had six or seven additional NDAs

18   signed post-petition.  And those groups are in the data room

19   that we prepared together with the company and Carl Marks.  And

20   we've had, to date, two significant management presentations

21   with Gordian and Carl Marks and management -- with interested

22   bidders.

23   Q.    And that's in addition to the due diligence materials that

24   are in the data room, management's met with two parties.  Is

25   that correct?

1    A.    Yes.  Management, Carl Marks and Gordian have had one- to

2    two-day meetings with, to date, two interested -- potentially

3    interested bidders.

4    Q.    Okay.  Now, together with Carl Marks Advisory Group, did

5    Gordian prepare summaries of the purchase price of the

6    stalking-horse bid?

7    A.    Yes.

8    Q.    Mr. Kaufman --

9            THE COURT:  Shall we mark this Exhibit 1 for

10   identification?

11           MR. CALIFANO:  Yes, Your Honor.  Thank you.

12   (Summary of stalking-horse bid was hereby marked for

13   identification as Debtors' Exhibit 1, as of this date.)

14   Q.    Mr. Kaufman, can you identify the document that's been

15   marked as Exhibit 1?

16   A.    Yes.  This looks like the most recent iteration of the

17   understanding of the stalking horse bid and its component

18   parts.

19   Q.    Was this prepared by employees of Gordian Group under your

20   direction?

21   A.    Yes, in conjunction with Carl Marks.

22   Q.    Could you walk us through the components of the stalking-

23   horse bid as set forth in this schedule?

24   A.    Sure.  The largest component is repayment of the first

25   lien debt of about forty-eight million dollars; repayment of

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 42

1    the second lien notes without the bridge of fifteen million;

2    repayment of the second lien notes with the bridge amount

3    funded, which is another five; repayment of second lien notes

4    with the bridge closing fee of two million; second lien accrued

5    interest of 1.2; total DIP funding, which is of course an

6    estimated number of 7.6 million; payment of accrued

7    professional fees, about three and a half million; payment of

8    cure costs, about four million; payment of a DIP exit fee of

9    500,000; a million dollar expense reimbursement pool for the

10   stalking horse.  Then a noncash number, which is assumed

11   liabilities of about eleven million dollars --

12   Q.   And just that -- those assumed liabilities, those are the

13   ordinary course liabilities --

14   A.   Correct.

15   Q.   -- estimated as of a November 25th closing?

16   A.   Correct.

17   Q.   Thank you.

18   A.   And then priority claims, which has, I think, just been

19   increased to about 1.4 million; funding of other admin and

20   wind-down expenses, again, an estimated number of about 1.2

21   million.  And that comprises how we're looking at the stalking-

22   horse bid of a little over 100 million dollars.

23        Then you've got the breakup fee of 3.3 million; and as has

24   been discussed, the incremental overbid -- initial overbid of

25   1.25 million for a total initial overbid of about 106 million

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 43

1   dollars.

2   Q.   Okay.  Approximately ninety-five million of that would be

3   cash?

4   A.   Approximately.

5           MR. CALIFANO:  Your Honor, we'd ask that Exhibit 1 be

6   moved in to admission.

7           THE COURT:  Any objections?

8           All right, it's received.

9   (Summary of stalking-horse bid was hereby received into

10  evidence as Debtors' Exhibit 1, as of this date.)

11          MR. CALIFANO:  Your Honor, I have no further questions

12  of Mr. Kaufman.  I don't know if the Court has any questions.

13          THE COURT:  Does anyone else wish to examine?

14          MR. COHEN: Yes, Your Honor, briefly.

15          THE COURT:  All right.

16  CROSS-EXAMINATION

17  BY MR. COHEN:

18  Q.   Good day, Mr. Kaufman.  Mr. Kaufman, are you familiar with

19  the terms of the bidding procedures that have been presented to

20  this Court?

21  A.   Generally, yes.

22  Q.   Okay.  Are you familiar with the latest revisions that

23  were summarized for the Court and gone over with the Court in

24  red-line this morning?

25  A.   Generally, yes.

1    Q.    Are you familiar with the recent addition that in order to

2    be a qualified bid, the bidder must disclose any agreement that

3    exists or as proposed between the qualified bidder and any

4    member of debtors' management or any other party-in-interest?

5    Are you familiar with that provision?

6    A.    I am.

7    Q.    And are you familiar with the sale motion -- bid

8    procedures motion, I'm sorry, that was filed with this Court?

9    A.    Yes.

10   Q.    In the bid procedures motion, in paragraph 22, the debtor

11   states that "Upon information and belief, the debtors'

12   management are negotiating with the stalking-horse purchaser,

13   regarding the terms of potential employment agreements,

14   including potential equity incentive and equity participation

15   options, following the sale of the acquired assets."  Are you

16   familiar with that statement?

17   A.    I am.

18   Q.    Are you aware of any --

19         MR. COHEN:  I'm sorry.  Withdrawn.

20   Q.    Are you aware of the status of the negotiations between

21   the stalking-horse purchaser with management regarding the

22   terms of potential agreements?

23   A.    I am not.

24   Q.    Are you aware of any prior agreements reached between the

25   stalking-horse purchaser and management?

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 45

1    A.    Yes.  Pre-petition when there -- the original plan for

2    Bayside had been for them to try and promulgate a transaction

3    through a plan of reorganization, and there was a term sheet

4    that the debtor had and that included terms of compensation, of

5    equity upside for management.  And so yes I -- so I am

6    familiar -- I was familiar with that.  And then when Bayside

7    shifted to a 363 sale and said that's what they wanted to do

8    and the debtor ended up going down that path, Bayside told us

9    that all deals are off the table and that deal was no longer

10   necessarily operative.

11        We have periodically inquired as to whether management and

12   Bayside have reached a same or different accord, and we've been

13   told that they've not, and in fact, have been told that there

14   are no current discussions about that.  And that's the best

15   that I know.

16   Q.    The statement in the sale motion, just for clarification,

17   that statement was made subsequent to the switch from the plan

18   process to the sale process, correct?

19   A.    Yes.

20   Q.    Were you or your team at your instruction involved in the

21   negotiation of the plan structure, pre-petition?

22   A.    Yes, we were involved with the plan structure.

23   Q.    And are you familiar with the terms of the arrangement you

24   just alluded to, that were encompassed in the plan term sheet?

25   A.    I was very familiar.  But I can't give you chapter and

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 46

1    verse right now.

2    Q.   Is there --

3    A.   I'd be glad to look at it again.

4    Q.   -- is there a document that would refresh your

5    recollection?

6    A.   Yeah, there was a term sheet between Bayside and the

7    company.

8            MR. COHEN:  Your Honor, if I might approach and just

9    present the witness with a document to refresh his

10   recollection?

11           MR. CALIFANO:  Your Honor, just because -- this is

12   outside the scope of the direct.  And I don't know where

13   they're going, and we disclosed it.  It's -- I don't know why

14   we're doing this now.  This would be something that's part of

15   the sale hearing.  But it is outside the scope of our direct

16   testimony.  I'm not sure why we're doing this at this point.

17           MR. COHEN:  Your Honor, we're approving today, the

18   stalking horse purchaser.  And in the bid procedures, it

19   approves them as a qualified bidder.  In order to be a

20   qualified bidder, it is required to disclose any agreement that

21   exists with management.  And it's just relevant, so the Court

22   is aware, as is the committee, what, if any, of the details are

23   relative to a prior deal, and whether that deal may be yet

24   again, an element of an undisclosed portion of the stalking-

25   horse offer.

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 47 of 64

Page 47

1          THE COURT:  So do I understand that any prior offer in

2     connection with pre-petition negotiations has been taken off

3     the table?  Is that the witness' understanding?

4          THE WITNESS:  I'm kind of the wrong one to ask because

5     I'm not in -- you know, involved with those discussions.  But,

6     yes, Your Honor, that is my understanding.  That is what I

7     was -- been told.

8          THE COURT:  Mr. Sage.  Can you clarify?

9          MR. SAGE:  Your Honor, a couple things.  One, the bid

10     protect -- the bid protections that have been negotiated and

11     approved or will be approved, I guess, include -- you know,

12     include this provision that says, "and disclose any agreements

13     that exist or as proposed between the qualified bidder and any

14     member of the debtors' management".

15          So that's -- it's going to be disclosed.  It has to be

16     disclosed as part of this -- these bid protections.

17          THE COURT:  And it has to be disclosed by Bayside, as

18     well as other potential --

19          MR. SAGE:  Correct.

20          THE COURT:  -- buyers.

21          MR. SAGE:  Correct.  So that's A.  And B, as the

22     witness has testified and I can agree with the witness, there

23     is no agreement right now.  And so there was a term sheet that

24     dealt with a plan, pre-petition.  We're not there.  And there

25     is no agreement right now.  The parties will talk and have

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 48

1    agreed to talk; but there's no agreement today.  So, you know,

2    we don't need to belabor that point.  There is no agreement.

3            THE COURT:  All right.  I'm not sure if we need it for

4    the record today, Mr. Cohen, but I'll hear from you.

5            MR. COHEN:  No, Your Honor.  I think confirmation from

6    Mr. Kaufman as supplemented by Mr. Sage is precisely what we

7    wanted to cover today.

8            THE COURT:  All right.

9            MR. COHEN:  Thank you.

10           THE COURT:  All right, Mr. Kaufman -- anybody else

11   wish to question?

12           Mr. Kaufman, do you understand what your client's

13   thinking was in shifting from a 363 sale -- to a 363 sale from

14   a plan proposal?

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  What is that?

17           THE WITNESS:  That we needed money; we needed to get

18   into Chapter 11; and the stalking horse changed its mind and

19   decided that it wanted to switch from a plan to a 363.

20           THE COURT:  Did they tell you what their thinking was,

21   as to their change of mind?

22           THE WITNESS:  They did.  The debtor was standing firm

23   on the ability to do a market test, even in conjunction with a

24   plan of reorganization.  And we were told by the stalking horse

25   that given that, they would just as soon do a 363 instead of a

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 49 of 64

Page 49

1    plan with us trying to stand firm on a market test.

2        THE COURT:  Do you believe the debtor did stand firm

3    on subjecting the possible sale to a market test that included

4    both strategic and financial purchasers?

5        THE WITNESS:  Very firm.

6        THE COURT:  Do you believe that the -- do you

7    understand that the current timetable is that an auction will

8    take place on November 7th, 2011?  Do you believe that will

9    give prospective purchasers enough time to do their diligence

10   and make a competing offer if they're so advised?

11       THE WITNESS:  I do.

12       THE COURT:  All right.

13       Any other question from any party who wishes to

14   examine the witness?

15       All right.  Thank you very much, Mr. Kaufman.  You may

16   step down.

17       MR. CALIFANO:  Thank you, Your Honor.  We'd like to

18   call Marc Pfefferle from Carl Marks Advisory Group.

19       THE COURT:  Please state your name for the record.

20       MR. PFEFFERLE:  Marc Pfefferle.

21       THE COURT:  And spell your last name.

22       MR. PFEFFERLE:  P as in Peter, F as in Frank, E as in

23   Edward, F-F as in Frank Frank, E-R-L-E.

24   (Witness sworn)

25       THE COURT:  You may be seated.

1    DIRECT EXAMINATION

2    BY MR. CALIFANO:

3    Q.    Thank you, Mr. Pfefferle.  Can you tell us how you're

4    employed?

5    A.    Yes.  I'm a partner at Carl Marks Advisory Group.

6    Q.    Okay.  And what is Carl Marks Advisory Group's

7    relationship to this debtor?

8    A.    We're employed as the chief restructuring officer and

9    financial advisor.

10   Q.    Okay.  And as chief restructuring officer and financial

11   advisor, what have been your duties and responsibilities since

12   the filing of this Chapter 11 case?

13   A.    Number one, overall responsibility for coordinating the

14   overall restructuring efforts; assistance in all post-petition

15   bankruptcy administration; other activities;, whether it be

16   motions or administrative SOFAs and schedules and the like;

17   preparation, modification, reporting against all cash flow DIP

18   requirements; assistance with the ongoing 363 sale process;

19   importing -- helping to coordinate due diligence activities and

20   cooperation with interested parties; and other related

21   activities.

22   Q.    Okay.  Thank you.

23         And in your role as CRO, have you been in contact with the

24   debtors' customers and vendors and court reporters?

25   A.    Yes, directly and through the management team and

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 51 of 64

Page 51

1    directing the management team.

2    Q.    And how long have you been at Carl Marks Advisory Group?

3    A.    I've been at Carl Marks since 1992.

4    Q.    Okay.  And during that period of time, from 1992 until

5    now, have you previously served in the role of CRO?

6    A.    Yes.  I've served twelve times in related roles; either

7    CEO, CRO, federal receiver -- equivalent-type roles.

8    Q.    Okay.  Now, based on your experience as a CRO and based on

9    your knowledge of the debtors' operations and your

10    communications with management, do you be it's appropriate for

11    this debtor to engage in an expedited sale process?

12    A.    Yes, I do.

13    Q.    Okay.  And why do you say that?

14    A.    We -- several reasons.  The first and foremost being that

15    the debtor has -- is a service of -- service business.  And

16    when we presented our restructuring plans to our customers and

17    our employees, things were -- you know, things were pretty dire

18    at the outset.  And the expedited process allowed us to give

19    customers and employees and court runn -- reporters confidence

20    that the restructuring would be successful, that we could

21    return to a normal-course situation in a very prompt time

22    frame, that we had the necessary funds to go through this

23    process and -- so, at this point, that did allow us to

24    stabilize the situation and operate in a normal-course basis.

25    Any change at this point would cause a significant disruption

1    in terms of having people's expectations set for a particular

2    outcome and creating uncertainty which would damage the

3    estates.

4    Q.    Okay.  And is there anything about the debtors' business

5    that makes it particularly vulnerable to an extended Chapter 11

6    process?

7    A.    Yes.  I mean, we are cut -- if you look at the nature of

8    our business and customer base, it -- the business requires

9    absolute delivery of work product that's delivered through both

10   employees and 1099 and affiliate reporters, that need to be

11   done on schedule, both the actual depositions and related work

12   and the delivery of the work product, in order to meet the

13   customers' needs.

14        In the case of corporate clients who we have relations on

15   a national basis to do their work, they need absolute certainty

16   that the work can be completed and delivered as they expect.

17   And any uncertainty in that process, as we noted in the first-

18   day hearings, we had lost one major corporate customer because

19   of just concerns.  Despite the DIP, despite the expedited

20   process, they still chose to instruct their attorneys they work

21   with not to use the -- not to use the debtor.

22        So it's a very sensitive business and it requires absolute

23   confidence of delivery.

24   Q.    And in your opinion, would the debtors' business be harmed

25   significantly and the value to parties-in-interest be harmed

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 53

1   significantly, were the sale not to go forward as scheduled?

2   A.   For the sale not to go forward as scheduled, what would

3   happen is we would be signaling and having to disclose that the

4   plans we laid out, communicated and made representations and

5   gave people confidence in, is no longer on the table; it would

6   introduce significant uncertainty that could be very damaging

7   to the estates.

8   Q.   Okay.  Switching to the st -- are you familiar with the

9   stalking-horse purchase agreement?

10  A.   Yes.

11  Q.   Okay.  Is it your understanding that the stalking-horse

12  bidder has agreed to pay all priority, administrative and wind-

13  down costs as has been estimated by Carl Marks?

14  A.   As has been estimated, yes.  And Carl Marks and the debtor

15  have worked together with extreme diligence to try to estimate

16  those amounts with as much confidence as possible.  And the

17  agreement, as it stands in the schedules, give (sic) us

18  confidence that we can cover both priority pre-petition taxes

19  and 503(b)(9) claims as well as post-petition administrative

20  claims.

21  Q.   Okay.  Did Carl Marks Advisory Group and members of Carl

22  Marks Advisory Group, at your direction, prepare a schedule of

23  anticipated priority, administrative and wind-down claims?

24  A.   Yes.

25  Q.   Okay.

Page 54

1              MR. CALIFANO:  May I approach, Your Honor?

2              THE COURT:  Yes.  We'll mark this as Exhibit 2, for

3       ID.

4       (Schedule with priority, administrative and wind-down costs was

5       hereby marked for identification as Debtors' Exhibit 2, as of

6       this date.)

7       Q.   Can you identify the document that's been presented to

8       you?

9       A.   Yes.

10      Q.   Okay.  And what is that document?

11      A.   It represents priority, administrative and wind-down

12      costs.  There should be one addition to the schedule, which is

13      professional fees under Section 1.2 of the APA, which would be

14      estimated to be outstanding at the time of closing, which is

15      approximately 3.95 million dollars.  So the total should be

16      seventeen-950.

17      Q.   Okay.  And those professional fees, are they covered in

18      the asset purchase agreement?

19      A.   Yes.

20      Q.   Okay.  Now, can you walk us through the categories that

21      are on the schedule?

22      A.   Yes.  And I -- if I may, I want to group them a little bit

23      differently as well, because they're grouped in numerical

24      materiality sequence, smallest to highest and -- but it's

25      important to kind of articulate the components.

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 55 of 64

Page 55

1          Out of the 14.3 million, there's approximately 11.1

2     million which are classified in, I believe, Schedule

3     1.1(b)(ii) --

4     Q.   Of the asset purchase agreement?

5     A.   -- excuse me if I'm on off on that -- of the asset

6     purchase agreement which are assumed liabilities.  And an

7     additional 3.2 million dollars, which is either part of the DIP

8     or separately covered under Section 1.2 of the APA.

9          So, if I may, the components that are not in the assumed

10    liabilities -- and I bring that up because the assumed

11    liabilities are estimated, and the schedule says that, you

12    know, if there was some risk that the crude payables were

13    higher, those would be covered under the schedule.  So I have

14    confidence that the admi -- that those admin claims would be

15    taken care of.

16         The September rent, as is common in many cases, the stub

17    period -- that's the stub period since we filed during the

18    month.  Typically, the stub period rent is not paid at the

19    beginning of the case.  It's paid at the end of the case.  And

20    we wanted to make sure there was absolutely confidence that

21    that admin claim would be paid and it is in the DIP budget.

22         In addition, under Section 1.2, there's an amount for

23    wind-down costs, approximately 1.2 million, and that includes

24    400,000 of committee professional expenses that we discussed at

25    the last hearing, and so we're comfortable that that's covered.

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 56

1    And it covers a whole range of closure activities to take the

2    estate and close it down in an orderly, you know, manner in

3    addition to filing a plan and disclosure statement, so that

4    everything's tied up neatly.

5         Taxes and 503(b)(9)s,; the 503(b)(9)s, we performed a

6    detailed analysis by vendor of all receipts within twenty days

7    of the bankruptcy; what had been paid on a COD basis, so we're

8    very comfortable in that number, which is about 100,000 -- just

9    over 100,000 dollars.  The taxes themselves, it was a detailed

10   analysis of outstanding taxes.  There was and is ongoing,

11   communication with the actual states, in particular with 941

12   taxes, which is ongoing.  So they're -- you know, that's our

13   best estimate at this time.  But that 1.3 million, the

14   difference between the 1.4 and the 503(b)(9), includes 200,000

15   dollars of estimated additional taxes that we haven't found

16   yet.  It also includes some taxes that we believe will

17   ultimately be determined to be nonpriority taxes.

18        As an example, there's approximately 316,000 dollars of

19   941 tax claimed for an entity -- and for the periods in 2009

20   and 2010, some specific quarters where the employees for that

21   entity -- there were no employees for that entity after 2008.

22   So I believe it's a totally incorrect statement, although we do

23   have a statement of liens.  So, it is a claim.  I don't believe

24   it's a priority claim because there was no actual employees and

25   no obligation.

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 57 of 64

Page 57

1        So, we're trying to nail down exactly, but I have pretty

2    high confidence that our numbers will be well within the budget

3    and I understand also that while the APA states the 1.3 million

4    as part of the tax and 503(b)(9), while the schedule says 1.4,

5    I believe that the stalking horse had agreed to increase that

6    number to 1.4.  So there's really no significant risk in my

7    opinion that we'll go over that amount.  And -- but we continue

8    detailed analysis, and anything we find will be immediately

9    discussed.

10        The rest of the assumed liabilities -- so that takes care

11    of the other items.  The 3.95, there's a specific clause in

12    Section 1.2 that takes care of that.  So anything unpaid -- and

13    that does presume that the September and October fee apps are

14    paid, the actual budget is higher than 3.950, but that's the

15    estimate of what professional fees would be outstanding at

16    closing.

17    Q.    Okay.  Now, based on your analysis, are you confident that

18    even if the stock -- stalking-horse purchase price is not

19    topped at auction, the debtor will be able to pay its

20    administrative, wind-down and priority claims?

21    A.    I have reasonable confidence based on the work done.

22    Q.    Okay.  Now, who prepared this schedule?

23    A.    This was prepared by my team, Carl Marks team in Atlanta

24    with --

25    Q.    Prepared by employees under your direction?

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GALLO HOLDINGS, LLC, ET AL.
Pg 58 of 64

Page 58

1    A.   Yes, with the, again, input and assistance from company

2    management and employees.

3              MR. CALIFANO:  Your Honor, we would ask that this

4    chart be moved into admission.

5              THE COURT:  Any objection?

6              All right, it's received.

7    (Schedule with priority, administrative and wind-down costs was

8    hereby received into evidence as Debtors' Exhibit 2, as of this

9    date.)

10             MR. CALIFANO:  We have no further questions, Your

11   Honor.

12             THE COURT:  Anyone else?

13             All right.  Thank you, Mr. Pfefferle.  You may step

14   down.

15             Any further evidence, Mr. Califano?

16             MR. CALIFANO:  No, Your Honor.

17             THE COURT:  Anyone wish to supplement or put any

18   further evidence in the record?

19             All right.  Anything further with regard to either the

20   DIP or the approval of the bid procedures?

21             MR. CALIFANO:  No, the only one item we had open, Your

22   Honor, was the question of the dates.

23             THE COURT:  The dates.  All right.

24             Well, first, I need to find that I believe the debtors

25   have adequately justified the provision for an expedited sale.

1   It appears that the -- there is a good business justification

2   for the use of a sale under Section 363 of the Bankruptcy Code,

3   and that perhaps, even more important in this case, there are

4   provisions that protect the debtor against a quick sale and

5   administrative insolvency that would not be possible in a -- in

6   connection with a confirmed plan of reorganization.

7           The uncontradicted testimony is that the timing

8   permits a competing bid or bids and that the sale procedures

9   appear fair and the playing field appears to be untilted in

10  favor of the stalking horse.  I think we need to be certain

11  that the DIP order excludes all in terrorem procedures and

12  language tying the DIP to the auction procedures and to the

13  debtors' cooperation, but I am assured that those changes will

14  be made.

15          Now, perhaps it's time to turn to a date.  You want

16  November 7th for the auction which I gather, would take place,

17  presumably, at your offices?

18          MR. CALIFANO:  That is correct, Your Honor.

19          THE COURT:  And you'll have a reporter and if

20  necessary, to -- to just -- to transcribe the proceedings?

21          All right, that week I will be out from Wednesday to

22  Friday.  Friday is a holiday for the court.  I'll be out

23  Wednesday and Thursday.  So, frankly, I question whether it

24  makes sense to put the sale hearing on the 8th.  But no one has

25  indicated to me in testimony or otherwise that having it on the

11-14220-alg   Doc 216   Filed 10/24/11   Entered 10/24/11 16:09:43   Main Document
ALEXANDER GARCIA HOLDINGS, LLC, ET AL.
Pg 60 of 64

Page 60

 1    8th or having it a week or ten days later would make any

 2    difference in terms of the ability of competing bids to come

 3    in.  I will state for the record, without inviting it, that if

 4    anybody comes in and asks for more time and gives a very good

 5    reason for it, that I'll hear them.  I'm not saying anything

 6    more than that.  I recognize that the DIP isn't open forever,

 7    but I would hope that it could stay open at least for a

 8    reasonable period of time after the auction so that it appears

 9    that the playing field is not being tilted and that in fact the

10    playing field is not being tilted under the circumstances.

11            But if you want the sale hearing on November the 8th,

12    I'll set it for November the 8th.  That -- that's fast.  It can

13    be adjourned.  If you want to talk about it, that's also fine.

14            MR. CALIFANO:  Yes, I mean -- can we do late afternoon

15    on the 15th?  I'm sorry; on the --

16            THE COURT:  8th?

17            MR. CALIFANO:  -- 8th.

18            THE COURT:  On the 8th.  Well, you may not want it too

19    late in the afternoon if you want to -- well, we can always

20    order -- enter the order the next day.  Yes, we can have it at

21    2:30.

22            MR. CALIFANO:  Sure.  2:30 on the 8th.

23            THE COURT:  On the 8th?

24            MR. CALIFANO:  Yes.

25            THE COURT:  Subject -- but these are -- these dates

11-14220-alg    Doc 216    Filed 10/24/11    Entered 10/24/11 16:09:43    Main Document
Pg 61 of 64
ALEXANDER GORDON HOLDINGS, LLC, ET AL.

Page 61

1    are subject to adjournment --

2              MR. CALIFANO:  Yes, Your Honor.

3              MS. HERSHCOPF:  Your Honor, if you could just tell us

4    on your calendar if we didn't do the 8th, what would be the

5    next calendar date that would be possible --

6              THE COURT:  Next calendar date --

7              MS. HERSHCOPF:  -- for Your Honor?

8              THE COURT:  -- I would think would be Tuesday, the --

9    conceivably on Monday, but I have a Monday commitment.  I have

10   one commitment to the AIRA in the afternoon and I have a --

11   well, possibly Monday morning, but that might be truncated.

12   Tuesday -- do you want --

13             MS. HERSHCOPF:  Your Honor, so I agree with Bayside

14   that we should aim for the 8th and to the extent -- and we're

15   all going to know if we can't make that date and rather than

16   abuse the Court's time on the 8th, if we can't make it, then

17   we'll know that we can roll over to the next Tuesday.

18             THE COURT:  So we go over to the 15th, then?

19             MR. CALIFANO:  Well, why don't we stay with the 8th --

20             MS. HERSHCOPF:  Stay with the 8th.

21             MR. CALIFANO:  -- and if we do have an overnight, you

22   know, long twenty-seven hour auction, then we can just come

23   back and move things out to the 16th.

24             THE COURT:  15th.

25             MR. CALIFANO:  15th.  Yes, Your Honor.

ALEXANDER GALLO HOLDINGS, LLC, ET AL.

Page 62

1            THE COURT:  If you want the 16th --

2            MR. CALIFANO:  No, we'll take --

3            THE COURT:  -- I think I can arrange --

4            MR. CALIFANO:  -- 8th now at 2:30.

5            THE COURT:  The alternative should be, I think, the

6    15th in the morning.

7            MR. SAGE:  They -- we'll not put that in the order.

8    We'll just know that among the parties.

9            THE COURT:  Anything else today?

10           MR. CALIFANO:  No, Your Honor.

11           THE COURT:  All right.

12           MR. CALIFANO:  So --

13           THE COURT:  Thank you.

14           MR. CALIFANO:  -- we'll resubmit the DIP order --

15           THE COURT:  Thank you very much.

16           MR. CALIFANO:  -- with the change.  Thank you, Your

17    Honor.

18           MR. SAGE:  Thank you, Your Honor.

19        (Whereupon these proceedings were concluded at 12:41 PM)

20

21

22

23

24

25

1

2                           I N D E X

3

4    WITNESS               EXAMINATION BY      PAGE

5    Mr. Kaufman           Mr. Califano        39

6    Mr. Kaufman           Mr. Cohen           43

7    Mr. Pfefferle         Mr. Califano        50

8

9                        E X H I B I T S

10   DEBTORS'              DESCRIPTION        I.D.      Evid.

11   1                     Summary of         41        43

12                         stalking-horse bid

13   2                     Schedule with      54        58

14                         priority,

15                         administrative and

16                         wind-down costs

17

18                           RULINGS

19                                             Page      Line

20   Debtor adequately justified provision for    59        6

21   expedited sale; there is good business

22   justification for a 363 sale;

23   bidding proceedings motion granted

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    Penina              Digitally signed by Penina
     Wolicki             Wolicki
                         DN: cn=Penina Wolicki, c=US
8                        Date: 2011.10.24 11:53:33 -04'00'
     _____

9    PENINA WOLICKI

10   AAERT Certified Electronic Transcriber CET**D-569

11   Also transcribed by:     Sara Davis (CET**D-567)

12

13

14   Veritext

15   200 Old Country Road

16   Suite 580

17   Mineola, NY 11501

18

19   Date:  October 23, 2011

20

21

22

23

24

25