UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
In re:                                       :    Chapter 11
                                             :
ALEXANDER GALLO HOLDINGS,  LLC, et           :    Case No. 11-14220 (ALG)
al.,¹                                        :    (Jointly Administered)
                                             :
                    Debtors.                 :
                                             :
------------------------------------------------------------ X
```

### ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 (I) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[2] dated September 14, 2011, of the above-

captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of orders

under Bankruptcy Code sections 105, 363, 365, 503 and 507 and Bankruptcy Rules 2002, 6004,

6006 and 9006 and Local Rules 6004-1 and 6006-1 (I) (A) approving the Bidding Procedures for

the sale of all of the Acquired Assets, (B) authorizing the Debtors to enter into the Stalking Horse

Agreement, (C) approving the Stalking Horse Protections in connection therewith, (D) approving

the form and manner of the Sale Notice, and (E) scheduling the Auction and Sale Hearing dates;

(II) approving the sale of the Acquired Assets free and clear of all liens and interests; (III)

approving certain procedures related to the assumption and assignment of executory contracts

---

[1]      The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Alexander Gallo Holdings, LLC (4040); Set Depo, LLC (4236); AG/Sanction LLC (2187); Unlimited Languages, Inc. (7755); The Hobart West Group, Inc. (9849); Deponet, LLC (0336); Esquire Deposition Services, LLC (9684); Esquire Litigation Solutions, LLC (0947); Esquire Solutions, LLC (9382); Hobart West Solutions, LLC (6005); and D-M Information Systems, Inc. (3504).

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or, if not defined in the Sale Motion, as defined in the Asset Purchase Agreement by and among Bayside Gallo Acquisition, LLC and the Sellers named therein, dated October 6, 2011 (the "APA").

and unexpired leases, and (IV) granting related relief, authorizing, among other things, the

Debtors to (i) sell the Acquired Assets to the Buyer free and clear of all liens, claims, and

encumbrances, other than the Assumed Liabilities (the "Sale"), (ii) enter into the APA, a copy of

which is annexed hereto as Exhibit A, and (iii) assume and assign to the Buyer certain executory

contracts and unexpired leases in connection with such Sale; and the Court having (x) entered an

order on October 6, 2011 [Docket No. 144] (the "**Bid Procedures Order**") approving, among

other things, the proposed Bidding Procedures, the Assignment and Assumption Procedures, the

Break-Up Fee and Expense Reimbursement, subject to the Bidding Procedures and approval of

the Sale at the Sale Hearing, the Debtors' entry into the APA, and the Sale Notice; (y) reviewed

and considered the Sale Motion and all relief requested therein, the objections thereto and

statements of counsel and the evidence presented in support of the relief requested by the

Debtors in the Sale Motion at a hearing before the Court on November 8, 2011 (the "**Sale**

**Hearing**"); (z) found that, after an extensive marketing process by the Debtors, the Buyer

submitted the highest and best bid for the Acquired Assets; and, subject to the below with respect

to the assumption and assignment of certain executory contracts and unexpired leases, adequate

and sufficient notice of the Bidding Procedures, the APA, and all transactions contemplated

thereunder and in this Order were given in the manner directed by the Court in the Bid

Procedures Order; and all interested parties having been afforded an opportunity to be heard with

respect to the Sale Motion and all relief related thereto; and it appearing that the Court has

jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in

the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and

after due deliberation thereon; and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT**:[3]

## Jurisdiction, Final Order and Statutory Predicates

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

B.    The statutory predicates for the relief requested in the Sale Motion are Bankruptcy Code sections 105(a), 107, 363 and 365, Bankruptcy Rules 2002, 6004, 6006 and 9006, and Local Rules 6004-1 and 6006-1.

C.    This Order is intended as a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of this Order as set forth herein.

## Notice of the Sale and Auction

D.    The actual written Sale Notice was provided to the following parties (the "**Notice Parties**"): (i) the U.S. Trustee; (ii) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (the "**Committee**"); (iii) counsel to the Buyer; (iv) all known creditors of the Debtors; (v) all entities reasonably known to have expressed an interest in a transaction with respect to the Acquired Assets during the past nine (9) months, (vi) any entity known or reasonably believed to have asserted a security interest in or lien against any of the Acquired Assets, (vii) the attorneys general for all states in which Acquired Assets are

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

located and all taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service, and (viii) all parties entitled to notice pursuant to Bankruptcy Rule 2002 [Docket Nos. 150, 215].

E.      The Debtors published notice of the Sale Motion, the time and place of the proposed Auction, the time and place of the Sale Hearing (as scheduled in the Bid Procedures Order), and the time for filing objections to the Sale Motion in *The Wall Street Journal (National Edition)* on October 11, 2011 [Docket No. 186].

F.      The Sale Notice was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and the Sale Hearing.

G.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale Hearing, the Sale and the transactions contemplated thereby has been provided in accordance with the Bid Procedures Order, Bankruptcy Code sections 105(a) and 363, and Bankruptcy Rules 2002, 6004, 6006 and 9006.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, the Sale is or shall be required.

H.      The disclosures made by the Debtors concerning the Sale Motion, the APA, the Sale and the Sale Hearing were good, complete, and adequate.

I.      A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein, has been afforded to all interested persons and entities, including the Notice Parties.

**<u>Good Faith of Buyer</u>**

J.      The APA was negotiated, proposed and entered into by the Sellers and the Buyer without collusion, in good faith and from arms' length bargaining positions.

K.     Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the APA to be avoided under Bankruptcy Code section 363(n).  Specifically, the Buyer has not acted in a collusive manner with any person.

L.     The Buyer is purchasing the Acquired Assets, in accordance with the APA in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by such provision, and otherwise has proceeded in good faith in all respects.

**Highest and Best Offer**

M.     The APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.  Approval of the Sale Motion and the APA and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**No Fraudulent Transfer**

N.     The consideration provided by the Buyer pursuant to the APA (a) is fair and reasonable, (b) is the highest or best offer for the Acquired Assets and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the laws of the United States.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.  Approval of the Sale Motion and the APA and the consummation of the

transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

O.      The Buyer is not a mere continuation of the Debtors or their estates and there is no continuity of enterprise between the Buyer and the Debtors.  The Buyer is not holding itself out to the public as a continuation of the Debtors.  The Buyer is not a successor to the Debtors or their estates and the Sale does not amount to a consolidation, merger, or de facto merger of Buyer and the Debtors.

## **Validity of Transfer**

P.      Each Debtor (a) has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, (b) has all corporate authority necessary to consummate the transactions contemplated by the APA, and (c) has taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate the Sale and the APA and the transactions contemplated thereby.

Q.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors.  None of the Debtors nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

R.      The Debtors are the sole and lawful owners of the Acquired Assets. Subject to Bankruptcy Code sections 363(f) and 365(a), the transfer of each of the Acquired Assets to the Buyer, in accordance with the APA will be, as of the Closing Date, a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Buyer with all

right, title, and interest of the Debtors to the Acquired Assets free and clear of (a) all liens and

encumbrances relating to, accruing or arising any time prior to the Closing Date (collectively,

"**Liens**") and (b) all debts arising under, relating to, or in connection with any act of the Debtors

or claims (as that term is defined in Bankruptcy Code section 101(5)), liabilities, obligations,

demands, guaranties, interests and matters of any kind and nature, whether arising prior to or

subsequent to the commencement of these cases, and whether imposed by agreement,

understanding, law, equity or otherwise (including, without limitation, rights with respect to

Claims (as defined below) and Liens (i) that purport to give to any party a right of setoff or

recoupment against, or a right or option to effect any forfeiture, modification, profit sharing

interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the

Debtors' or the Buyer's interests in the Acquired Assets, or any similar rights, or (ii) in respect of

taxes (collectively, as defined in this clause (b), "**Claims**"), relating to, accruing or arising any

time prior to the Closing Date, with the exception of the Assumed Liabilities.

## Section 363(f) is Satisfied

S.      The conditions of Bankruptcy Code section 363(f) have been satisfied in

full; therefore, the Debtors may sell the Acquired Assets free and clear of any interest in the

property.

T.      The Buyer would not have entered into the APA and would not

consummate the transactions contemplated thereby if the Sale to the Buyer and the assumption of

any Assumed Liabilities by the Buyer were not free and clear of all Liens and Claims, other than

the Assumed Liabilities.  Unless otherwise expressly included in the definitions of "Assumed

Liabilities" in the APA, the Buyer shall not be responsible for any Liens or Claims, including in

respect of the following:  (a) any labor or employment agreements; (b) any mortgages, deeds of

trust and security interests; (c) intercompany loans and receivables between the Debtors; (d) any

pension, welfare, compensation or other employee benefit plans, agreements, practices and

programs, including, without limitation, any pension plan of any Debtor; (e) any other employee,

worker's compensation, occupational disease or unemployment or temporary disability related

claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the

Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards

Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973,

(v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988,

(vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment

Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated

Omnibus Budget Reconciliation Act of 1985, (x) state discrimination laws, (xi) state

unemployment compensation laws or any other similar state laws, or (xii) any other state or

federal benefits or claims relating to any employment with any of the Debtors or any of their

respective predecessors; (f) any bulk sales or similar law; (g) any tax statutes or ordinances,

including, without limitation, the Internal Revenue Code of 1986, as amended; and (h) any

theories of successor liability.

U.      The Debtors may sell the Acquired Assets in accordance with the APA

free and clear of all Liens and Claims against the Debtors, their estates or any of the Acquired

Assets (except the Assumed Liabilities) because, in each case, one or more of the standards set

forth in Bankruptcy Code section 363(f)(l)-(5) has been satisfied.  Those holders of Liens or

Claims against the Debtors, their estates or any of the Acquired Assets who did not object, or

who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to

the Sale pursuant to Bankruptcy Code section 363(f)(2).

**Cure/Adequate Protection**

V.      Pursuant to the terms of the APA and the Bid Procedures Order, on

November 2, 2011 [Docket Nos. 227-233], the Debtors filed that certain "*Notice of (I) Entry Into*

*Stalking Horse Agreement and (II) Potential Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases in Connection with the Sale of Substantially All of the Debtors'*

*Assets*" (the "Cure Notice") which, with respect to certain unexpired leases and executory

contracts,  provided notice of: (i) the title of the Contract or Lease to be assumed, (ii) the name of

the counterparty to such Contract or Lease, (iii) the amount, if any, determined by the Debtors to

be necessary to be paid to cure any existing default under such Contract or Lease in accordance

with sections 365(b) and (f)(2) of the Bankruptcy Code (the "Cure Amount"), (iv) the proposed

effective date of the assignment, (v) the deadline by which any counterparty to such Contract or

Lease must object, and (vi) the proposed hearing date for any such objections (November 16,

2011 at 2:30 p.m. (the "Cure Objection Hearing")).

**Compelling Circumstances for an Immediate Sale**

W.      Good and sufficient reasons for approval of the APA and the Sale have

been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtors,

their estates, their creditors and other parties in interest.  The Debtors have demonstrated both

(a) good, sufficient and sound business purposes and justifications and (b) compelling

circumstances for the Sale other than in the ordinary course of business, pursuant to Bankruptcy

Code section 363(b) before, and outside of a plan of reorganization, in that, among other things,

the immediate consummation of the Sale is necessary and appropriate to maximize the value of

the Debtors' estates and the Sale will provide the means for the Debtors to maximize creditor

recoveries.

X.      To maximize the value of the Acquired Assets and preserve the viability of
the business to which the Acquired Assets relate, it is essential that the Sale occur within the time
constraints set forth in the APA.  Time is of the essence in consummating the Sale.

Y.      Given all of the circumstances of these chapter 11 cases and the adequacy
and fair value of the Purchase Price, the proposed Sale constitutes a reasonable and sound
exercise of the Debtors' business judgment and should be approved.

Z.      The consummation of the Sale is legal, valid and properly authorized
under all applicable provisions of the Bankruptcy Code, including, without limitation,
Bankruptcy Code sections 105(a), 363(b), 363(f), and 363(m) and all of the applicable
requirements of such sections have been complied with in respect of the transaction.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.      The relief requested in the Sale Motion is granted and approved, and the
Sale contemplated thereby is approved.

2.      All objections to the Sale Motion or the relief requested therein that have
not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing, by
stipulation filed with the Court, or by representation by the Debtors in a separate pleading, and
all reservations of rights included therein, other than with respect to the assumption and
assignment of Assumed Contracts, including with respect to proposed cure amounts in
connection therewith, are hereby denied and overruled with prejudice.

**Approval of the APA**

3.      The APA, the schedules attached thereto and made a part thereof, and all
other ancillary documents, and all of the terms and conditions thereof, are hereby approved and,
as contemplated in Section 1.1(a)(ix) of the APA, all avoidance and preference actions, if any,

with respect to the parties listed on Schedule 1.1(a)(ix) are hereby transferred to the Buyer and,

at the Buyer's option with respect to each such action, shall be extinguished, subject to the

furnishing of releases by such parties to the Debtors and the Buyer of any and all claims they

may have against the Debtors or their estates.  The Debtors and the Buyer may make

amendments to the APA, the schedules attached thereto and made a part thereof, and all other

ancillary documents, without further approval of this Court provided that all such amendments

shall be, prior to Closing, filed with this Court and served on the Committee and the U.S. Trustee

and, other than additions of parties to the Employees, 1099 Employees and Preferred Provider

Network sections of Schedule 1.1(a)(ix), no additional names will be added to Schedule

1.1(a)(ix) without the approval of the Committee, which such approval shall not be unreasonably

withheld, conditioned or delayed, or further order of the Court.  Notwithstanding the foregoing,

no potential claims of the Debtors or their estates against Alexander Gallo or Andrew Sims shall

be extinguished, released, transferred or otherwise disposed of without further order of this

Court.

            4.        Pursuant to Bankruptcy Code sections 363(b) and 363(f), the Debtors are

authorized and empowered to take any and all actions necessary or appropriate to

(a) consummate the Sale pursuant to and in accordance with the terms and conditions of the APA

(b) close the Sale as contemplated in the APA and this Order, and (c) execute and deliver,

perform under, consummate, implement, and close fully the transactions contemplated by the

APA, together with all additional instruments and documents that may be reasonably necessary

or desirable to implement the APA and the Sale.  The Buyer shall not be required to seek or

obtain relief from the automatic stay under Bankruptcy Code section 362 to enforce any of its

remedies under the APA or any other Sale related document.  The automatic stay imposed by

Bankruptcy Code section 362 is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

5.      This Order shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, any Debtor, any holders of Liens, Claims or other interests in, against or on all or any portion of the Acquired Assets (whether known or unknown), the Buyer and all successors and assigns of the Buyer, the Acquired Assets and any trustees, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' cases.  This Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and the respective successors and assigns of each of the foregoing.

**Transfer of the Acquired Assets**

6.      Pursuant to the terms of the APA and Bankruptcy Code sections 105(a), 363(b), and 363(f), the Debtors are authorized to transfer the Acquired Assets to the Buyer on the Closing Date,  and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest Buyer with title to the Acquired Assets and, other than the Assumed Liabilities, shall be free and clear of all Liens, Claims and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims in respect of the Excluded Liabilities, with all such Liens, Claims or other interests to attach to the net cash proceeds, if any, ultimately attributable to the property against or in which such Liens, Claims or interests are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such Liens, Claims or interests now have against the Acquired Assets, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.  Upon the Closing, the Buyer shall take

title to and possession of the Acquired Assets in accordance with the APA subject only to the

Assumed Liabilities.

7.        All persons and entities that are in possession of some or all of the

Acquired Assets on the Closing Date are directed to surrender possession of such Acquired

Assets to the Buyer in accordance with the APA at the Closing.  On the Closing Date, each of the

Debtors' creditors is authorized and directed to execute such documents and take all other

actions as may be reasonably necessary to release its Liens, Claims, or other interests in the

Acquired Assets, if any, as such Liens, Claims, or interests may have been recorded or may

otherwise exist.

8.        On the Closing Date, this Order shall be construed and shall constitute for

any and all purposes a full and complete general assignment, conveyance and transfer of the

Sellers' interests in the Acquired Assets.  Each and every federal, state, and local governmental

agency or department is hereby directed to accept any and all documents and instruments

necessary and appropriate to consummate the transactions contemplated by the APA.

9.        A certified copy of this Order may be filed with the appropriate clerk

and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record

except those assumed as Assumed Liabilities.

10.        If any person or entity which has filed statements or other documents or

agreements evidencing Liens on, Claims against, or interests in, all or any portion of the

Acquired Assets (other than statements or documents with respect to the Assumed Liabilities)

shall not have delivered to the Debtors prior to the Closing, after request therefor, in proper form

for filing and executed by the appropriate parties, termination statements, instruments of

satisfaction, releases of liens and easements, and any other documents necessary for the purpose

of documenting the release of all Liens, Claims, or other interests which the person or entity has

or may assert with respect to all or any portion of the Acquired Assets, the Debtors are hereby

authorized and directed, and the Buyer is hereby authorized, to execute and file such statements,

instruments, releases and other documents on behalf of such person or entity with respect to the

Acquired Assets.

11.     This Order is and shall be effective as a determination that, on the Closing

Date, all Liens, Claims or other interest of any kind or nature whatsoever existing as to the

Acquired Assets prior to the Closing Date, other than the Assumed Liabilities, shall have been

unconditionally released, discharged and terminated, and that the conveyances described herein

have been effected.  This Order is and shall be binding upon and govern the acts of all persons

and entities, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any lease; and each of

the foregoing persons and entities is hereby directed to accept for filing any and all of the

documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Agreement.

12.     The Debtors are not, and this Order shall not be construed to determine

otherwise, selling, assuming, assigning, or in any other way transferring to the Buyer any

intellectual property or assets of Miller Heiman, Inc. in the Debtors' possession, pursuant to the

contracts, agreements and licenses entered into by the Debtors and Miller Heiman, Inc., and that

any such rights, assets and/or intellectual property shall be Excluded Assets held by the Debtors and turned over to Miller Heiman, Inc.

## **Prohibition of Actions Against the Buyer**

13.    Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the APA, the Buyer shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the APA, the Buyer shall not be liable for any Claims against the Debtors or any of its predecessors or affiliates for actions taken or liabilities incurred prior to the Closing, and the Buyer shall not have successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties not assumed under the APA, intercompany loans and receivables between the Debtors, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing.

14.    Except with respect to the Assumed Liabilities, or as otherwise expressly provided for in this Order or the APA, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal

or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent,

liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or

in any way relating to the Debtors, the operation of the Debtors' business prior to the Closing

Date or the transfer of the Acquired Assets to the Buyer in accordance with the APA, hereby are

forever barred and estopped from asserting against the Buyer, its successors or assigns, their

property or the Acquired Assets, such persons' or entities' Liens or Claims against the Acquired

Assets, including, without limitation, the following actions:  (a) commencing or continuing in

any manner any action or other proceeding against the Buyer, its successors, assets or properties;

(b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or

order against the Buyer, its successors, or their assets or properties; (c) creating, perfecting, or

enforcing any Lien or other Claim against the Buyer, its successors, their assets, or their

properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any

obligation due the Buyer or its successors; (e) commencing or continuing any action, in any

manner or place, that does not comply or is inconsistent with the provisions of this Order or other

orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or

(f) revoking, terminating or failing or refusing to transfer or renew any license, permit or

authorization to operate any of the Acquired Assets or conduct any of the businesses operated

with the Acquired Assets.

       15.     All persons and entities are hereby forever prohibited and enjoined from

taking any action that would adversely affect or interfere with the ability of the Debtors to sell

and transfer the Acquired Assets to the Buyer in accordance with the terms of the APA and this

Order.

16.     The Buyer has given substantial consideration under the APA for the benefit of the Debtors, their estates and creditors.  The consideration given by the Buyer shall constitute valid and valuable consideration under the APA and the provisions thereof.  The consideration provided by the Buyer for the Acquired Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

### First Lien Secured Parties

17.     On the Closing Date, the Senior Indebtedness (as defined in the *Final Order Approving Stipulation for Use of Cash Collateral, Adequate Protection and Continuing Use of Purchase Cards on a Secured Basis* entered by this Court on September 27, 2011 [Docket No. 116]), which includes, without limitation, obligations with respect to letters of credit, purchasing cards, swaps and advisory and legal fees, shall be paid in full in cash by wire transfer to Wells Fargo Bank, National Association (**"Wells Fargo"**), in its capacity as administrative agent under the First Lien Credit Agreement (in such capacity, the **"Senior Administrative Agent"**), except as otherwise provided for in paragraphs 17, 18 and 19 of this Order.

18.     On the Closing Date, the Debtors shall deposit a portion of the Aggregate Purchase Price attributable to Section 1.2(a)(iii) of the APA with the Senior Administrative Agent in an amount equal to 110% of the potential exposure of the Existing First Lien Lenders on account of any undrawn letter of credit issued for the benefit of the Debtors under the First Lien Credit Agreement.  Such deposit shall be used to repay amounts that become due and owing to the Existing First Lien Lenders on account of any letter of credit issued for the benefit of the Debtors under the First Lien Credit Agreement. To the extent such amount on deposit exceeds the amount that may be owing on the date that is six weeks after the latest expiration date of any

such letters of credit, the Senior Administrative Agent shall promptly return such surplus to Buyer.

19.     On the Closing Date, the Debtors' ability to use certain commercial cards issued to Gallo Holdings and certain related parties under the WellsOne Commercial Card Agreement (the **"P-Card Agreement"**) dated as of February 2, 2007, shall terminate.  All obligations due and owing under the P-Card Agreement as of the Closing Date shall be paid in full in cash by wire transfer to Wells Fargo on the Closing Date.  In addition, the Buyer shall deposit with Wells Fargo on the Closing Date the amount of $30,000 as cash collateral for obligations under the P-Card Agreement that have not yet cleared but will become final after the Closing Date.  Such deposit shall be used to pay amounts that become final after the Closing Date.  To the extent such amount on deposit exceeds the amount that may be owing, Wells Fargo shall promptly return such surplus to Buyer.  If the deposit set forth above in this Paragraph 19 is insufficient to pay the amount that may be owing, following receipt by Buyer of a written request from Wells Fargo, the Buyer shall promptly pay to Wells Fargo the amount requested that is sufficient to pay for the remaining outstanding obligations under the P-Card Agreement.

20.     On the Closing Date, the Buyer shall deposit with the Senior Administrative Agent cash collateral in the amount of $10,000 as collateral for amounts that may become due and owing as Senior Indebtedness after the Closing Date, including, without limitation, for the payment of advisory and legal fees incurred by the First Lien Secured Parties in connection with these bankruptcy cases and after the Closing Date. To the extent such amount on deposit exceeds the amount that may be owing, the Senior Administrative Agent shall return such surplus to Buyer on or about January 31, 2012.

21.    All bank accounts and lockbox accounts of the Debtors maintained with Wells Fargo shall be transferred to the Buyer.  All agreements between the Debtors and Wells Fargo with respect to such bank accounts and lockbox accounts shall be assumed by the Buyer pursuant to written assumption agreements executed by Buyer and Wells Fargo.  Pursuant to such documentation, Wells Fargo will be authorized to close all such bank accounts and lockbox accounts on any date that is 120 days or more after the Closing Date.

### Hearing on Assumed Contracts

22.    A hearing to consider any objections to the assumption and assignment of any Assumed Contracts, including with respect to any proposed cure amounts in connection therewith, will be held before the Court on **November 16, 2011 at 2:30 p.m. (prevailing Eastern Time)** (the "Cure Hearing").  The Debtors will present to the Court for signature at the Cure Hearing a proposed order on the assumption and assignment of Assumed Contracts.

23.    Written objections to the proposed assumption and assignment of any of the Assumed Contracts must be filed with the Clerk of the Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, and served on the following parties **so as to be actually received no later than 12:00 p.m. (prevailing Eastern Time) on November 15, 2011** (the "Objection Deadline"): (i) DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 (Attn: Thomas R. Califano, Esq. and Jeremy R. Johnson, Esq.); (ii) the Office of the Unites States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Nazar Khodorovsky, Trial Attorney); (iii) Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036 (Attn: Michael J. Sage, Esq. and Michael H.M. Brown, Esq.); and (iv) Cooley LLP, The Grace Building, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. and Jeffrey L. Cohen, Esq.).

**Other Provisions**

24.    The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

25.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

26.    Pursuant to Bankruptcy Rules 7062, 9014, and 6004(h), this Order shall be effective immediately upon entry and the Debtors and Buyer are authorized to close the Sale immediately upon entry of this Order.

27.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

28.    The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent..

29.     The Court shall retain jurisdiction to, among other things, interpret,

implement, and enforce the terms and provisions of this Order and the APA, all amendments

thereto and any waivers and consents thereunder and each of the agreements executed in

connection therewith to which the Debtors are a party or which has been assigned by the Debtors

to the Buyer in accordance with the APA, and to adjudicate, if necessary, any and all disputes

concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction

to (a) compel delivery of the Acquired Assets to Buyer in accordance with the APA;

(b) interpret, implement and enforce the provisions of this Order; (c) protect Buyer against any

Liens or Claims against the Sellers or the Acquired Assets of any kind or nature whatsoever,

attaching to the proceeds of the Sale, and (d) enter any orders under section 363 and 365 of the

Bankruptcy Code with respect to the Assumed Contracts.

30.     Any amounts payable by the Debtors under the APA or any of the

documents delivered by the Debtors in connection with the APA (i) shall be paid in the manner

provided in the APA and the Bid Procedures Order, without further order of this Court, (ii) shall

be allowed administrative claims in an amount equal to such payments in accordance with

Bankruptcy Code sections 503(b) and 507(a)(2), (iii) shall have the other protections provided in

the Bid Procedures Order, and (iv) shall not be discharged, modified, or otherwise affected by

any reorganization plan for the Debtors, except by an express agreement with Buyer, its

successors, or assigns.

31.     All time periods set forth in this Order shall be calculated in accordance

with Bankruptcy Rule 9006(a).

32.     To the extent that this Order is inconsistent with any prior order or

pleading with respect to the Sale Motion in these chapter 11 cases, the terms of this Order shall

govern.

DATE: November 10, 2011
         New York, New York


         _/s/ Allan L. Gropper_____
         UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

Execution Version

FIRST AMENDMENT TO

ASSET PURCHASE AGREEMENT

by and among

BAYSIDE GALLO ACQUISITION, LLC

And

THE SELLERS NAMED HEREIN

DATED AS OF NOVEMBER 8, 2011

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (this "Amendment"), is entered into as of November 8, 2011, by and among Bayside Gallo Acquisition, LLC, a Delaware limited liability company ("Buyer"), Alexander Gallo Holdings, LLC, a Georgia corporation ("Gallo"), The Hobart West Group, Inc., a Delaware corporation ("Hobart"), Unlimited Languages, a Florida corporation("Unlimited Languages"), AG/Sanction LLC, a Delaware limited liability company ("AG/Sanction"), Set Depo, LLC, a Georgia limited liability company ("Set Depo"), Deponet, LLC, a Delaware limited liability company ("Deponet"), Esquire Deposition Services, LLC, a Delaware limited liability company ("EDS"), Esquire Litigation Solutions, LLC, a Delaware limited liability company ("ELS"), Esquire Solutions, LLC, a Delaware limited liability company ("ES"), Hobart West Solutions, LLC, a Delaware limited liability company ("HWS") and D-M Information Systems, Inc., a California corporation ("D-MIS," together with Gallo, Hobart, Unlimited Languages, AG/Sanction, Set Depo,  Deponent, EDS, ELS, ES, HWS, the "Sellers"), with reference to the following facts:

A.      Buyer and Sellers entered into that certain Asset Purchase Agreement dated as of October 6, 2011 (the "Purchase Agreement").

B.      The Parties desire to amend and restate certain provisions of the Purchase Agreement and to enter into certain other agreements, each as set forth below in this Amendment.

E.      Capitalized terms not otherwise defined herein have the meanings assigned to them in the Purchase Agreement.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the Parties hereto hereby agree as follows:

1.      Section 1.1 of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"Purchase and Sale of Acquired Assets; Assumed Liabilities.

(a)      Purchase and Sale of Acquired Assets.  Subject to the terms and conditions hereof, at the Closing, the Sellers shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase from the Sellers, all of each Seller's right, title and interest in and to all of such Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not any of such assets have any value for accounting purposes or are carried or reflected on or specifically referred to in either the Sellers' books of account or financial statements, excluding only the Excluded Assets (the foregoing collectively, the "Acquired Assets"), free and clear of any and all Encumbrances other than Permitted Encumbrances, including all of the following:

(i)      all cash and cash equivalents, security and like deposits, securities

instruments and other investments and all bank accounts;

(ii)    all trade and other notes and accounts receivable, advance payments, deposits (including deposits on inventory), prepaid items and expenses, deferred charges, rights of offset and credits and claims for refund;

(iii)    all inventory of raw materials, work in process, parts, subassemblies and finished goods, wherever located and whether or not obsolete or carried on the Sellers' books of account, in each case with any transferable warranty and service rights of the applicable Seller with respect to such Acquired Assets;

(iv)    all rights and interests in and to real property;

(v)    all fixed assets and other personal property and interests therein, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and software and related documentation (including any source code or systems documentation associated therewith), stored data, communication equipment, trade fixtures and leasehold improvements, in each case with any transferable warranty and service rights of the applicable Seller with respect to such Acquired Assets;

(vi)    all rights, remedies and benefits of Sellers arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including, without limitation, rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of the equipment or the inventory of Sellers (or components thereof), the other Acquired Assets or products purchased or ordered by Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

(vii)    subject to Section 4.7, all rights under Contracts, agreements and purchase and sale orders listed as being assumed by Sellers (A) by order of the Bankruptcy Court or (B) a confirmed reorganization plan of the Sellers, excluding Contracts, agreements and purchase and sale orders rejected by Sellers (Y) by order of the Bankruptcy Court or (Z) in connection with any confirmed reorganization plan of the Sellers ("Rejected Contracts"), including  all rights under any Lease for Real Property set forth on Schedule 1.1(a)(vii) ("Assumed Leases") (collectively with the Assumed Customer Contracts and the Assumed Employment Contracts, the "Assumed Contracts"), but excluding in any event all obligations under the DIP Financing Agreement and the Fundamental Documents (as defined therein), the First Lien Credit Agreement and the Loan Documents (as defined therein), the Second Lien Note Purchase Agreement and the Note Documents (as defined therein), the Winston Financing Agreement and the loan documents related thereto, the AKKR Financing Agreement and the loan documents and the Excluded Contracts;

(viii)    telephone and fax numbers;

(ix)     all goodwill, choses in action, causes of action, judgments, actions, claims and rights of any kind as against others (whether by contract or otherwise) relating to any of the Acquired Assets (including the Assigned Intellectual Property), the Assumed Liabilities or the Business, including any avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code with respect to each of the parties set forth on Schedule 1.1(a)(ix);

(x)     books, minute books, corporate records, books of account and records and originals of manuals, documents, correspondence, sales and credit reports, customer lists, literature, brochures, advertising or promotional material and the like;

(xi)     all office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind wherever located, including, without limitation, all property of any kind located in any building, office or other space leased, owned or occupied by Sellers or in any warehouse where any of Sellers' properties and assets may be situated;

(xii)     the right to receive and retain mail, accounts receivable payments and other communications;

(xiii)     all Tax Returns to the extent of, or to the extent maintained for, the Acquired Assets or the Business, but excluding any such items to the extent (i) they are solely included in, or solely related to, any Excluded Assets or Excluded Liabilities or (ii) any Law prohibits their transfer;

(xiv)     all indemnities;

(xv)     all Intellectual Property owned (in whole or part) by the Sellers, including without limitation (i) the trademarks and trade names "Alexander Gallo," "Unlimited Languages," "AG/Sanction," "Set Depo," "The Hobart West Group," "Deponet," "Esquire Deposition Services," "Esquire Litigation Services," "Esquire Solutions," "Hobart West Solutions," "D-M Information Services" and (ii) all Intellectual Property listed on Schedule 1.1(a)(x)(v); together with all registrations and applications for the foregoing, all common law rights in the foregoing, all rights of action arising from the foregoing, including without limitation all claims for damages by reason of infringement of the foregoing and all present, past and future rights to sue and collect damages or seek injunctive relief for any such infringement, and further including all income, royalties and any other payment now and hereafter due and/or payable to Buyer, in each case, to be held and enjoyed by Buyer for its own use and benefit and for its successors and assigns as the same would have been held by Sellers had this assignment not been made (collectively, the "Assigned Intellectual Property");

(xvi)     all indoor and outdoor signage, advertising, promotional materials, décor pieces, accents and artwork or decorations (including, in each case, all Intellectual Property rights and benefits relating to the foregoing);

(xvii)   any Permits to the extent their transfer is permitted by applicable Law;

(xviii)  all Tax assets, to the extent permitted to be transferred by applicable Law;

(xix)    all refunds of Taxes (or rights to refunds of Taxes, whether claimed or unclaimed) for all taxable periods (or portions thereof), whether ending on, prior to, or after the Closing Date;

(xx)     all of Sellers' rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect or any and all workers' compensation matters, claims, potential claims, purported claims and similar related items;

(xxi)    all insurance policies and benefits (including key man life insurance policies and benefits), including insurance rights and proceeds and including any accounts receivable credit insurance policy, rights and proceeds;

(xxii)   any proceeds pursuant to that certain Purchase and Sale Agreement (the "ELS Agreement") by and among DTI of California, LLC, a limited liability company organized under the laws of the State of Georgia, ELS, Gallo and the other parties thereo;

(xxiii)  the Benefit Plans set forth on Schedule 1.1(a)(xxiii) (such Benefit Plans, the "Assumed Benefit Plans"), including any trust or funding reserve or other assets, insurance policies and Contracts associated therewith; and

(xxiv)  all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of any of the Acquired Assets and all other tangible and intangible assets that are not expressly identified as Excluded Assets.

(xxv)   the employment Contracts set forth on Schedule 1.1(a)(xxv) (the "Scheduled Employment Contracts") and each other employment Contract to which any Seller is a party to the extent any such employment Contract is in substantially the same form as the Scheduled Employment Contracts and not listed on Schedule 1.1(b)(ii) as an Excluded Contract (collectively, the "Assumed Employment Contracts") (it being understood and agreed that to the extent it is determined that any Assumed Employment Contract is an executory contract within the meaning of Section 365 of the Bankruptcy Code, such Assumed Employment Contract shall be deemed to be a Designated Contract for purposes of this Agreement); and

(xxvi)  all customer Contracts to which any Seller is a party (the "Assumed Customer Contracts") (it being understood and agreed that to the extent it is determined that any Assumed Customer Contract is an executory contract within the meaning of Section 365 of the Bankruptcy Code, such Assumed Customer Contract shall be deemed to be a Designated Contract for purposes of this Agreement).

Without limiting the generality of the foregoing, the Acquired Assets shall include all of the assets of any of the Sellers on the Balance Sheet and all assets acquired by the Sellers since the Balance Sheet Date, except to the extent disposed of in the ordinary course of business since the Balance Sheet Date or except to the extent specifically identified herein as an Excluded Asset.

(b)    Excluded Assets.  Notwithstanding anything herein to the contrary, from and after the Closing, the Sellers shall retain all of their right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Acquired Assets shall not include, solely the following assets and properties (such retained assets and properties being the "Excluded Assets"):

(i)    subject to Section 4.7, all Leases for Real Property set forth on Schedule 1.1(b)(i) to the extent not assumed by Sellers by order of the Bankruptcy Court (the "Excluded Leases");

(ii)    subject to Section 4.7, all Rejected Contracts, including the Contracts  set forth on Schedule 1.1(b)(ii) to the extent not assumed by Sellers by order of the Bankruptcy Court (together with the Excluded Leases, the "Excluded Contracts");

(iii)    the DIP Financing Agreement and the Fundamental Documents (as defined therein), the First Lien Credit Agreement and the Loan Documents (as defined therein), the Second Lien Note Purchase Agreement and the Note Documents (as defined therein), the Winston Financing Agreement and the loan documents related thereto and the AKKR Financing Agreement and the loan documents;

(iv)    all rights under this Agreement and any Ancillary Agreement;

(v)    all of the equity interests in any Subsidiary of Gallo, including all of the equity interests in Hobart, Unlimited Languages, AG/Sanction, Set Depo, Deponet, EDS, ELS, ES, HWS and D-MIS;

(vi)    the avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code except for the avoidance or preference actions with respect to each of the parties set forth on Schedule 1.1(a)(ix);

(vii)    each Benefit Plan (other than the Assumed Benefit Plans), including all assets (whether in trust or otherwise), insurance policies and Contracts associated with any such Benefit Plan;

(viii)    the books and records pertaining to the organization and existence of each Seller; and

(ix)    all MHI Intellectual Property including without limitation the Miller Heiman Methodologies, the AC Modules, the Programs and materials associated therewith, any components thereof, and any Derivatives thereof, in each case, as

those terms are defined in the Miller Heiman Inc. Standard Terms and Conditions in effect as of December 8, 2010.

(c)    Assumed Liabilities.  Subject to the terms and conditions hereof, at the Closing, Buyer shall assume and agree to fully pay, discharge, satisfy and perform, the following liabilities and obligations of the Sellers, except in each case to the extent any such liabilities or obligations (a) that would have been performed, paid or otherwise discharged on or prior to the Closing Date, but for a breach or default by any Seller or (b) are Excluded Liabilities (the "Assumed Liabilities").

(i)    all of the liabilities and obligations of the Sellers arising under or relating to any Assumed Contract to the extent such liabilities and obligations relate to events or occurrences following the Closing Date;

(ii)    all current liabilities set forth on Schedule 1.1(c)(ii); and

(iii)    the obligations to provide benefits or payment under the Assumed Benefit Plans.

(d)    Excluded Liabilities.  Notwithstanding anything contained herein to the contrary, the Excluded Liabilities shall not be assumed by Buyer, but instead shall be retained, performed, paid or discharged by the Sellers.  The term "Excluded Liabilities" as used herein means any and all liabilities or obligations of any Seller or any of its affiliates of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, existing on the Closing Date, or arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date, excepting only the Assumed Liabilities; provided however that without limiting the foregoing, the Excluded Liabilities shall include the following:

(i)    any obligation or liability for Taxes incurred by any Seller, including the Transfer Taxes as set forth in Section 8.2, and any liability of any Seller for the Taxes of another person under a contractual indemnity or covenant, as a transferee or otherwise under applicable Tax Laws, regulations or administrative rules, and any other obligation or liability for Taxes related to the Acquired Assets or the Business arising in, or in connection with, a taxable period (or portion thereof) ending on or before the Closing Date;

(ii)    any claim, obligation or liability in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(iii)    any Debt, including the Existing First Lien Facilities, the Existing Second Lien Facilities, the Existing Winston Notes and the Existing AKKR Notes;

(iv)    any and all fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by any Seller or in connection

with the transactions contemplated by this Agreement or the Chapter 11 Cases, including all fees, costs and expenses incurred in connection with or by virtue of (a) the negotiation, preparation and review of this Agreement (including the exhibits and schedules hereto) and all Ancillary Agreements, (b) the preparation and submission of any filing or notice required to be made or given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any consent required to be obtained in connection with any of such transactions, (c) the negotiation, preparation and review of the DIP Financing, and (d) the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, including any retention bonuses, "success" fees, change of control payments and any other payment obligations payable as a result of the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements;

(v)     any obligation or liability of any Seller to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of any Seller pursuant to any Affiliate Agreement;

(vi)     any obligation or liability of any Seller arising out of this Agreement and any Ancillary Agreement;

(vii)     any obligation or liability arising out of or relating to any business or property formerly owned or operated by any Seller, any affiliate or predecessor thereof, but not presently owned and operated by the Sellers;

(viii)     all liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, any Seller, or any assets or properties of any Seller, whether commenced, filed, initiated, or threatened before or after the Closing and whether relating to facts, events, or circumstances arising or occurring before or after the Closing;

(ix)     all liabilities of the Sellers arising and to be performed prior to the Closing Date arising from or related to the Business, the Excluded Assets or the Acquired Assets, except to the extent of the specific liabilities set forth on Schedule 1.1(c)(ii);

(x)     all liabilities of the Sellers relating to actions, events, circumstances or conditions occurring or existing on or prior to the Closing Date;

(xi)     any obligation or liability of any Seller or their predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to Buyer as part of the Acquired Assets or, is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer;

(xii)     except as provided in Section 1.1(c)(ii), in Section 1.1(c)(iii) or in the last

sentence of Section 4.5(e), and except as provided in any employment Contracts that are not expressly included as an Excluded Asset, any obligation or liability with respect to compensation, severance or benefits of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual), whether or not employed by Buyer or any of its affiliates after the Closing, that (A) arises out of or relates to the employment, service provider or other relationship between any Seller or ERISA Affiliate and any such individual, including the termination of such relationship, (B) arises out of or relates to any Benefit Plan or (C) arises out of or relates to events or conditions occurring on or before the Closing Date;

(xiii)    any and all liabilities under the ELS Purchase Agreement; and

(xiv)    any Environmental Liability."

2.    Section 4.5(d) of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"Seller shall provide to Buyer as soon as administratively feasible on or prior to the Closing Date, a schedule setting forth the names of the individuals who participate in the flexible spending account sponsored by Sellers (such individuals, the "FSA Participants," and such flexible spending accounts, the "Seller FSA") and the amount each FSA Participant has contributed to the Seller FSA for the current calendar year and the amount reimbursed by the Seller FSA to the FSA Participant (or eligible dependant) for the current calendar year (the aggregate difference between the amounts so contributed and the amounts so reimbursed, the "FSA Balance").  Buyer and Sellers agree to take such steps as may be reasonably necessary to allow Buyer to assume the Seller FSA as of the Closing."

3.    Section 4.5(e) of the Purchase Agreement is hereby amended and restated in its entirety to read as follows:

"Except as otherwise specifically provided in Section 1.1(c)(ii), Section 1.1(c)(iii) or in the last sentence hereof, the Sellers shall be solely responsible for any liability, claim or expense with respect to employment, termination of employment, compensation or employee benefits of any nature (including, but not limited to the benefits to be provided under the Benefit Plans) owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or ERISA Affiliate thereof (or the beneficiary of any such individual) whether or not such individual becomes a Transferred Employee, that arises out of or relates to the provision of services to or on behalf of, or the employment relationship between, any Seller or ERISA Affiliate thereof and any such individual or the termination of such relationship or provision of services

on or before the Closing Date.  Without limiting the foregoing, the Sellers shall be responsible for the payment of any severance payment or benefits that become due to any current or former employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by any Seller or ERISA Affiliate thereof.  The Buyer or its affiliates shall be responsible for any severance benefits for any Transferred Employee who terminates employment with the Buyer or such affiliate after the Closing Date.  In addition, notwithstanding anything contained in this Agreement to the contrary and provided that Sellers have provided the applicable individuals with all required notice and other documents in a timely manner, Buyer shall cause its or one of its affiliates' health plans to provide all legally mandated health care continuation coverage for any employees (and their qualified beneficiaries) of Sellers who had a loss of coverage due to a "qualifying event" (within the meaning of Section 603 of ERISA) which occurred or occurs on or prior to the Closing Date."

4.    The Schedules to the Purchase Agreement are hereby amended and restated in their entirety to read as set forth on <u>Annex A</u> hereto.

5.    The Purchase Agreement is hereby amended to add a new Section 4.9, which shall read as follows:

"On or prior to November 9, 2011, the Sellers shall deliver to the Buyer a list (the "<u>Contract List</u>") setting forth (i) each current customer contract to which any Seller is a party or any other contract to which any Seller is a party pursuant to which any such Seller generates or reasonably expects to generate revenue and (ii) each written employment agreement pursuant to which any Seller is a party (each a "<u>Key Contract</u>").  The Contract List shall be certified to the Buyer as being true, complete and correct by an executive officer of Gallo as of the date of its delivery to the Buyer.  During the period commencing on November 9, 2011 and ending three days prior to the Closing, the Sellers shall provide prompt written notice to the Buyer of any changes to the Contract List, including, without limitation, any changes resulting from the entry into by any Seller of a new Key Contract, the amendment of any existing Key Contract, or any other modification or termination thereof.  Three (3) days prior to the Closing, the Sellers shall deliver to the Buyer an updated, cumulative list of each then-current Key Contract (the "<u>Final Contract List</u>").   The Final Contract List shall be certified to the Buyer as being true, complete and correct by an executive officer of Gallo as of the date of its delivery to the Buyer."

6.    <u>No Other Changes</u>.  This Amendment shall constitute an amendment to the Purchase Agreement.  Except for the agreements of the Parties as memorialized in this Amendment, the Parties do not intend any further amendment of the Purchase Agreement, but instead intend that the Purchase Agreement shall remain in full force and effect in accordance with its terms.  In the case of any conflict or inconsistency between the provisions of this Amendment and the Purchase Agreement with regard to the subject matter of this Amendment,

the terms and provisions of this Amendment shall prevail and govern.  In the case of any other conflict or inconsistency, the terms and provisions of the Purchase Agreement shall prevail and govern.

7.    <u>Miscellaneous</u>.  Article IX of the Purchase Agreement is hereby incorporated in this Amendment.

***Signature Pages Follow Immediately Hereafter***

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Amendment as of the date first above written.

**BUYER:**

BAYSIDE GALLO ACQUISITION, LLC


By:_____
Name:
Title:


**SELLERS:**

[_____]


By:_____
Name:
Title:

<u>Annex A</u>

[attached]

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

by and among

BAYSIDE GALLO ACQUISITION, LLC

and

THE SELLERS NAMED HEREIN

Dated October 6, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I.        THE TRANSACTION........................................................... 2

    1.1.    Purchase and Sale of Acquired Assets; Assumed Liabilities................................ 2

    1.2.    Purchase Price; Payment........................................................... 8

    1.3.    Bulk Sales Laws.................................................................. 8

ARTICLE II.        CLOSING ................................................................... 9

    2.1.    Closing Date..................................................................... 9

    2.2.    Closing Deliveries............................................................... 9

ARTICLE III.        REPRESENTATIONS AND WARRANTIES OF BUYER ......................... 10

    3.1.    Organization.................................................................... 10

    3.2.    Authority ...................................................................... 10

    3.3.    No Conflict..................................................................... 10

    3.4.    Consents....................................................................... 10

ARTICLE IV.        COVENANTS ................................................................ 10

    4.1.    Access ......................................................................... 10

    4.2.    Commercially Reasonable Efforts; HSR Act ..................................... 11

    4.3.    Name Change................................................................... 11

    4.4.    Further Assurances.............................................................. 12

    4.5.    Employee Matters .............................................................. 12

    4.6.    Bankruptcy Court Orders........................................................ 14

    4.7.    Assumption and Rejection of Contracts and Leases............................... 15

    4.8.    "G" Reorganization............................................................. 16

ARTICLE V.        CONDITIONS TO BUYER'S OBLIGATIONS.................................. 16

    5.1.    Covenants and Agreements Performed.............................................. 16

    5.2.    Expiration or Termination of HSR Periods ...................................... 16

    5.3.    No Prohibition or Proceedings................................................... 17

    5.4.    No Injunction or Statute........................................................ 17

    5.5.    Material Adverse Effect......................................................... 17

    5.6.    Bankruptcy Court............................................................... 17

EAST\46944016.1

16692423.17.BUSINESS

## TABLE OF CONTENTS
(continued)

Page

5.7.   DIP Financing Agreement ............................................................ 17

5.8.   Sufficiency of Assets .................................................................. 17

ARTICLE VI.   CONDITIONS TO THE SELLERS' OBLIGATIONS ................ 17

6.1.   Representations and Warranties True and Correct ............................ 17

6.2.   Covenants and Agreements Performed ......................................... 18

6.3.   Expiration or Termination of HSR Periods ................................... 18

6.4.   Bankruptcy Court ....................................................................... 18

ARTICLE VII.   TERMINATION PRIOR TO CLOSING ................................... 18

7.1.   Termination ............................................................................... 18

7.2.   Effect on Obligations ................................................................. 19

7.3.   Break-Up Fee; Expense Reimbursement ...................................... 19

ARTICLE VIII.   TAX MATTERS ............................................................... 20

8.1.   Allocation ................................................................................. 20

8.2.   Transfer Taxes .......................................................................... 20

8.3.   Wage Reporting ........................................................................ 20

8.4.   Cooperation on Tax Matters ....................................................... 20

8.5.   Tax Returns .............................................................................. 21

ARTICLE IX.   MISCELLANEOUS ............................................................. 21

9.1.   Interpretive Provisions ............................................................... 21

9.2.   Entire Agreement; Survival ........................................................ 21

9.3.   Successors and Assigns ............................................................. 22

9.4.   Headings .................................................................................. 22

9.5.   Modification and Waiver ............................................................ 22

9.6.   Expenses .................................................................................. 22

9.7.   Notices ..................................................................................... 22

9.8.   Governing Law; Consent to Jurisdiction ...................................... 24

9.9.   Public Announcements ............................................................... 24

9.10.   No Third Party Beneficiaries ..................................................... 25

9.11.   Counterparts ............................................................................ 25

ARTICLE X.   CERTAIN DEFINITIONS ...................................................... 25

EAST\46944016.1

## TABLE OF CONTENTS
(continued)

**Page**

EAST\46944016.1

## EXHIBITS

Exhibit A        Form of Assignment of Intellectual Property
Exhibit B        Bid Procedures

## SCHEDULES

Schedule 1.1(a)(vii)    Assumed Leases
Schedule 1.1(a)(ix)     Avoidance Actions
Schedule 1.1(a)(xv)     List of Intellectual Property
Schedule 1.1(b)(i)      Excluded Leases
Schedule 1.1(b)(ii)     Other Excluded Contracts
Schedule 1.1(c)(ii)     Current Liabilities
Schedule 1.2(a)(v)      Professional Fees
Schedule 1.2(a)(viii)   Other Liabilities
Schedule 4.5            Employees
Schedule 8.1            Allocation of Aggregate Purchase Price

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of October 6, 2011, by and among Bayside Gallo Acquisition, LLC, a Delaware limited liability company ("Buyer"), Alexander Gallo Holdings, LLC, a Georgia corporation ("Gallo"), The Hobart West Group, Inc., a Delaware corporation ("Hobart"), Unlimited Languages, a Florida corporation("Unlimited Languages"), AG/Sanction LLC, a Delaware limited liability company ("AG/Sanction"), Set Depo, LLC, a Georgia limited liability company ("Set Depo"), Deponet, LLC, a Delaware limited liability company ("Deponet"), Esquire Deposition Services, LLC, a Delaware limited liability company ("EDS"), Esquire Litigation Solutions, LLC, a Delaware limited liability company ("ELS"), Esquire Solutions, LLC, a Delaware limited liability company ("ES"), Hobart West Solutions, LLC, a Delaware limited liability company ("HWS") and D-M Information Systems, Inc., a California corporation ("D-MIS," together with Gallo, Hobart, Unlimited Languages, AG/Sanction, Set Depo, Deponent, EDS, ELS, ES, HWS, the "Sellers").

## RECITALS

A.     WHEREAS, the Sellers are engaged in the Business (as defined herein).

B.     WHEREAS, Hobart, Unlimited Languages, AG/Sanction and Set Depo are each direct subsidiaries of Gallo and Deponet, EDS, ELS, ES, HWS and D-MIS are each direct wholly-owned subsidiaries of Hobart.

C.     WHEREAS, the Sellers have filed voluntary petitions (the "Chapter 11 Cases") under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on September 7, 2011 (the "Petition Date").

D.     WHEREAS, prior to the Petition Date, (a) various financial institutions provided financings (the "Existing First Lien Facilities") to Gallo pursuant to that certain Credit Agreement, dated as of November 30, 2007, as amended, restated, supplemented or otherwise modified from time to time, among Gallo, the lenders party thereto (the "Existing First Lien Lenders") and Wells Fargo Bank, National Association, as administrative agent (the "First Lien Credit Agreement"), (b) various other financial institutions provided additional financings (the "Existing Second Lien Facilities") to Gallo pursuant to that certain Second Amended and Restated Note Purchase Agreement, dated as of November 30, 2007, as amended, supplemented, modified, restated or replaced from time to time, among Gallo, the guarantors identified therein and Grace Bay Holdings II, LLC (the "Second Lien Note Purchase Agreement"), (c) various other financial institutions provided additional financings (the "Existing Winston Notes") to Gallo pursuant to that certain Contribution and Subscription Agreement, dated as of September 22, 2008, as amended, restated, supplemented or otherwise modified form time to time, among Gallo, Winston Noteholders, LLC, Harvest Equity Partners, LLC and the other parties thereto from time to time (the "Winston Financing Agreement") and (d) various other financial institutions provided additional financings (the "Existing AKKR Notes") to Gallo pursuant to that certain Note Purchase Agreement, dated as of September 22, 2008, as amended, restated,

supplemented or otherwise modified from time to time, among Gallo, Gallo Holdings, LLC and Gallo Holdings II, LLC (the "AKKR Financing Agreement").

F.    WHEREAS, Bayside Gallo Recovery, LLC (in its capacity as a lender, the "DIP Lender"), has agreed to provided the Company with a $20,000,000 principal amount debtor in possession credit facility (the "DIP Financing") pursuant to that certain Debtor In Possession Credit, Security, Pledge and Guaranty Agreement, dated as of September 22, 2011, by and among Gallo and Hobart as Borrowers, the Guarantors party thereto, the Lenders party thereto and Bayside Gallo Recovery, LLC (in its capacity as administrative agent, the "Administrative Agent") (the "DIP Financing Agreement").

G.    WHEREAS, the Board of Directors (or similar governing body) of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation of and the ability to accept Alternative Transactions, a sale, assignment, and assumption of the Acquired Assets and Assumed Liabilities pursuant to this Agreement under Sections 363 and 365 of the Bankruptcy Code is in the best interests of such Seller.

H.    WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, the Sellers propose to sell and transfer, and Buyer proposes to buy and assume, substantially all of the assets and certain liabilities of the Sellers (the "Asset Acquisition").

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and upon the terms and subject to the conditions hereinafter set forth, the parties hereto, intending to be legally bound hereby, agree as follows:

ARTICLE I.
THE TRANSACTION

1.1.    Purchase and Sale of Acquired Assets; Assumed Liabilities.

(a)    Purchase and Sale of Acquired Assets.  Subject to the terms and conditions hereof, at the Closing, the Sellers shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase from the Sellers, all of each Seller's right, title and interest in and to all of such Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not any of such assets have any value for accounting purposes or are carried or reflected on or specifically referred to in either the Sellers' books of account or financial statements, excluding only the Excluded Assets (the foregoing collectively, the "Acquired Assets"), free and clear of any and all Encumbrances other than Permitted Encumbrances, including all of the following:

(i)    all cash and cash equivalents, security and like deposits, securities instruments and other investments and all bank accounts;

EAST\46944016.1

(ii)    all trade and other notes and accounts receivable, advance payments, deposits (including deposits on inventory), prepaid items and expenses, deferred charges, rights of offset and credits and claims for refund;

(iii)    all inventory of raw materials, work in process, parts, subassemblies and finished goods, wherever located and whether or not obsolete or carried on the Sellers' books of account, in each case with any transferable warranty and service rights of the applicable Seller with respect to such Acquired Assets;

(iv)    all rights and interests in and to real property;

(v)    all fixed assets and other personal property and interests therein, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and software and related documentation (including any source code or systems documentation associated therewith), stored data, communication equipment, trade fixtures and leasehold improvements, in each case with any transferable warranty and service rights of the applicable Seller with respect to such Acquired Assets;

(vi)    all rights, remedies and benefits of Sellers arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including, without limitation, rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of the equipment or the inventory of Sellers (or components thereof), the other Acquired Assets or products purchased or ordered by Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

(vii)    subject to Section 4.07, all rights under Contracts, agreements and purchase and sale orders not rejected by Sellers by order of the Bankruptcy Court or the subject of a rejection motion on the Closing Date ("Rejected Contracts"), including all rights under any Lease for Real Property set forth on Schedule 1.1(a)(vii) ("Assumed Leases") and any customer contracts and any contract renewal rights, but excluding obligations under the DIP Financing Agreement and the Fundamental Documents (as defined therein), the First Lien Credit Agreement and the Loan Documents (as defined therein), the Second Lien Note Purchase Agreement and the Note Documents (as defined therein), the Winston Financing Agreement and the loan documents related thereto, the AKKR Financing Agreement and the loan documents and the Excluded Contracts (the "Assumed Contracts");

(viii)    telephone and fax numbers;

(ix)    all goodwill, choses in action, causes of action, judgments, actions, claims and rights of any kind as against others (whether by contract or otherwise) relating to any of the Acquired Assets (including the Assigned Intellectual Property), the Assumed Liabilities or the Business, including any avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code set forth on Schedule 1.1(a)(ix);

(x)    books, minute books, corporate records, books of account and records and originals of manuals, documents, correspondence, sales and credit reports, customer lists, literature, brochures, advertising or promotional material and the like;

- 3 -

(xi)  all office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind wherever located, including, without limitation, all property of any kind located in any building, office or other space leased, owned or occupied by Sellers or in any warehouse where any of Sellers' properties and assets may be situated;

(xii)  the right to receive and retain mail, accounts receivable payments and other communications;

(xiii)  all Tax Returns to the extent of, or to the extent maintained for, the Acquired Assets or the Business, but excluding any such items to the extent (i) they are solely included in, or solely related to, any Excluded Assets or Excluded Liabilities or (ii) any Law prohibits their transfer;

(xiv)  all indemnities;

(xv)  all Intellectual Property owned (in whole or part) by the Sellers, including without limitation (i) the trademarks and trade names "Alexander Gallo," "Unlimited Languages," "AG/Sanction," "Set Depo," "The Hobart West Group," "Deponet," "Esquire Deposition Services," "Esquire Litigation Services," "Esquire Solutions," "Hobart West Solutions," "D-M Information Services" and (ii) all Intellectual Property listed on Schedule 1.1(a)(x)(v); together with all registrations and applications for the foregoing, all common law rights in the foregoing, all rights of action arising from the foregoing, including without limitation all claims for damages by reason of infringement of the foregoing and all present, past and future rights to sue and collect damages or seek injunctive relief for any such infringement, and further including all income, royalties and any other payment now and hereafter due and/or payable to Buyer, in each case, to be held and enjoyed by Buyer for its own use and benefit and for its successors and assigns as the same would have been held by Sellers had this assignment not been made (collectively, the "Assigned Intellectual Property");;

(xvi)  all indoor and outdoor signage, advertising, promotional materials, décor pieces, accents and artwork or decorations (including, in each case, all Intellectual Property rights and benefits relating to the foregoing);

(xvii)  any Permits to the extent their transfer is permitted by applicable Law;

(xviii)  all Tax assets, to the extent permitted to be transferred by applicable Law;

(xix)  all refunds of Taxes (or rights to refunds of Taxes, whether claimed or unclaimed) for all taxable periods (or portions thereof), whether ending on, prior to, or after the Closing Date;

(xx)  all of Sellers' rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect or any and all workers' compensation matters, claims, potential claims, purported claims and similar related items;

- 4 -

(xxi)   all insurance policies and benefits, including insurance rights and proceeds and including any accounts receivable credit insurance policy, rights and proceeds;

(xxii)   any proceeds pursuant to that certain Purchase and Sale Agreement (the "ELS Agreement") by and among DTI of California, LLC, a limited liability company organized under the laws of the State of Georgia, ELS, Gallo and the other parties thereo; and

(xxiii)   all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of any of the Acquired Assets and all other tangible and intangible assets that are not expressly identified as Excluded Assets.

Without limiting the generality of the foregoing, the Acquired Assets shall include all of the assets of any of the Sellers on the Balance Sheet and all assets acquired by the Sellers since the Balance Sheet Date, except to the extent disposed of in the ordinary course of business since the Balance Sheet Date or except to the extent specifically identified herein as an Excluded Asset.

(b)   Excluded Assets.  Notwithstanding anything herein to the contrary, from and after the Closing, the Sellers shall retain all of their right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Acquired Assets shall not include, solely the following assets and properties (such retained assets and properties being the "Excluded Assets"):

(i)   subject to Section 4.7, all Leases for Real Property set forth on Schedule 1.1(b)(i) to the extent not assumed by Sellers by order of the Bankruptcy Court (the "Excluded Leases");

(ii)   subject to Section 4.7, all Contracts (other than leases for real property) set forth on Schedule 1.1(b)(ii) to the extent not assumed by Sellers by order of the Bankruptcy Court (together with the Excluded Leases and the Rejected Contracts, the "Excluded Contracts");

(iii)   the DIP Financing Agreement and the Fundamental Documents (as defined therein), the First Lien Credit Agreement and the Loan Documents (as defined therein), the Second Lien Note Purchase Agreement and the Note Documents (as defined therein), the Winston Financing Agreement and the loan documents related thereto and the AKKR Financing Agreement and the loan documents;

(iv)   all rights under this Agreement and any Ancillary Agreement;

(v)   all of the equity interests in any Subsidiary of Gallo, including all of the equity interests in Hobart, Unlimited Languages, AG/Sanction, Set Depo, Deponet, EDS, ELS, ES, HWS and D-MIS;

(vi)   the avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code except for the avoidance or preference actions set forth on Schedule 1.1(a)(ix);

- 5 -

(vii)    all assets (whether in trust or otherwise) with respect to any Benefit Plan of Sellers; and

(viii)    the books and records pertaining to the organization and existence of each Seller.

(c)    Assumed Liabilities.  Subject to the terms and conditions hereof, at the Closing, Buyer shall assume and agree to fully pay, discharge, satisfy and perform, the following liabilities and obligations of the Sellers, except in each case to the extent any such liabilities or obligations (a) that would have been performed, paid or otherwise discharged on or prior to the Closing Date, but for a breach or default by any Seller or (b) are Excluded Liabilities (the "Assumed Liabilities").

(i)    all of the liabilities and obligations of the Sellers arising under or relating to any Assumed Contract to the extent such liabilities and obligations relate to events or occurrences following the Closing Date; and

(ii)    all current liabilities set forth on Schedule 1.1(c)(ii).

(d)    Excluded Liabilities.  Notwithstanding anything contained herein to the contrary, the Excluded Liabilities shall not be assumed by Buyer, but instead shall be retained, performed, paid or discharged by the Sellers.  The term "Excluded Liabilities" as used herein means any and all liabilities or obligations of any Seller or any of its affiliates of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, existing on the Closing Date, or arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date, excepting only the Assumed Liabilities; provided however that without limiting the foregoing, the Excluded Liabilities shall include the following:

(i)    any obligation or liability for Taxes incurred by any Seller, including the Transfer Taxes as set forth in Section 8.2, and any liability of any Seller for the Taxes of another person under a contractual indemnity or covenant, as a transferee or otherwise under applicable Tax Laws, regulations or administrative rules, and any other obligation or liability for Taxes related to the Acquired Assets or the Business arising in, or in connection with, a taxable period (or portion thereof) ending on or before the Closing Date;

(ii)    any claim, obligation or liability in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(iii)    any Debt, including the Existing First Lien Facilities, the Existing Second Lien Facilities, the Existing Winston Notes and the Existing AKKR Notes;

(iv)    any and all fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by any Seller or in connection with the transactions contemplated by this Agreement or the Chapter 11 Cases, including all fees, costs and expenses incurred in connection with or by virtue of (a) the negotiation, preparation and review of this Agreement (including the exhibits and schedules hereto) and all Ancillary Agreements, (b) the preparation and submission of any filing or notice required to be made or

- 6 -

given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any consent required to be obtained in connection with any of such transactions, (c) the negotiation, preparation and review of the DIP Financing, and (d) the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, including any retention bonuses, "success" fees, change of control payments and any other payment obligations payable as a result of the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements;

(v)    any obligation or liability of any Seller to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of any Seller pursuant to any Affiliate Agreement;

(vi)    any obligation or liability of any Seller arising out of this Agreement and any Ancillary Agreement;

(vii)    any obligation or liability arising out of or relating to any business or property formerly owned or operated by any Seller, any affiliate or predecessor thereof, but not presently owned and operated by the Sellers;

(viii)    all liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, any Seller, or any assets or properties of any Seller, whether commenced, filed, initiated, or threatened before or after the Closing and whether relating to facts, events, or circumstances arising or occurring before or after the Closing;

(ix)    all liabilities of the Sellers arising and to be performed prior to the Closing Date arising from or related to the Business, the Excluded Assets or the Acquired Assets, except to the extent of the specific liabilities set forth on Schedule 1.1(c)(ii);

(x)    all liabilities of the Sellers relating to actions, events, circumstances or conditions occurring or existing on or prior to the Closing Date;

(xi)    any obligation or liability of any Seller or their predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to Buyer as part of the Acquired Assets or, is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer;

(xii)    except as provided in Section 1.1(c)(ii) or any employment Contracts that are not expressly included as an Excluded Asset, any obligation or liability with respect to compensation, severance or benefits of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual), whether or not employed by Buyer or any of its affiliates after the Closing, that (A) arises out of or relates to the employment, service provider or other relationship between any Seller or ERISA Affiliate and any such individual, including the termination of such relationship, (B) arises out of or relates to any Benefit Plan or (C) arises out of or relates to events or conditions occurring on or before the Closing Date;

- 7 -

(xiii)   any and all liabilities under the ELS Purchase Agreement; and

(xiv)   any Environmental Liability.

1.2.   <u>Purchase Price; Payment</u>.

(a)   The purchase price (the "<u>Aggregate Purchase Price</u>") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of (i) the release of the Company and any guarantors (and their respective successors and assigns) of obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise relating to, (x) the DIP Financing Agreement and (y) the Second Lien Note Purchase Agreement (collectively, the "<u>Credit Bid and Release</u>"), (ii) the assumption of the Assumed Liabilities which are estimated to be $11,102,000 (iii) the amounts payable under the Existing First Lien Facilities as of the Closing, which are estimated to be $48,000,000, (iv) One Million Two Hundred Thirty Thousand Dollars ($1,230,000) (which amount represents wind down costs), (v) the professional fees for the professionals set forth on Schedule 1.2(a)(v) that are accrued and outstanding as of the Closing; provided that the amount payable for each such line item set forth on Schedule 1.2(a)(v) pursuant to this clause shall not exceed 105% of such scheduled amount of professional fees less the amount of such scheduled professional fees that are paid after October 2, 2011 and prior to the Closing; (vi) any professional fees of the Existing Second Lien Facilities lenders and the DIP Lender accrued and outstanding as of the Closing; (vii) actual Cure Costs outstanding as of the Closing, which are estimated to be $3,945,000; (viii) subject to Section 1.2(b), reimbursement of up to $1,434,975 with respect to the liabilities identified on Schedule 1.2(a)(viii) that are due and payable during the ninety day period after the Closing Date and (ix) any Cure Costs or administrative expenses paid by Buyer pursuant to the third to last sentence of Section 4.7. At the Closing, Buyer shall pay and deliver an amount equal to the sum of clauses (iii) through (vii), by wire transfer of immediately available funds to an account that has been designated by Gallo. The amounts payable pursuant to clause (viii) shall be paid in accordance with Section 1.2(b).

(b)   If during the ninety day period after the Closing Date, Sellers' notify Buyer in writing that any of the liabilities specifically identified on Schedule 1.2(a)(viii) are due and payable by the Sellers, Buyer shall pay such amount to Sellers within 10 Business Days of receipt of copies of remittances and other supporting documentation as is reasonably requested by Buyer. Notwithstanding anything herein to the contrary, Buyer's obligation to pay Sellers pursuant to Section 1.2(a)(viii) shall terminate on the ninety day anniversary of the Closing Date and shall not exceed $1,434,975 less any amounts paid after October 2, 2011 and prior to the Closing Date in respect of the liabilities identified on Schedule 1.2(a)(viii). In any case where Sellers recover from a third party any amount in respect of any liability for which Buyer actually reimbursed Sellers pursuant to Section 1.2(a)(viii), Sellers shall promptly pay over to Buyer such amount so recovered.

1.3.   <u>Bulk Sales Laws</u>. Buyer hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets

- 8 -

shall be free and clear of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), interests, or Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer" Laws.

ARTICLE II.
CLOSING

2.1.    Closing Date.  The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Dechert LLP in New York, NY beginning at 9 a.m. New York time on the third Business Day after all of the conditions set forth in Articles V and VI have been satisfied (other than those conditions which by their nature are only capable of being satisfied at Closing, but subject to the fulfillment or waiver of such conditions at the Closing), or at such other place, time, or date as Buyer and Gallo may agree in writing (such time and date being referred to herein as the "Closing Date").  For financial accounting and tax purposes, to the extent permitted by Law, the Closing shall be deemed to have become effective as of the open of business on the Closing Date (the "Effective Time").

2.2.    Closing Deliveries.

(a)    Deliveries by Buyer to the Sellers.  At the Closing, Buyer shall deliver or cause to be delivered the payments in accordance with Section 1.2 to the Sellers.

(b)    Deliveries by the Sellers.  At the Closing, the Sellers shall deliver or cause to be delivered the following to Buyer:

(i)    the Assignment of Intellectual Property substantially in the form attached hereto as Exhibit A (the "Assignment of Intellectual Property"), duly executed by the Sellers;

(ii)    title certificates to any trailers and motor vehicles included in the Acquired Assets, duly executed by the applicable Seller (together with any other transfer forms necessary to transfer title to such trailers and vehicles);

(iii)    any other transfer documents, as may reasonably be requested by Buyer;

(iv)    pay-off letters and lien releases or other written evidence reasonably satisfactory to Buyer, evidencing the release of all Encumbrances pursuant to the Existing First Lien Facilities on the Acquired Assets that are not Permitted Encumbrances;

(v)    a duly executed certificate from each Seller prepared in accordance with Treasury regulations section 1.1445-2 and dated as of the Closing Date certifying that such Seller is not a foreign person; and

- 9 -

(vi)      such other agreements, certificates and documents as may be reasonably requested by Buyer to effectuate or evidence the transactions contemplated hereby.

ARTICLE III.
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Sellers as follows:

3.1.      Organization.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to carry on its business as it is now being conducted, and to execute, deliver, and perform this Agreement and each Ancillary Agreement to which it is a party, and to consummate the transactions contemplated hereby and thereby.

3.2.      Authority.  The execution, delivery, and performance by Buyer of this Agreement, and each Ancillary Agreement to which Buyer is a party, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Buyer.  This Agreement has been, and each Ancillary Agreement to which Buyer is a party will be at Closing, duly and validly executed and delivered by Buyer and constitutes, or will constitute, the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its respective terms, except as such enforcement shall be limited by bankruptcy, insolvency, moratorium or similar law affecting creditors' rights generally and subject to general principles of equity.

3.3.      No Conflict.  The execution, delivery, and performance by Buyer of this Agreement and each Ancillary Agreement to which Buyer is a party, and the consummation by Buyer of the transactions contemplated hereby and thereby, does not and will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which Buyer is subject or (ii) violate any provision of the limited liability company agreement or other governance documents of Buyer.

3.4.      Consents.  Except for the consent, approvals, authorization, exemptions or filings with Authorities in connection with the commencement of the Chapter 11 Cases and the entry of the Bankruptcy Orders, no consent, approval, or authorization of, or exemption by, or filing with, any Authority is required to be obtained or made by Buyer in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party.

ARTICLE IV.
COVENANTS

4.1.      Access.  Prior to the Closing, the Sellers shall give Buyer and its authorized representatives reasonable access to all of its personnel, books, records, plants, offices, and other facilities and properties, and permit Buyer to make such inspections thereof as Buyer may reasonably request, and cause its officers and advisors to furnish Buyer with such financial, operating and other information regarding the Sellers' business, agreements, commitments, liabilities, personnel, and properties as Buyer may reasonably request.

- 10 -

4.2.   Commercially Reasonable Efforts; HSR Act.

(a)   Commercially Reasonable Efforts.  Subject to the terms and conditions of this Agreement, each of the parties hereto agrees to use its commercially reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, using its commercially reasonable best efforts (i) to obtain any other consents or approvals as are necessary in connection with the consummation of the transactions contemplated hereby, (ii) to effect, in addition to filings discussed in Section 4.2(b), all registrations and filings as are necessary or desirable in connection with the consummation of the transactions contemplated hereby, (iii) prior to the Closing, to defend any lawsuits or other legal proceedings, whether judicial or administrative, whether brought by private parties or Authorities or officials, challenging this Agreement or the consummation of the transactions contemplated hereby, and (iv) to furnish to each other such information and assistance and to consult with each other with respect to the terms of any registration, filing, application or undertaking as may be reasonably requested in connection with the foregoing.

(b)   HSR Act.

(i)   Each party hereto shall (i) make the filings, if any, required of it or any of its affiliates under the the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") in connection with this Agreement and the transactions contemplated hereby, as soon as practicable, but in any event no later than five (5) Business Days following the date hereof, (ii) comply at the earliest practicable date and after consultation with the other party hereto with any request for additional information or documentary material received by it or any of its affiliates from any applicable Authority in connection with filings required under the HSR Act, (iii) cooperate with one another in connection with any filing under the HSR Act and in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement initiated by any Authority in connection with filings required under the HSR Act and (iv) use its reasonable best efforts to secure the termination of any waiting periods under the HSR Act in order to permit the consummation of the transactions contemplated hereby at the earliest possible date.  Each party hereto shall promptly inform the other party of any material communication made to, or received by such party from any other Authority regarding any of the transactions contemplated hereby.  The filing fees assessed under the HSR Act shall be borne by the Buyer.

(ii)   Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 4.2 shall limit a party's right to terminate this Agreement pursuant to Section 7.1(b) or 7.1(c) so long as such party has, up to the date of such termination, complied in all respects with its obligations under this Section 4.2.

4.3.   Name Change.  As soon as reasonably practicable but in no event more than 45 days after Closing, the Sellers and their affiliates will change their legal names to names that are not confusingly similar to "Alexander Gallo," "Unlimited Languages," "AG/Sanction," "Set Depo," "The Hobart West Group," "Deponet", "Esquire Deposition Services," "Esquire Litigation Services," "Esquire Solutions," "Hobart West Solutions" or "D-M Information Services" or any derivation thereof and shall not thereafter further change their or any of their

- 11 -

subsidiaries legal names, or use any trade names, that are confusingly similar with any of the foregoing.

4.4.    Further Assurances.

(a)    From time to time after the Closing, Buyer shall, at the request of the Sellers and at Sellers' sole cost and expense, execute and deliver any further instruments or documents and take all such further action as the Sellers may reasonably request in order to evidence the consummation of the transactions contemplated hereby.  From time to time after the Closing, each Seller shall, at the request of Buyer and at Buyer's sole cost and expense, execute and deliver any further instruments or documents and take all such further action as Buyer may reasonably request in order to evidence the consummation of the transactions contemplated hereby.

(b)    After the Closing, each Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that any Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Acquired Assets or relates to the Assumed Liabilities.  After the Closing, Buyer shall promptly transfer or deliver to the Sellers cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Excluded Liabilities.

(c)    After the Closing, Buyer shall provide, at no out-of-pocket cost to Buyer, reasonable access during normal business hours to Sellers with respect to the Sellers' books and records necessary to wind down the Sellers' operations, file tax returns and process claims, including, but not limited to providing office space and general office services for the period of six (6) months after the Closing at the Sellers' offices in Atlanta, GA.

4.5.    Employee Matters.

(a)    Buyer intends to extend offers of employment (which may be for employment with Buyer or any of its affiliates) to (i) all of the Sellers' employees set forth on Schedule 4.5 as of the date hereof who have not been terminated or otherwise left the employ of the Sellers prior to the Closing Date and (ii) some or all of those additional employees set forth in the updated Schedule 4.5 as of three (3) days prior to Closing.  Consistent with applicable law, the Sellers shall provide Buyer access to their personnel records and personnel files, and shall provide such other information regarding their employees as Buyer may reasonably request.  All such employees who accept such offers of employment with Buyer or its affiliates are hereinafter referred to as the "Transferred Employees" and such acceptance of offers shall be effective immediately after the Closing.  Effective as of immediately before the Closing, each Seller shall terminate the employment of its respective employees who are Transferred Employees.  Each Transferred Employee shall be entitled to participate in all of Buyer's employee benefit plans in accordance with the terms of those plans, to the same extent and in the same manner as new employees of Buyer.

(b)    With respect to any benefit plans, programs, and arrangements of Buyer in which Transferred Employees participate after the Closing, Buyer shall use commercially

reasonable efforts to: (i) waive all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to Transferred Employees to the extent such limitations were waived or otherwise satisfied under the comparable Benefit Plans, (ii) recognize all service of Transferred Employees with the Sellers for purposes of eligibility to participate, but only to the same extent such service would be taken into account under a comparable Benefit Plan immediately prior to the Closing and (iii) provide that, with respect to the year in which the Closing occurs, any year-to-date covered expenses incurred on or before the Closing by a Transferred Employee or a Transferred Employee's covered dependent shall be taken into account for purposes of satisfying applicable deductible, coinsurance and maximum out-of-pocket provisions after the Closing under Buyer's health and welfare plans.

(c)     As soon as practicable following the Closing Date, Sellers shall use their reasonable best efforts to cause the assets of the Sellers' 401(k) Plan to be transferred to the Buyer's 401(k) Plan, and Buyer shall use its reasonable best efforts to cause the Buyer 401(k) Plan to accept such transfer, in each case, in accordance with Section 414(l) of the Code and the Treasury Regulations thereunder.  Buyer and Sellers agree to take such steps as may be reasonably requested by the other party to effect the transfer described in this Section 4.5(c). Sellers shall, on or prior to the Closing Date, remit all contributions (including, without limitation, elective deferrals and matching contributions) to the Seller 401(k) Plan that are required to be made (or otherwise relate to services performed) with respect to payroll periods ending on or prior to the Closing Date.

(d)     Effective as of the Closing, Transferred Employees shall no longer be eligible to contribute to the flexible spending account sponsored by Sellers except as otherwise provided by and in accordance with COBRA (such accounts, "Seller FSA" and such Transferred Employees in the Seller FSA, "FSA Participants").  Effective as of the Closing Date, Buyer shall establish flexible spending accounts (the "Buyer FSA") which shall (i) permit immediate participation as of the first day of the month immediately following Closing for all FSA Participants and (ii) accept for reimbursement any claims related to the calendar year in which the Closing Date occurs and eligible for reimbursement on the basis of FSA Participant elections initially made under the Seller FSA, which have not been previously reimbursed by Seller.  The salary reduction election of FSA Participants under the Seller FSA will be continued by the Buyer following Closing.  Seller shall provide to Buyer as soon as administratively feasible on or prior to the Closing Date, a schedule setting forth the FSA Participants and the amount each FSA Participant has elected to contribute to the Seller FSA for the current calendar year and the amount reimbursed by the Seller FSA to the FSA Participant (or eligible dependant) (the "FSA Balances").  To the extent the FSA Balances in the aggregate are positive, the Seller shall make a payment to the Buyer at Closing equal to the aggregate FSA Balances at the Closing.  To the extent the FSA Balances in the aggregate are negative, the Buyer shall make a payment to the Seller at Closing equal to the aggregate FSA Balances at the Closing.  Notwithstanding the foregoing, no person who elects COBRA continuation coverage with respect to such person's flexible spending account shall be considered a FSA Participant and any such person's flexible spending account balance shall not be a FSA Balance.

(e)     The Sellers shall be solely responsible for any liability, claim or expense with respect to employment, termination of employment, compensation or employee benefits of

- 13 -

any nature (including, but not limited to the benefits to be provided under the Benefit Plans) owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or ERISA Affiliate thereof (or the beneficiary of any such individual) whether or not such individual becomes a Transferred Employee, that arises out of or relates to the provision of services to or on behalf of, or the employment relationship between, any Seller or ERISA Affiliate thereof and any such individual or the termination of such relationship or provision of services on or before the Closing Date.  Without limiting the foregoing, (i) the Sellers shall be responsible for the payment of any severance payment or benefits that become due to any current or former employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by any Seller or ERISA Affiliate thereof and (ii) the Sellers shall be responsible for all legally mandated health care continuation coverage for their, and their affiliates', current and former employees (and their qualified beneficiaries) who had or have a loss of coverage due to a "qualifying event" (within the meaning of Section 603 of ERISA) which occurred or occurs on or prior to the Closing Date including, without limitation, any loss of coverage that results directly or indirectly from the transactions contemplated by this Agreement.  The Buyer or its affiliates shall be responsible for any severance benefits for any Transferred Employee who terminates employment with the Buyer or such affiliate after the Closing Date.

(f)     The provisions of this Section 4.5 are for the benefit of the parties to this Agreement only and shall not be construed to grant any rights, as a third party beneficiary or otherwise, to any person who is not a party to this Agreement, nor shall any provision of this Agreement be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise to limit the right of Buyer or the Sellers to amend, modify or terminate any such employee benefit plan.  In addition, nothing contained herein shall be construed to (i) prohibit any amendments to or termination of any employee benefit plans or (ii) prohibit the termination or change in terms of employment of any employee (including any Transferred Employee) as permitted under applicable law.  Nothing herein, expressed or implied, shall confer upon any employee (including any Transferred Employee) any rights or remedies (including, without limitation, any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement.

(g)     Sellers intend that Buyer will qualify as a successor employer for the purpose of receiving credit for the payment of taxes under FICA and FUTA by Sellers with respect to Transferred Employees.  Buyer and Sellers shall cooperate to effectuate the foregoing.

4.6.   <u>Bankruptcy Court Orders</u>.

(a)     In connection with the transactions contemplated by this Agreement, Sellers shall file with the Bankruptcy Court after the execution of this Agreement by each of the parties hereto, motions for, and shall use their best efforts to obtain an order (the "<u>Sale Order</u>") to be entered no later than November 8, 2011, in form and substance acceptable to Buyer, among other things, (i) approving the Asset Acquisition by Buyer (free and clear of all Encumbrances pursuant to sections 363(b) and 363(f) of the Bankruptcy Code), (ii) approving the assumption by and assignment to Buyer of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code and (iii) containing findings of fact and conclusions of law that Buyer is a good faith

- 14 -

purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and that Buyer is not a successor to Seller and shall not be liable under any theory of successor liability.

(b)    If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Sellers shall diligently defend against such appeal, petition or motion and shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided that Sellers consult with Buyer at Buyer's reasonable request regarding the status of any such Actions.

(c)    Sellers shall consult with Buyer and its representatives upon Buyer's reasonable request concerning the Sale Order, any other Orders of the Bankruptcy Court and the bankruptcy proceedings in connection therewith and provide Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.  Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan it submits to the Bankruptcy Court or any other court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, any transaction contemplated by or approved pursuant to the Sale Order.

4.7.    Assumption and Rejection of Contracts and Leases.  At the election of Buyer pursuant to written notice given to Sellers at any time prior to the date that is 5 Business Days prior to the Closing Date, Sellers shall seek to assume or reject, as directed by Buyer, any executory contracts or unexpired leases to which any Seller is a party or is otherwise bound. Sellers shall give written notice to Buyer prior to the submission of any motion in their Chapter 11 Cases to assume or reject any executory contracts or unexpired leases, and, without the prior written consent of Buyer, Sellers shall not assume or reject any executory contract or unexpired lease.  Any executory contracts or unexpired leases that are rejected subject to Bankruptcy Court approval or are the subject of a rejection motion on the Closing Date, after complying with the provisions of this Section 4.7 shall constitute Excluded Assets at Closing and shall not constitute an Assumed Contract.  The Sellers shall promptly provide Buyer with a written schedule containing the Sellers' best estimate of the Cure Costs for each executory contract or unexpired lease to which each Seller is a party or is otherwise bound.  For purposes of this Agreement, "Cure Costs" shall mean all monetary liabilities, including prepetition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.  Notwithstanding the foregoing, in the event that Buyer is unable to determine whether to direct the Sellers to assume or reject an executory contract or an unexpired lease (each a "Designated Contract") prior to the date that is 5 Business Days prior to the Closing Date, then each such contract and lease shall, pursuant to Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court, be neither rejected nor assumed until Buyer so directs Sellers, provided that the (i) Cure Costs in respect of such assumed contracts and (ii) administrative expenses that are incurred from the Closing Date through the date that such contract or lease is either assumed or rejected shall be paid by Buyer.  For the avoidance of doubt, any such contracts that are assumed after the

- 15 -

Closing shall be deemed an Assumed Contract and any such contracts that are rejected after the Closing shall be deemed a Rejected Contract.  On or prior to the Closing, Buyer shall deliver to Sellers a list of such Designated Contracts.

4.8.    "G" Reorganization.

(a)    The parties agree that the Buyer has the right to elect by written notice (to Sellers at any time prior to the Closing, to direct that the Asset Acquisition shall instead be effected pursuant to the following transactions which are intended to qualify as a reorganization pursuant to Section 368(a)(1)(G) of the Code (a "G Reorganization"): (i) Sellers shall contribute the Assets (other than Excluded Assets) (the "Asset Contribution") to a newly formed Subsidiary of the Company which is treated as a corporation for U.S. tax purposes ("Newco") or one or more wholly-owned Subsidiaries of Newco which are treated as disregarded entities for U.S. income tax purposes in consideration for equity interests of Newco (with allocation of the equity interests to each Seller to be reasonably determined by Buyer) and Newco shall accept the Acquired Assets and assume only the Assumed Liabilities pursuant to Article II herein as if Newco was substituted for Buyer; (ii) immediately following the Asset Contribution, Sellers shall exchange and deliver to Buyer, free and clear of any and all Encumbrances and with all rights attached thereto, and Buyer shall acquire, 100% of the equity interests of Newco (the "Equity Exchange") from the Sellers, (iii) in consideration of the equity interests, Buyer shall exchange the Aggregate Purchase Price (other than the assumption of the Assumed Liabilities, which will have been effected in the manner described in the paragraph) in the same manner as set forth in this Agreement and (iv) Sellers shall take any other actions and make the elections requested by Buyer in order to permit the Asset Acquisition to qualify as a "G" Reorganization and preserve the tax attributes of the Acquired Assets.

(b)    The Asset Contribution and Equity Exchange contemplated by this Section 4.12 shall be affected pursuant to amendments to this Agreement and such other customary documentation as may be agreed between Buyer and Sellers, and such amended Agreement and other documentation is intended to constitute part of a "plan of reorganization" as defined in Treasury Regulation Section 1.368-2(g).

ARTICLE V.
CONDITIONS TO BUYER'S OBLIGATIONS

The obligation of Buyer to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

5.1.    Covenants and Agreements Performed.  The Sellers shall have performed or complied with in all material respects, or delivered, all covenants, agreements (including the Ancillary Agreements), conditions or documents required by this Agreement to be performed, complied with, or delivered by or on behalf of any Seller and  prior to or on the Closing Date.

5.2.    Expiration or Termination of HSR Periods.  All waiting periods, if any, applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.

5.3.    <u>No Prohibition or Proceedings</u>.  No litigation, action, investigation, inquiry or request for information by any Authority and no legal or administrative proceeding shall have been instituted that (a) seeks to restrict, limit, prohibit or enjoin the transactions contemplated by this Agreement, or (b) could have a Material Adverse Effect.

5.4.    <u>No Injunction or Statute</u>.  No statute, rule, regulation, executive order, decree, injunction or other order enacted, entered, promulgated, enforced or issued by any Authority preventing consummation of the transactions contemplated by this Agreement shall be in effect on the Closing Date.

5.5.    <u>Material Adverse Effect</u>.  At the Closing Date, there is no, and since the date hereof, there has not been a Material Adverse Effect.

5.6.    <u>Bankruptcy Court</u>.

(i)    The Bankruptcy Court shall have entered no later than October 6, 2011, the Financing Order, in form and substance reasonably acceptable to Buyer, approving the DIP Financing and such order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent.

(ii)    The Cash Collateral Order that was entered by the Bankruptcy Court on September 27, 2011 shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent, and no subsequent Cash Collateral Order shall have been entered without Buyer's prior written consent.

(iii)    The Bankruptcy Court shall have entered the Sale Order by November 8, 2011, which date may be waived or extended by Buyer in its sole discretion, and the Sale Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent. The Sale Order shall be in form and substance acceptable to Buyer.

5.7.    <u>DIP Financing Agreement</u>.  No Default or Event of Default under the DIP Financing Agreement (except pursuant to Section 7(a) thereof) shall have occurred and be continuing, and the Termination Date under the Financing Order shall not have occurred.

5.8.    <u>Sufficiency of Assets</u>.  The Acquired Assets constitute all of the assets, properties and rights necessary for the operation of the Sellers' business in the same manner as is currently conducted.

ARTICLE VI.<br><u>CONDITIONS TO THE SELLERS' OBLIGATIONS</u>

The obligations of the Sellers to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

6.1.    <u>Representations and Warranties True and Correct</u>.  The representations and warranties of Buyer contained in this Agreement and the Ancillary Agreements (without

giving effect to any limitations as to "materiality" or "Material Adverse Effect" set forth therein) shall be true and correct at and as of the Closing Date with the same effect as though made at and as of such time (except for representations that are as of a specific date which representations shall be true and correct as of such date), except where all failures to be so true and correct would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

6.2.    <u>Covenants and Agreements Performed</u>.  Buyer shall have performed or complied with in all material respects, or delivered, all covenants, agreements (including the Ancillary Agreements), conditions or documents required by this Agreement to be performed, complied with, or delivered by Buyer prior to or on the Closing Date.

6.3.    <u>Expiration or Termination of HSR Periods</u>.  All waiting periods, if any, applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.

6.4.    <u>Bankruptcy Court</u>.

(i)    The Bankruptcy Court shall have entered no later than October 6, 2011, the Financing Order, in form and substance reasonably acceptable to Buyer, approving the DIP Financing and such order shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent.

(ii)    The Cash Collateral Order that was entered by the Bankruptcy Court on September 27, 2011 shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent, and no subsequent Cash Collateral Order shall have been entered without Buyer's prior written consent.

(iii)    The Bankruptcy Court shall have entered the Sale Order by November 8, 2011, which date may be waived or extended by Buyer in its sole discretion, and the Sale Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent. The Sale Order shall be in form and substance acceptable to Buyer.

ARTICLE VII.
<u>TERMINATION PRIOR TO CLOSING</u>

7.1.    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    By the mutual written consent of Buyer and Gallo; or

(b)    By either Gallo or Buyer by written notice given to the other, if the Closing has not occurred on or before December 15, 2011 in the case of Buyer, or if the Closing has not occurred on or before March 31, 2012 in the case of Gallo; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this Section 7.1(b) shall not be available to any party whose failure to perform any of its obligations under this Agreement required to be

- 18 -

performed by it at or prior to the Closing has been the cause of, or resulted in, the failure of the Closing to occur;

(c)     By Buyer if (i) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bid Procedures Order, or (ii) the Bankruptcy Court shall not have entered the Sale Order no later than November 8, 2011, or (iv) the closing of the transactions contemplated by this Agreement shall not have occurred on or prior to November 23, 2011, or (v) the Bid Procedures Order or the Sale Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(d)     By Buyer or Gallo, (i) if Sellers comply with the Bidding Procedures and accept a Qualifying Bid (as defined in the Bidding Procedures) from a Person other than Buyer or its permitted transferee or (ii) by Buyer, if Sellers enter into an agreement or transaction, including any Alternative Transaction, with a third party (including any of Sellers' creditors or shareholders) which is materially inconsistent with this Agreement and the transactions contemplated hereby in any material respect; or

(e)     By either Gallo or Buyer by written notice given to the other, if there has been a material breach by (i) Buyer, in the case of notice from Gallo, or (ii) any Seller, in the case of notice from Buyer, of any of the covenants or agreements made by such parties in this Agreement and such breach (if curable) has not been cured or waived within 10 days after notice of the same.

(f)     By Buyer, if the Auction (if any) shall not have commenced within five (5) days of the Auction Date.

7.2.    Effect on Obligations.  Termination of this Agreement pursuant to Section 7.1 shall terminate all obligations of the parties hereunder, except for their obligations under this Section, and Article IX; provided, however, that unless this Agreement has been terminated pursuant to Section 7.1(a), termination of this Agreement shall not relieve a breaching party (whether or not it is the terminating party) from any liability to the other party hereto arising from or related to its breach of any covenants or agreements contained herein.

7.3.    Break-Up Fee; Expense Reimbursement.  If this Agreement is terminated in accordance with Section 7.1(b), (c) or (e), then Sellers shall promptly (and in any event within five (5) Business Days after such event) jointly and severally pay Buyer (in immediately available funds), and Buyer shall be deemed to have earned, the Expense Reimbursement.  If this Agreement is terminated in accordance with Section 7.1(d), then Sellers shall, promptly (and in any event as of the closing of the corresponding transaction) jointly and severally pay Buyer (in immediately available funds), and Buyer shall be deemed to have earned, both (i) the Expense Reimbursement and (ii) an amount equal to 3.75% of the Aggregate Purchase Price (the "Break-Up Fee").  The Expense Reimbursement shall constitute administrative expenses of the Sellers with priority over any and all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code until paid and shall be payable within two (2) Business Days, notwithstanding section 507(a) of the Bankruptcy Code.  The Break-Up Fee shall constitute administrative expenses of the Sellers of the kind specified in section 503(b) of the Bankruptcy Code.  The Sellers shall pay the Break-Up fee from the proceeds from the closing of an

- 19 -

Alternative Transaction on the closing date of such Alternative Transaction.  The Parties hereby acknowledge that the amounts payable pursuant to this Section 7.3 are commercially reasonable and necessary to induce Buyer to enter into this Agreement and consummate the transactions contemplated hereby.  For the avoidance of doubt, the covenants set forth in this Section 7.3 are continuing obligations, separate and independent from the other obligations of the Parties (and shall not limit Buyer's other rights and remedies under or in respect of this Agreement), and survive termination of this Agreement.

ARTICLE VIII.<br>TAX MATTERS

8.1.    <u>Allocation</u>.  Promptly after the Closing, Buyer shall prepare and deliver to Gallo (on behalf of the Sellers) the allocation ("<u>Allocation</u>") of the Aggregate Purchase Price among the Acquired Assets sold by the Sellers (and the non-competition agreement described in Section 4.7) in a manner that is consistent with the principles set forth on Schedule 8.1.  The parties agree that the Allocation is intended to comply with Section 1060 of the Code.  The parties shall cooperate to comply with all substantive and procedural requirements of Section 1060 of the Code and any regulations thereunder, and the Allocation shall be adjusted and/or supplemented if, and to the extent, necessary to comply with the requirements of Section 1060 of the Code.  Neither of Buyer nor Sellers will take, nor permit any affiliated person to take, for federal, state or local income tax purposes, any position inconsistent with the Allocation, or, if applicable, such adjusted or supplemental allocation.  The Sellers and Buyer agree to report, as and when required, the Allocation among the Acquired Assets in a manner consistent with such Allocation in the preparation and filing of all Tax Returns (including IRS Form 8594) and shall cooperate with each other in preparing and filing any supplements to such form as may be required under Section 1060 of the Code.

8.2.    <u>Transfer Taxes</u>.  All Taxes, including, without limitation, all state and local and all recording and filing fees (collectively, the "Transfer Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets or otherwise as a result of the transactions contemplated by this Agreement, and that are not exempt under section 1146(a) of the Bankruptcy Code, shall be borne by the Sellers.  Buyer and the Sellers shall cooperate to (a) determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

8.3.    <u>Wage Reporting</u>.  As of the Closing, Sellers agree to join in any election made by Buyer regarding the procedure to be utilized with respect to wage reporting set forth in Revenue Procedure 2004-53.

8.4.    <u>Cooperation on Tax Matters</u>.  Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as is practicable, such information and assistance relating to the Sellers and the Acquired Assets (including without limitation access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer and

- 20 -

the Sellers shall retain all books and records with respect to Taxes for any period up to and including the Closing Date, pertaining to the Sellers and the Acquired Assets or the Assumed Liabilities, for at least 7 years following the Closing Date.  At the end of such period, each party shall provide the others with at least 30 days prior written notice before destroying such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.

8.5.    Tax Returns.  To the extent Buyer could have any liability for any Tax of Sellers or relating to the Business or the Acquired Assets (by virtue of an assumption of the liability pursuant to Section 1.1(c), reimbursement pursuant to Section 1.2(a)(viii), or otherwise), Buyer shall have the right to review any Tax Return (including any amended Tax Return or settlements or compromises) related to such Tax and all Buyer comments respecting such Tax Return shall be incorporated prior to the filing of such Tax Return.


ARTICLE IX.
MISCELLANEOUS

9.1.    Interpretive Provisions.

(a)    Whenever used in this Agreement, (i) "including" (or any variation thereof) means including without limitation and (ii) any reference to gender shall include all genders.

(b)    The parties acknowledge and agree that (i) each party and its counsel have reviewed the terms and provisions of this Agreement and have contributed to its drafting, (ii) the normal rule of construction, to the effect that any ambiguities are resolved against the drafting party, shall not be employed in the interpretation of it, and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

9.2.    Entire Agreement; Survival.

(a)    This Agreement (including the certificates, schedules and exhibits attached hereto) together with the Ancillary Agreements constitute the sole understanding and agreement of the parties with respect to the subject matter hereof.  The parties agree and acknowledge that as of the Closing Date, the confidentiality agreement dated May 23, 2011 executed by Bayside Capital, Inc.  is terminated.

(b)    The representations and warranties of Buyer contained in this Agreement and the Ancillary Agreements, and any other certificates or documents delivered pursuant to this Agreement shall not survive the Closing and none of the parties shall have any liability to each other after the Closing for any breach thereof.  The covenants and obligations contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.  The right to any remedy or remedies based upon the representations and warranties, covenants, and obligations contained in this Agreement shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after

- 21 -

the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant, or obligation, and will not affect the right to any remedy or remedies based upon such representations, warranties, covenants and obligations.

9.3.    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; provided however, that this Agreement may not be assigned by any Seller without the prior written consent of Buyer or be assigned by Buyer without the prior written consent of the Sellers, except that (i) Buyer may, at its election and provided it remains liable for its obligations hereunder, assign this Agreement to one or more affiliates of Buyer, and Buyer or any such assignee may make a collateral assignment of its rights (but not its obligations) under this Agreement to any lender providing financing to Buyer in connection with the Closing.

9.4.    Headings.  The headings of the Articles, Sections, and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

9.5.    Modification and Waiver.  No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the parties hereto, except that any of the terms or provisions of this Agreement may be waived in writing at any time by the party that is entitled to the benefits of such waived terms or provisions.  No single waiver of any of the provisions of this Agreement shall be deemed to or shall constitute, absent an express statement otherwise, a continuous waiver of such provision or a waiver of any other provision hereof (whether or not similar).  No delay on the part of any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

9.6.    Expenses.  Except as otherwise expressly provided herein, each of the parties hereto shall bear the expenses incurred by that party incident to this Agreement and the transactions contemplated hereby, including all fees and disbursements of counsel and accountants retained by such party, whether or not the transactions contemplated hereby shall be consummated.

9.7.    Notices.  Any notice, request, instruction, or other document to be given hereunder by any party hereto to any other party shall be in writing and shall be given by delivery in person, by electronic facsimile transmission, by overnight courier or by registered or certified mail, postage prepaid (and shall be deemed given when delivered if delivered by hand, when transmission confirmation is received if delivered by facsimile during normal business hours, one Business Day after deposited with an overnight courier service if delivered by overnight courier and three days after mailing if mailed), as follows:

to the Sellers, to:

Alexander Gallo Holdings, LLC
2700 Centennial Tower
101 Marietta Street

- 22 -

Atlanta, GA 30303
Attention:  Alexander Gallo
Email:  agallo@alexandergalloholdings.com
Telephone: (877) 495-0777
Fax No.:  (404) 529-9299

Carl Marks Advisory Group LLC
900 Third Avenue, 33rd Floor
New York, NY  10022
Attention:  Mark L. Pfefferle
Telephone: (212) 909-8441
Email: mpfefferle@carlmarks.com

Gordian Group, LLC
950 Third Avenue, 17th Floor
New York, NY  10022
Attention:  Peter S. Kaufmann
Email: psk@gordiangroup.com
Telephone: (212) 486-3600
Fax No.: (212) 486-3616

With a copy to:

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Attention:  Thomas R. Califano
Email: thomas.califano@dlapiper.com
Attention:  Jeremy R. Johnson
Email:  jeremy.johnson@dlapiper.com
Telephone: (212) 335-4540
Fax No.: (212) 335-4501

- 23 -

to Buyer to:

     Bayside Capital, Inc.
1450 Brickell Avenue, 31st Floor
Miami, Florida 33131
Attention:  Jackson Craig
          Adam Schimel
Fax No.: (305) 381-4864

with a copy to:

     Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Attention:  Michael J. Sage, Esq.
         Mark E. Thierfelder, Esq.
Fax No.: (215) 994-2222

to the Committee to:

     Cooley LLP
1114 Avenue of the Americas
New York, New York 10036
Attention: Cathy Hershcopf, Esq.
       Jeffrey L. Cohen, Esq.
Fax No.:  (212) 479-6275

or at such other address for a party as shall be specified by like notice.

        9.8.    Governing Law; Consent to Jurisdiction.  This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of law thereof that would defer to the substantive laws of any other jurisdiction.  The parties agree that, during the period from the date hereof until the date on which Sellers' Chapter 11 Cases are closed or dismissed (the "Bankruptcy Period"), the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any other agreement entered into in connection herewith.  The parties further agree that, following the Bankruptcy Period, any action or proceeding with respect to such controversy, claim or dispute shall be brought against any of the parties exclusively in either the United States District Court for the Southern District of New York or any state court of the state of New York, and each of the parties hereby consents to the personal jurisdiction of such court and the Bankruptcy Court (and to the appropriate appellate courts) in any such action or proceeding and waives any objection, including, without limitation, any objection to the laying of venue or on the grounds of forum non conveniens, which any of them may now or hereafter have to the

- 24 -

bringing of such action or proceeding in such respective jurisdictions. Each party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury.

9.9.    Public Announcements. Neither any Seller nor Buyer shall make any public statements, including any press releases, with respect to this Agreement and the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld) except as may be required by law. If a public statement is required to be made by law, the parties shall consult with each other in advance as to the contents and timing thereof.

9.10.    No Third Party Beneficiaries. This Agreement is intended and agreed to be solely for the benefit of the parties hereto and their permitted successors and assigns, and no other party shall be entitled to rely on this Agreement or accrue any benefit, claim, or right of any kind whatsoever pursuant to, under, by, or through this Agreement.

9.11.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.

ARTICLE X.
CERTAIN DEFINITIONS

10.1.    "Affiliate Agreement" means any agreement or contract between any director, officer, employee or greater than five percent (5%) stockholder of any Seller or Affiliate of any such Person, on one hand, and any Seller, on the other hand, related to the Business, including any contract providing for the employment of, furnishing of services by, rental of real or personal property from or otherwise requiring payments to any such Person or firm, other than employment-at-will arrangements in the ordinary course of business.

10.2.    "Ancillary Agreement" means any agreement, exhibit, schedule, statement, document or certificate executed or delivered in accordance with, in connection with or required by this Agreement, and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Agreement.

10.3.    "Alternative Transaction" means (i) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any part of the Acquired Assets or the Business or any rights thereto or therein by any Seller (other than the transfer thereof to Buyer or its Affiliates in accordance with this Agreement) or (ii) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any portion of the equity interests in any Seller, in each case

- 25 -

whether structured or effected (or contemplated to be structured or effected) as an agreement, a plan of reorganization, or otherwise.

10.4.    "<u>Auction</u>" means the public sale of the Acquired Assets contemplated by the Bid Procedures Order.

10.5.    "<u>Auction Date</u>" means November 7, 2011, provided that such date may be extended as necessary as mutually agreed to by the Parties in their reasonable discretion.

10.6.    "<u>Authority</u>" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity, agency, court or authority (foreign, federal, state or local) exercising executive, legislative, judicial, regulatory or administrative functions of government or any arbitrator or mediator.

10.7.    "<u>Balance Sheet</u>" means the consolidated audited balance sheet of the Sellers as of the Balance Sheet Date.

10.8.    "<u>Balance Sheet Date</u>" means December 31, 2010.

10.9.    "<u>Bankruptcy Orders</u>" means the Bid Procedures Order and the Sale Order.

10.10.    "<u>Benefit Plans</u>" means all "employee benefit plans," as defined in Section 3(3) of the ERISA and all other retirement, profit sharing, bonus, stock, stock option, equity-based, profits interest, employment, change in control, health, life, disability, group insurance, savings, deferred compensation, incentive compensation, paid time off, severance, salary continuation and other fringe benefit arrangements, plans, programs, contracts, policies, or practices maintained, contributed to, or required to be contributed to by any Seller or any ERISA Affiliate for the benefit of any current or former employee, officer, director, member, partner or independent contractor of any Seller or with respect to which any Seller or any ERISA Affiliate may have any liability.

10.11.    "<u>Bid Procedures Order</u>" means the order of the Bankruptcy Court in form and substance acceptable to Buyer, (i) fixing the date, time and location of the hearing to approve consummation of the Asset Acquisition (ii) fixing the time, date and location of an auction, (iii) approving the Break-up Fee and the Expense Reimbursement, (iv) approving the form and manner of sale notice and bidding procedures notice, (v) approving procedures for the assumption and, if necessary, assignment of executory contracts and unexpired leases, (vi) containing such other appropriate buyer protections as may be reasonably requested by Buyer, and (vii) otherwise approving the Bidding Procedures attached as <u>Exhibit B</u> hereto (the "<u>Bidding Procedures</u>").

10.12.    "<u>Business</u>" means (i) the business of providing and selling court reporting and litigation support services, (ii) any business that uses any trademark, trade names or slogans similar to the "Alexander Gallo," "Unlimited Languages," "AG/Sanction," "Set Depo," "The Hobart West Group," "Deponet", "Esquire Deposition Services," "Esquire Litigation Services," "Esquire Solutions," "Hobart West Solutions" or "D-M Information Services" trademarks (including any associated logos, designs or trade dress), trade names or slogans or any of the trademark, trade names or slogans similar to the d/b/a's set forth on Schedule 1.1(a)(xv) hereto,

- 26 -

or (iii) any activities that are otherwise competitive with the business of the Sellers or Buyer as conducted as of the Closing Date.

10.13. "Business Day" means any day other than a day on which banks in the State of New York are required or authorized to be closed.

10.14. "Cash Collateral Order" shall mean such interim and final order or orders of the Bankruptcy Court approving that certain cash collateral motion filed with the Bankruptcy Court.

10.15. "Code" means the Internal Revenue Code of 1986, as amended.

10.16. "Contracts" means all written or oral agreements, contracts, leases, or commitments to which any Seller is a party or by which any Seller or any of their properties or assets is bound as of the date hereof and between the date hereof and the Closing Date.

10.17. "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of stock, as trustee or executor, by contract or credit arrangement or otherwise;

10.18. "Debt" means all principal, interest, premiums, penalties or other obligations related to (a) all indebtedness of any Seller for borrowed money, (b) all obligations (contingent or otherwise) of any Seller for the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and consistent with past practice) (including notes payable to the sellers of such property or services), (c) all obligations of any Seller evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by any Seller, (e) all obligations of any Seller as lessee or lessees under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of any Seller under acceptance, letter of credit or similar facilities, (g) all obligations owing pursuant to factoring agreements for accounts receivable, (h) all obligations in respect of unfunded pensions, (i) all Debt of the type referred to in clauses (a) through (h) above guaranteed directly or indirectly in any manner by any Seller , or in effect guaranteed directly or indirectly by any Seller through an agreement (w) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (x) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (y) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (z) otherwise to assure a creditor against loss; provided, that such Debt referred under this clause (i) is of the type that would be reflected as debt on a balance sheet prepared in accordance with GAAP, (j) all Debt of the type referred to in clauses (a) through (i) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any lien on property (including accounts and contract rights) owned by any Seller, even though such person has not assumed, become liable for or guaranteed the payment of such Debt, and (k) all accrued but unpaid interest (or interest

equivalent) to the date of determination, and all prepayment premiums or penalties payable upon repayment of any items of Debt of the type referred to in clauses (a) through (j) above.

10.19.  "EBITDA" shall mean net income calculated in accordance with GAAP net of interest expense, income tax expense, depreciation and amortization.

10.20.  "Encumbrances" shall mean any charge, claim, community or other marital property interest, condition, easement, encroachment, encumbrance, license, equitable interest, lien, mortgage, deed of trust, option, pledge, security interest, servitude, right of way, right of first option, right of first refusal, or other restriction or third-party right of any kind or nature whatsoever, including any right of first refusal or restriction on voting.

10.21.  "Environmental Laws" shall mean all foreign, federal, state and local laws, rules, regulations, ordinances, the common law, judgments, orders, consent agreements, work practices, standards and norms relating to (i) the protection of the environment (including air, surface and subsurface water, drinking water supplies, surface and subsurface land, the interior of any building or building component, soil and natural resources) or human health or (ii) the presence, Management, Release or threat of Release of or exposure to Hazardous Substances.

10.22.  "Environmental Liabilities" mean any and all losses, claims, demands, liabilities, obligations, causes of action, damages, costs and expenses, fines or penalties (including without limitation attorney fees and other defense costs), known or unknown, foreseen or unforeseen, whether contingent or otherwise, fixed or absolute, present or future asserted against or incurred by Buyer arising out of or related to (a) actual or alleged environmental conditions, including without limitation, (i) the presence, Release, threat of Release, Management or exposure first occurring, or as a result of facts, circumstances or events first existing or occurring, prior to the Closing of or to Hazardous Substances at, on, in, migrating to, migrating from or under any property now or previously owned, operated, used or leased by any Seller or any predecessor of Seller or in connection with Sellers' business whether into the air, soil, sediment, bedrock, ground or surface waters, buildings or structures on-site or off-site or (ii) arising from the off-site or on-site transportation, storage, treatment, recycling or disposal of Hazardous Substances Managed or Released by or on behalf of any Seller or any predecessor of Seller or at or from any property now or previously owned, used, operated or leased by any Seller or any predecessor of any Seller or in connection with Sellers' business; or (b) any actual or alleged violation of any Environmental Law in connection with the Acquired Assets or the Seller's business first existing prior to the Closing Date (including without limitation costs and expenses required to bring the Acquired Assets, Buyer or any Seller into compliance with Environmental Laws and fines, penalties and defense costs incurred after the Closing Date to come into compliance with Environmental Laws).

10.23.  "ERISA" means Employee Retirement Income Security Act of 1974, as amended.

10.24.  "ERISA Affiliate" means any person, entity, trade or business (whether or not incorporated) that is treated as a single employer with any Seller under Section 414 of the Code.

- 28 -

10.25.  "<u>Expense Reimbursement</u>" means the aggregate amount of the reasonable charges, costs, fees, payments, and expenses (including, without limitation, all fees, expenses and disbursements of any representatives of Buyer and its Affiliates) paid or incurred by or on behalf of Buyer or its Affiliates relating to or in connection with (i) the purchase of the Business, including the transactions contemplated by this Agreement and any documents or agreements related hereto, (ii) the negotiation, preparation, execution or performance of agreements relating to the purchase of the Business, including this Agreement, and certain documents or agreements related thereto, (iii) business, financial, legal, accounting, tax, and other due diligence relating to the Business, (iv) the Chapter 11 Cases, and (v) the diligence, analysis, negotiation, preparation, or execution of any contracts or arrangements with any current or prospective lessors, vendors, agents, or payees of Sellers and the Business <u>provided</u>, <u>however</u>, that any such amounts paid pursuant to the DIP Financing Agreement shall not be included in the calculation of the Expense Reimbursement; <u>provided</u>, <u>further</u>, that Expense Reimbursement shall not exceed $1,000,000 in the aggregate.  The Expense Reimbursement shall be subject to reasonable documentation, which documentation shall be provided to the Sellers, the official committee of unsecured creditors appointed in the Sellers' Chapter 11 Cases and the Office of the United States Trustee. Notwithstanding the foregoing, the Expense Reimbursement cap shall not apply following a breach by the Sellers of any condition, covenant or other term set forth in this Agreement.

10.26.  "<u>Final Order</u>" shall mean an order of the Bankruptcy Court (a) as to which the time to appeal or reconsider shall have expired and as to which no appeal or motion to reconsider shall then be pending, or (b) if an appeal or motion for reconsideration shall have been filed or sought, either (i) no stay of the order shall be in effect or (ii) if such a stay shall have been granted by the Bankruptcy Court, then (A) the stay shall have been dissolved or (B) a final order of the district court having jurisdiction to hear such appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court order or timely motion to seek review or rehearing of such order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat as not being a Final Order, any order for which an appeal, motion to seek review, motion to seek rehearing, or any similar motion is pending notwithstanding that such order is not then subject to stay.

10.27.  "<u>Financing Order</u>" shall mean such final order or orders of the Bankruptcy Court authorizing the DIP Financing.

10.28.  "<u>GAAP</u>" means United States generally accepted accounting principles consistently applied throughout the relevant periods.

10.29.  "<u>Hazardous Substances</u>" shall mean any and all hazardous or toxic substances, wastes or materials, any pollutants, contaminants, or explosive materials (including polychlorinated biphenyls, urea formaldehyde,  asbestos, volatile and semi-volatile organic

- 29 -

compounds, oil, petroleum products and fractions and radioactive materials), or any other similar substances or materials regulated under Environmental Laws.

10.30.  "knowledge", "to the knowledge" or "known" and words of similar import shall mean the actual knowledge of a natural person or, with respect to a Person that is not a natural person, the actual knowledge of the officers and management of such Person, after due inquiry.

10.31.  "Intellectual Property" means any and all intellectual property rights and other similar proprietary rights in any jurisdiction, whether registered or unregistered, whether owned or held for use under license, including all rights and interests pertaining to or deriving from:  (a) patents and patent applications, reexaminations, extensions and counterparts claiming priority therefrom; inventions, invention disclosures, discoveries and improvements, whether or not patentable; (b) computer software and firmware, including data files, source code, object code and software-related specifications and documentation; (c) works of authorship; (d) trade secrets (including, those trade secrets defined in the Uniform Trade Secrets Act and under corresponding foreign statutory Law and common law), business, technical and know-how information, non-public information, and confidential information and rights to limit the use or disclosure thereof by any Person; (e) trademarks, trade names, service marks, certification marks, service names, brands, trade dress and logos and the goodwill associated therewith; (f) proprietary databases and data compilations and all documentation relating to the foregoing, including manuals, memoranda and records; and (g) domain names; including in each case any registrations of, applications to register, and renewals and extensions of, any of the foregoing with or by any governmental authority in any jurisdiction..

10.32.  "IRS" means Internal Revenue Service.

10.33.  "Laws" shall mean any federal, state or local law (including, without limitation, principles of common law), statute, ordinance, regulation, Permit, certificate, judgment, order, award or other determination, decision or requirement of any Authority.

10.34.  "Leases" mean all written or oral leases and subleases of real property to which any Seller is a party (as lessor, lessee, sublessee, licensee or otherwise) (collectively, the "Leased Real Property").

10.35.  "Litigation" means any, dispute, claim, action, suit, proceeding, review, arbitration or investigation before any Authority.

10.36.  "Managed" or "Management" mean or refer to the use, possession, generation, treatment, manufacture, processing, management, handling, storage, recycling, transport or disposal.

10.37.  "Material Adverse Effect" means any circumstance or event which, individually or in the aggregate with any other circumstance or event, is or could be reasonably expected to be material and adverse to the business, properties, operations, assets, liabilities (including contingent liabilities), condition (financial or otherwise), EBITDA, prospects, results of operations or material Contracts of the Sellers individually or taken as a whole; provided, however, the events leading up to the filing of the Chapter 11 Cases that have been disclosed in

- 30 -

writing (including electronic communication) to the DIP Lender prior to the Initial Date (as defined in the DIP Financing Agreement) and the act and effects caused directly by the filing of the Chapter 11 Cases shall not, in and of itself, be deemed to constitute or give rise to a Material Adverse Effect.

10.38.  "<u>Order</u>" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Authority.

10.39.  "<u>Permits</u>" mean all governmental or other industry permits, registrations, certificates, certifications, exemptions, licenses, franchises, consents, approvals and authorizations.

10.40.  "<u>Permitted Encumbrances</u>" means (i) liens for Taxes not yet due and payable to the extent such Taxes are timely discharged by the Sellers and (ii) in the case of real estate, minor imperfections of title, none of which, individually or in the aggregate, materially detracts from the value of the affected properties, or materially impairs the use of the affected properties in the manner such properties currently are being used or materially impairs the operations of the Sellers.

10.41.  "<u>Person</u>" or "<u>person</u>" means an individual, corporation, partnership, association, limited liability company, trust, unincorporated organization, other entity or group (as group is defined in Section 13(d)(3) of the Exchange Act).

10.42.  "<u>Released</u>" or "<u>Release</u>" means released, spilled, leaked, discharged, disposed of, pumped, poured, emitted, emptied, injected, leached, dumped or allowed to escape.

10.43.  "<u>Tax</u>" means (i) all income taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings, or profits) and all gross receipts, estimated, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, or windfall profit taxes, unpaid property taxes, environment, alternative, or add-on minimum taxes, custom duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts and (ii) any obligation to indemnify or otherwise assume or succeed to any liability described in clause (i) hereof of any other Person whether by contract or under common law doctrine of de facto merger and successor liability or otherwise.

10.44.  "<u>Taxing Authority</u>" means any federal, state, local, and foreign governmental entity or other authority responsible for the collection or assessment of Tax.

10.45.  "<u>Tax Return</u>" means any return, report, information return or other document (including any related or supporting information or any amended return) filed or required to be filed with any Taxing Authority or other authority in connection with the determination, assessment, or collection of any Tax paid or payable or the administration of any laws, regulations, or administrative requirements relating to any such Tax.

- 31 -

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**BUYER:**

Bayside Gallo Acquisition, LLC

By: _____

    Name:   **Richard Siegel**
    Title:    **Authorized Signatory**

**SELLERS:**

ALEXANDER GALLO HOLDINGS, LLC

By: _____

    Name:
    Title:

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**BUYER:**

Bayside Gallo Acquisition, LLC

By: _____
      Name:
      Title:

**SELLERS:**

ALEXANDER GALLO HOLDINGS, LLC

By:
      Name: ALEXANDER J. GALLO
      Title: PRESIDENT & CEO

[Signature Page to Asset Purchase Agreement]

**SELLERS** (continued):

THE HOBART WEST GROUP, INC.

By:

Name: ALEXANDER J. GAHN

Title: PRESIDENT

[Signature Page to Asset Purchase Agreement]

**SELLERS (continued):**

SET DEPO, LLC

By: _____

Name: ALEXANDER J. GALLO

Title: MANAGER

[Signature Page to Asset Purchase Agreement]

**SELLERS (continued):**

AG/SANCTION LLC

By: Alexander Gallo Holdings, LLC, its sole member

By:

Name: ALEXANDER J. GALLO
Title: PRESIDENT + CEO

[Signature Page to Asset Purchase Agreement]

**SELLERS (continued):**

UNLIMITED LANGUAGES, INC.

By: _____
Name: ALEXANDER J. GARLO
Title: CEO

[Signature Page to Asset Purchase Agreement]

**SELLERS (continued):**

PEACHTREE HOLDINGS, INC.

By: _____

Name: ALEXANDER J. GALLO

Title: PRESIDENT

**SELLERS (continued):**

DEPONET, LLC

By: The Hobart West Group, Inc., its sole member

By: _____
      Name:  ALEXANDER J. GANO
      Title:  PRESIDENT

[Signature Page to Asset Purchase Agreement]

**SELLERS (continued):**

ESQUIRE DEPOSITION SERVICES, LLC

By: The Hobart West Group, Inc., its sole member

By: _____
    Name: ALEXANDER J. GALLO
    Title: PRESIDENT

[Signature Page to Asset Purchase Agreement]

**SELLERS (continued):**

ESQUIRE LITIGATION SOLUTIONS, LLC

By: The Hobart West Group, Inc., its sole member

By: _____
     Name: ALEXANDER J. GALLO
     Title: PRESIDENT

**SELLERS (continued):**

ESQUIRE SOLUTIONS, LLC

By: The Hobart West Group, Inc., its sole member

By: _____
      Name: ALEXANDER J. GALLO
      Title: PRESIDENT

**SELLERS (continued):**

D-M INFORMATION SYSTEMS, INC.

By:
　　Name: ALEXANDER J. GARLO
　　Title: PRESIDENT

**SELLERS (continued):**

HOBART WEST SOLUTIONS, LLC

By: The Hobart West Group, Inc., its sole member

By: _____
    Name: ALEXANDER J. GALLO
    Title: PRESIDENT

[Signature Page to Asset Purchase Agreement]