Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 11-14220-alg

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   ALEXANDER GALLO HOLDINGS, LLC, et al.

9

10                  Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  November 8, 2011

19                  2:45 PM

20

21   B E F O R E:

22   HON. ALLAN L. GROPPER

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2   HEARING re Motion Filed by Debtors For an Order Authorizing and

3   Approving the Sale of Substantially All of the Debtors' Assets

4   Free and Clear of All Liens, Claims, Encumbrances, and Other

5   Interests, Approving Auction and Bidding Procedures in

6   Connection With the Sale of Substantially All of the Debtors'

7   Assets, Authorizing Entry Into a Stalking Horse Agreement and

8   Approving Stalking Horse Protections, Approving Procedures

9   Related to the Assumption and Assignment of Executory Contracts

10  and Unexpired Leases, Scheduling Auction and Sale Approval

11  Hearing, Approving the Form and Manner of Sale Notice, and

12  Granting Related Relief

13

14  HEARING re Second Motion Filed by Debtors for an Order

15  Authorizing the Debtors to Assume and Pay Amounts Owing on

16  Certain Preferred Provider Network Agreements

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    DLA PIPER LLP (US)

4         Attorneys for the Debtors

5         1251 Avenue of the Americas

6         New York, New York 10020

7

8    BY:   THOMAS R. CALIFANO, ESQ.

9          JEREMY R. JOHNSON, ESQ.

10         DANIEL G. EGAN, ESQ.

11

12

13   COOLEY LLP

14         Attorneys for the Official Committee of Unsecured

15          Creditors

16         1114 Avenue of the Americas

17         New York, NY 10036

18

19   BY:   JEFFREY L. COHEN, ESQ.

20         CATHY HERSHCOPF, ESQ.

21         ALEX R. VELINSKY, ESQ.

22

23

24

25

1

2  U.S. DEPARTMENT OF JUSTICE

3       Office of the United States Trustee

4       33 Whitehall Street

5       21st Floor

6       New York, NY 10004

7

8  BY:   NAZAR KHODOROVSKY, ESQ.

9

10

11  DECHERT LLP

12       Attorneys for Bayside Capital

13       1095 Avenue of the Americas

14       New York, NY 10036

15

16  BY:   MICHAEL J. SAGE, ESQ.

17       MICHAEL H.M. BROWN, ESQ.

18

19

20

21

22

23

24

25

Page 5

1

2   FAEGRE & BENSON LLP

3        Attorneys for Wells Fargo Bank, N.A.

4        2200 Wells Fargo Center

5        90 South Seventh Street

6        Minneapolis, MN 55402

7

8   BY:   MICHAEL R. STEWART, ESQ.

9        COLIN F. DOUGHERTY, ESQ. (TELEPHONICALLY)

10

11

12   FULBRIGHT & JAWORSKI LLP

13        Attorneys for Miller Hieman

14        666 Fifth Avenue

15        New York, NY 10103

16

17   BY:   DAVID L. BARRACK, ESQ.

18

19

20   HUNTON & WILLIAMS LLP

21        Attorneys for Winston Noteholders LLC

22        200 Park Avenue

23        New York, NY 10166

24

25   BY:   PETER S. PARTEE, ESQ.

1

2   LOWENSTEIN SANDLER PC

3         Attorneys for Alex Gallo and Andrew Sims

4         65 Livingston Avenue

5         Roseland, NJ 07068

6

7   BY:   SHARON L. LEVINE, ESQ.

8         TOM LIVOLSI, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALEXANDER GALLO HOLDINGS, LLC, et al.

1              P R O C E E D I N G S

2              THE COURT:  Please be seated.  May I have appearances,

3       please?  Alexander Gallo Holdings, et al.

4              MR. CALIFANO:  Good afternoon, Your Honor.  Tom

5       Califano, DLA Piper, on behalf of the debtors.  With me is my

6       partner, Jeremy Johnson, and my associate, Dan Egan.  And also

7       in the courtroom for the company is Alex Gallo, the CEO, Andrew

8       Sims, the CFO, and Dom DiCicco, the general counsel, and

9       representatives of Gordian Group and Carl Marks.  Thank you.

10             MR. SAGE:  Good afternoon, Your Honor.  Michael Sage

11      of Dechert on behalf of Bayside.  My colleague, Michael Brown,

12      is here as well and our client from Bayside Adam Schimel is in

13      the courtroom as well.

14             MR. COHEN:  Good afternoon, Your Honor.  Jeffrey

15      Cohen, Cooley LLP, on behalf of the committee with my partner,

16      Cathy Hershcopf, and my associate, Alex Velinsky.

17             MR. KHODOROVSKY:  May it please the Court, Your Honor,

18      Nazar Khodorovsky for the U.S. trustee.

19             MR. PARTEE:  May it please the Court, Your Honor.

20      Peter Partee from Hunton & Williams LLP here on behalf of

21      Winston Noteholders LLC, chairman of the creditors' committee

22      and the largest unsubordinated unsecured creditor.

23             MR. STEWART:  Michael Stewart of Faegre & Benson on

24      behalf of Wells Fargo as administrative agent for the senior

25      lenders.  And also on the phone today, Your Honor, just

1    listening, not participating, are the two loan officers in

2    charge of this matter, Reggie Dawson and Trent Brendon and my

3    colleague, Colin Dougherty.

4            MS. LEVINE:  Good afternoon, Your Honor.  Sharon

5    Levine and Tom Livolsi, Lowenstein Sandler, for Alex Gallo and

6    Andrew Sims.

7            THE COURT:  All right.  Mr. Califano, where do we

8    start?

9            MR. CALIFANO:  Well, Your Honor, we have two motions

10   on today.  One is a second motion with respect to the

11   assumption of what we have called preferred provider network

12   contracts.  That we have not received an objection to.  And we

13   also have the sale hearing to which we've received an

14   objection.

15           We have narrowed the objection with respect to the

16   sale.  And we have agreed to defer, and we have to work out the

17   timing on this, the determination with respect to the purchase

18   of claims against Mr. Gallo and Mr. Sims.  And what we've

19   agreed is to defer them.  Having read the committee's

20   objection, we agreed to defer them to a later date because we

21   understand the committee has said they do not have appropriate

22   information to make a determination at this point.  So what we

23   would ask is the issue with respect to whether it is

24   appropriate for the buyer to purchase those claims be deferred

25   to a date in which the committee will have what they believe is

ALEXANDER Reese O HOLDINGS, LLC, et al.

1    the appropriate time to review those claims.  So basically,

2    we're asking for that part of the sale to be carved out so we

3    can accommodate their request for more time.

4          THE COURT:    But do you want a completed sale

5    motion today with a purchase price and an order?  You said it's

6    a final order in your proposed 363 order.  Is that what you

7    want?

8          MR. CALIFANO:  Yes, Your Honor.

9          THE COURT:  All right.  So the question is whether or

10   not Mr. Gallo and Mr. Sims get a release for no further

11   consideration.

12         MR. CALIFANO:  And it's not truly a release.  It's

13   whether the claims -- whether it's appropriate for Bayside,

14   under the circumstances of this sale, to purchase those claims

15   without additional consideration.

16         THE COURT:  But you're not telling me that Bayside is

17   going to turn around and sue Mr. Gallo.

18         MR. CALIFANO:  No, they will not.

19         THE COURT:  Okay.

20         MR. CALIFANO:  We understand that they will not.

21         THE COURT:  And this is only company claims.  We're

22   not talking about third party claims under any circumstances.

23         MR. CALIFANO:  Solely company claims, Your Honor.

24         THE COURT:  All right.  Okay.  So I will look forward

25   to hearing from the committee exactly what remains at issue

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER Read & HOLDINGS, LLC, et al.
Pg 10 of 56

Page 10

```
 1     having read their objection.

 2              MR. CALIFANO:  Well, Your Honor --

 3              THE COURT:  But I don't know what you believe still to

 4     be outstanding but maybe it's better for us to hear from them

 5     directly as to what they believe to be at issue at the moment.

 6              MR. CALIFANO:  Yes, Your Honor.  I would just -- what

 7     I was going to ask is should we deal with the assumption motion

 8     which is unopposed first?

 9              THE COURT:  Well, let me ask you about the assumption

10     motion.  If we approve the sale, it would seem to me there's

11     absolutely no reason for this debtor to make the payments if

12     it's going to come out of this debtor's pocket.

13              MR. CALIFANO:  Well, Your Honor --

14              THE COURT:  Are you telling me these cure payments are

15     going to be made by the buyer as additional consideration

16     simply put on top of everything else?

17              MR. CALIFANO:  Yes, Your Honor.  I mean, what really

18     is --

19              THE COURT:  Then why do I have to deal with it today?

20     Why don't they just do what they want if they buy the assets?

21              MR. CALIFANO:  Well, we could, Your Honor.  But the

22     question is, it's a timing issue.  We have made payments.

23     Right now, we're scheduled to close on the 23rd.

24              THE COURT:  If I approve the sale today, the --

25              MR. CALIFANO:  The closing would be on the --
```

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER Read 6 HOLDINGS, LLC, et al.
Pg 11 of 56

Page 11

 1            THE COURT:  -- projected closing date is November

 2    23rd?

 3            MR. CALIFANO:  Yes, Your Honor.

 4            THE COURT:  All right.  So everybody can enjoy

 5    Thanksgiving?

 6            MR. CALIFANO:  That's the hope.  That is the hope.

 7            THE COURT:  Okay.

 8            MR. CALIFANO:  And it's a timing issue because this is

 9    a small world of court reporters.  And certain of them have

10    been paid.  Others have been -- are waiting to get paid.  So

11    it's purely a timing issue because whether or not the buyer

12    pays it directly or whether it's paid by the debtor, it'll come

13    out of either the DIP or the purchase price.  So it really is

14    just a timing issue.

15            THE COURT:  What is the DIP today?

16            MR. CALIFANO:  The DIP today, Your Honor, is six

17    million.  It's estimated as of the closing, it'll be eight

18    million.

19            THE COURT:  Why does it go up to eight million?

20            MR. CALIFANO:  Just because of the timing of certain

21    payments.

22            THE COURT:  And that's a payment for which the buyer

23    is responsible?

24            MR. CALIFANO:  Yes, Your Honor.  Well, the DIP under

25    the -- the DIP is just rolled into the purchase price.

11-14220-alg    Doc 293    Filed 11/11/11    Entered 11/21/11 16:34:18    Main Document
ALEXANDER Read of HOLDINGS, LLC, et al.
Pg 12 of 56

Page 12

1          THE COURT:  Where do I see that?  Is that in the

2     purchase agreement?  It's not in -- I was looking for it ---

3     you gave me a bunch of schedules today.  It's not in the

4     schedules, is it?  I -- maybe I should withdraw the question.

5     If that's what the intention is, I assume the parties have

6     taken care to have it in there.

7          MR. CALIFANO:  Yes, Your Honor.

8          THE COURT:  But -- see, I have the schedule of assumed

9     liabilities:  accounts payable, 4.1 million; payroll and

10     payroll taxes accrued, 1.7; reporter fees, 3.6.  Total, 1.1.  I

11     don't see the DIP in there.

12          MR. CALIFANO:  Well, Your Honor, it is, I am told, in

13     1.2(a) which is description of the purchase price.

14          THE COURT:  Okay.  All right.  And this additional --

15          MR. CALIFANO:  You see --

16          THE COURT:  The additional 400,000 that gets paid to

17     the preferred provider network is presumably in the 3.6 million

18     of reporters?

19          MR. CALIFANO:  It is in -- yes, Your Honor.

20          THE COURT:  Or it's somewhere.

21          MR. CALIFANO:  Yes.

22          THE COURT:  Okay.

23          MR. CALIFANO:  But the DIP -- it's in the DIP budget

24     and the DIP financing agreement as part of the --

25          THE COURT:  So as I understand the structure, all the

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER ROAD & HOLDINGS, LLC, et al.
Pg 13 of 56

Page 13

```
 1    priority and administrative creditors get paid in full, Wells

 2    Fargo gets paid in full, the second lien is satisfied by the

 3    credit bid.

 4              MR. CALIFANO:  Yes, Your Honor.

 5              THE COURT:  And everybody gets something other than

 6    the stockholders and the unsecured creditors.

 7              MR. CALIFANO:  Well, some of the unsecureds, Your

 8    Honor -- there's about 3.9 million in cures.  There is

 9    approximately 2.6 million in the preferred provider network.

10    So what --

11              THE COURT:  The employees are protected.

12              MR. CALIFANO:  The employees are protected, Your

13    Honor.

14              THE COURT:  Okay.

15              MR. CALIFANO:  Your Honor, and what it was designed

16    and where we're going --

17              THE COURT:  And I said before, that's pretty

18    impressive.

19              MR. CALIFANO:  And I think --

20              THE COURT:  I'm not ignoring that but I'll hear

21    from -- obviously, I'll hear from the committee whose duty is

22    to the unsecured creditors.

23              MR. CALIFANO:  Well, there are -- and I just wanted to

24    point out there are some unsecured creditors, probably -- 2.6

25    plus 3.9 is 6.5 million of unsecured creditors -- their cure
```

1    costs are being paid in full.  So --

2          THE COURT:  How many -- what is left of trade

3    creditors?

4          MR. CALIFANO:  There is, Your Honor --

5          THE COURT:  I'm now excluding the debt.

6          MR. CALIFANO:  The trade creditors -- there's -- I can

7    go through what's on the page.  There's 8.5 million in the

8    balance of trade creditors.  There's 6.1 million that is owed

9    to Mr. Gallo both in deferred comp and loans that he made for

10   the company which he received no payment.  There's 300,000 in

11   loans made by Mr. Sims for which he received no payment.  And

12   there's a hundred million of the AKKR notes and thirty million

13   of the Winston not for which he received no payment.

14       (Pause)

15          THE COURT:  Okay.

16          MR. CALIFANO:  And, Your Honor, the way it was

17   designed and the way it was negotiated was that next dollars

18   through the sale process would go to general unsecured

19   creditors.  We ran the agreed upon marketing process that the

20   committee had weighed in on.  We gave them updates on how the

21   process went.  Unfortunately, there were no bids, no other

22   bidders even attempted to qualify.  And I think that's evidence

23   that we've received full value for the assets.  There was -- no

24   one showed up.  No one was calling us the week before.  People

25   came in and did due diligence.  We had management meetings with

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER Read & HOLDINGS, LLC, et al.
Pg 15 of 56

Page 15

1    a number of potential buyers.  The committee was brought up to

2    speed on all of this.  No one posted which is probably a

3    reflection that we've gotten full value at least.

4            THE COURT:  Well, there's a lot of debt.  How much is

5    the second lien debt today?

6            MR. CALIFANO:  The second lien debt is 31.3 million,

7    Your Honor.  The first secured is estimated at 47.8.  And then,

8    as I said, between professional fees, assumed liabilities and

9    wind-down costs, there's an additional 16.4 million.

10           The total cash -- or total purchase price, Your Honor,

11   when you factor in these items, not counting breakup fee and

12   bid protection and the like, exceeds 103 million.

13           THE COURT:  Shall I hear from the committee as to

14   exactly where we are or any other party wishes to be heard?

15           MR. COHEN:  Good afternoon, Your Honor.  Jeffrey

16   Cohen, Cooley, on behalf of the committee.  I didn't see anyone

17   else get up so I assume it's my turn.  My apologies for my

18   voice.

19           Your Honor, the committee does, in fact, despite

20   filing an objection, echo your sentiment that it sounds like a

21   pretty good deal having covered those various buckets of claims

22   that Your Honor identified.  Your Honor is right.  That's a

23   solid result paying off the various tranches of security,

24   indebtedness, the admins and the priorities.  And all that's

25   left are the unsecureds and equity.  What we want is to make

1    sure, Your Honor, through something other than statements made

2    by counsel to the businesspeople that there is no, in fact,

3    undisclosed deal to deliver equity to either existing equity or

4    a management, one day, three months, six months after Your

5    Honor enters an order approving the sale.  It's one thing we've

6    heard from counsel to Bayside and counsel for the debtor for

7    them to say that despite there being a very detailed equity

8    arrangement and compensation structure laid out for management

9    in a plan support agreement that was aborted on the eve of

10   bankruptcy, it's one thing to hear from counsel that since that

11   agreement was abandoned that there have been no current

12   discussions on what the terms of their retention will be post-

13   sale.  But the fact is, Bayside is a financial party not a

14   strategic.  They are retaining the CEO, CFO and all of other

15   management.  And the terms of their compensation have to be

16   discussed at some point.  And the question is, Your Honor, does

17   going through a 363 sale rather than a plan alleviate the

18   parties from the obligation to disclose to Your Honor what the

19   details of those arrangements are.  And if it at all mirrors

20   what the plan support agreement was, somewhere close to fifty

21   percent of the equity in Newco of certain warrants were

22   exercised could have landed back in the laps of management.

23   And we just want to hear from the mouths of the businesspeople

24   before Your Honor enters an hour approving a sale that gives a

25   distribution to all but unsecureds and equity that that's not

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER ROAD & HOLDINGS, LLC, et al.
Pg 17 of 56

Page 17

1      going to happen, Your Honor.

2              THE COURT:  Well, let me ask you this.  Is there any

3      prohibition on the new owners coming to an arrangement

4      regarding employment with former management?

5              MR. COHEN:  I don't believe so, Your Honor.  The part

6      that's troubling from an intellectual standpoint is you do sit

7      back and you say, well, you know, we're not in a plan context.

8      You don't need to disclose to me who their new directors are

9      going to be.  They don't need to sit up here and tell me

10     they're not violating the absolute priority rule by

11     distributing equity to former equity holders who may also be

12     management.  But, frankly, Your Honor, setting the Code aside

13     for a moment and realizing that we're in a sale hearing other

14     than a plan hearing, to us, it shouldn't change.  To us, it's

15     still, for lack of a better term, morally distasteful that by

16     changing your disposition strategy, within twelve to twenty-

17     four hours of the bankruptcy filing, you could alleve

18     yourselves -- or alleviate yourselves the obligation to own up

19     to certain burdens of proof and to certain disclosures to the

20     Court.  And they can get on the stand, Your Honor, and say

21     exactly that, that they've had no conversations, they don't

22     plan on having conversations, they're going to work pro bono.

23     Let them say it to Your Honor and the order can get entered.

24     But, frankly, Your Honor, having seen an employment agreement

25     that governs the relationship between the company and the CEO

1    to date, having seen the level of detail that was included in

2    the original agreement between the parties, the committee finds

3    it hard to believe that no discussions had been or ever will

4    happen with regard to the terms of their compensation.  And

5    when you're looking at a pot of upwards of 150 million dollars

6    of unsecured creditors that look to receive nothing, I think

7    it's important to make sure that nothing is somehow being

8    circumvented around them.

9            THE COURT:  Well, let's parse out your three time

10   periods.  One, they could get up and say, to use your words,

11   that they haven't had any negotiation since the filing.  I

12   understand your point that before the filing there were

13   apparently some negotiations.  But let us say they say we

14   haven't reached the issue yet.  We want to hire you.  We want

15   you to stay around but the terms have not been reached.  Is

16   that the right thing to do or is that the wrong thing to do in

17   the context of this 363 sale as far as you're concerned?  In

18   other words, is it right for them to say, look, we've got a 363

19   sale?  It's not appropriate for us to discuss compensation at

20   this point.  It's an issue but it's premature.  Is that the

21   right or the wrong thing for them to do?

22           MR. COHEN:  In the committee's view, that's the wrong

23   thing for them to do.

24           THE COURT:  Wrong thing?

25           MR. COHEN:  Indeed, Your Honor.

1          THE COURT:  Why is that?

2          MR. COHEN:  'Cause, Your Honor, there was a marketing

3     process run for this company.  Prior to the petition date, that

4     marketing process opened only to financial parties.  Companies

5     prohibited from approaching strategics.

6          THE COURT:  Right.  But then after the filing, I

7     gather, it was opened up and you haven't complained that the

8     marketing process was somehow slanted, tilted, unfairly managed

9     to favor financial buyers rather than strategic buyers, is that

10    right?

11         MR. COHEN:  We have not made that argument.

12         THE COURT:  You have not made that argument.  So as

13    far as I understand your position, management, in that respect,

14    didn't do anything wrong or at least they didn't get in the way

15    of their investment bankers or their chief restructuring

16    officer.

17         MR. COHEN:  That's correct.

18         THE COURT:  Okay.  So why is it wrong for them to say

19    it's unseemly for us to discuss compensation at this point?

20    You're running the company.  We're a buyer.  We're going to

21    postpone that.

22         MR. COHEN:  It's a good question, Your Honor.  And

23    let's, if we can, play out the hypothetical a little bit

24    further.

25         THE COURT:  Okay.

Page 20

1          MR. COHEN:  Despite the fact that we know that there
2    were no bids at the bid deadline.  The fact that the process
3    was opened up as of the petition date or, I think, ten days or
4    so later to strategic parties, had a strategic party submitted
5    a bid by the bid deadline, it would have actually been
6    important to know if the financial party, the stalking horse,
7    had reached compensation arrangements with management 'cause at
8    an auction of comparing a strategic versus a financial where
9    the strategic was not going to retain management and the
10   financial would, you would have a different assumption of
11   liabilities column to compare against each other.  So I think
12   it would have been important had a bid come in from a strategic
13   to know what deal was in place with management and whether that
14   would have impacted the valuation announcements --

15          THE COURT:  Well, we do know.  There wasn't -- we do,
16   know unless you challenge the assertion, there was no deal.  So
17   their position is we had no deal.  We might make one but we had
18   no deal, therefore, any other buyer is in the same position as
19   we are.  You make your deal after the fact if you want to.

20          Mr. Califano?

21          MR. CALIFANO:  I'm sorry to interrupt but I just want
22   to remind Mr. Cohen that we agreed that prior to the auction if
23   a deal existed, we would notify all qualified bidders as to
24   what -- and the committee, of course, what that deal was.  So
25   we understand -- he's right that somebody would want to know.

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDRIA REAL ESTATE HOLDINGS, LLC, et al.
Pg 21 of 56

Page 21

1    And we anticipated that and we agreed that if a deal existed

2    prior to the auction that we would disclose it.

3            THE COURT:  But your position is that no deal was

4    reached and no deal is in existence as of today.

5            MR. CALIFANO:  It's better than my position.  It's the

6    actual truth, Your Honor.  But I will tell you if Mr. Cohen is

7    right that they should have been negotiating, the fault is on

8    me because I thought it would be inappropriate for them to

9    negotiate while we had a marketing process going on.  So the

10   person --

11           THE COURT:  Well, you might have read my decision in

12   Granite Broadcasting --

13           MR. CALIFANO:  Yeah.

14           THE COURT:  -- where I have dealt -- are you familiar

15   with it, Mr. Cohen?

16           MR. COHEN:  I am, Your Honor.

17           THE COURT:  I have dealt with these issues.

18   Certainly, my view in that case was that you shouldn't.  You

19   should divorce what management is going to get from

20   management -- if anything, from management's administration of

21   any sale or bidding process.  At least, that was my view in a

22   very hotly contested case, In re Granite Broadcasting, 369 B.R.

23   120, for those who are interested.

24           MR. CALIFANO:  And one more fact, Your Honor.  We did

25   disclose in the schedules that the buyer did intend to offer

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER Read 6 HOLDINGS, LLC, et al.
Pg 22 of 56

Page 22

1   employment post-sale hearing to the four insiders.  We did

2   disclose that and we actually asterisked it.  And we informed

3   the committee of that early on.  But no terms were reached and

4   no terms were actually negotiated during the marketing period.

5          MR. COHEN:  Well, in the sale motion, the debtors

6   disclosed that the management and the buyer were in the process

7   of negotiating the terms of post-sale compensation.  So while

8   they throughout said that no compensations were happening, in

9   the motion it said they were and that they will continue.  So

10  there was a little bit of a mixed message in that regard, Your

11  Honor.  There was slightly more than just the instinct or the

12  gut feeling that discussions have to happen at some point

13  anyway given the deal that was in place within hours of the

14  bankruptcy filing that was abandoned between the parties.

15         And, Your Honor, frankly, the committee is not

16  certainly discarding any of Your Honor's suggestions.  We agree

17  with all your observations.

18         THE COURT:  Well, you can -- you don't have to agree

19  with my observations or my decisions.

20         MR. COHEN:  I know.

21         THE COURT:  But I'm just trying to clarify where we

22  are.

23         MR. COHEN:  And I haven't before.  You've reminded me

24  of that.

25         THE COURT:  You said when you broke, I think, your

1    time period into pre and post, you said they shouldn't have

2    any -- if I heard you right, you said they shouldn't have any

3    discussions post purchase.  I don't -- is that the committee's

4    position?

5              MR. COHEN:  No.  No, Your Honor.  And perhaps I may

6    have misspoken.  If I did, I apologize.  Your question was

7    breaking it into three periods.  The last period we spoke about

8    was during the petition period, so petition date through today.

9    The post-sale period, actually, Your Honor, is what we're

10   concerned about.  We have between today and the closing date.

11   We have the closing date thereafter.  And your question was do

12   you think that we have a right or an ability to even control

13   what a buyer does with their company at that point.  And I

14   think you're right.  I agree with Your Honor the observation is

15   I don't think statutorily you necessarily have the ability to

16   tell a purchaser would a purchaser want to buy a company that

17   they still have oversight over.  And the Court no one has

18   oversight after the purchase.

19              To us, to the committee, Your Honor, we do not believe

20   that parties should be rewarded, perhaps at the good advice of

21   counsel, for the timing of their discussions if the timing of

22   their discussions would change the outcome of today's hearing.

23   Just because you delay those discussions for a month, had you

24   had them a week ago, and they came in in front of Your Honor

25   and said twenty-five percent of the company was going to

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER REALTY HOLDINGS, LLC, et al.
Pg 24 of 56

Page 24

```
 1    management, would it be a problem, 'cause if it would be a
 2    problem in that regard then it should be a problem anyway
 3    regardless of timing.  That's the committee's position.  And if
 4    the --
 5              THE COURT:  All right.
 6              MR. COHEN:  -- witnesses take the stand and they say
 7    what they say which is what I expect to hear that there have
 8    been and won't be, it is what it is, Your Honor.  At least, the
 9    businesspeople have gotten on and testified and Your Honor can
10    enter an order without us believing that maybe there's an
11    undisclosed agreement.
12              THE COURT:  All right.  Now the debtors want me to put
13    on for a subsequent hearing before November 23rd the question
14    of whether or not the company releases claims against Mr. Gallo
15    and Mr. Sims.  I think that's the proposition.
16              MR. COHEN:  Well, if it's the proposition between
17    counsel, it was not before November 23rd, then maybe I should
18    get updated.
19              MR. CALIFANO:  Excuse me?
20              THE COURT:  I thought that you wanted this done, if
21    possible, before the closing date.
22              MR. CALIFANO:  If we could do it before the closing
23    date that would be ---
24              THE COURT:  That would be good but not essential.
25              MR. CALIFANO:  It would be -- I think it would be
```

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
Pg 25 of 56
ALEXANDER Read & HOLDINGS, LLC, et al.

Page 25

1    appropriate.  But if we can't do it before then, we'll do it

2    after.

3              THE COURT:  All right.  I'll hear from Mr. Cohen then

4    as to -- and I don't have to hear from him now as to what a

5    reasonable period of investigation would be.

6              MR. COHEN:  No.  I'm fine.  If Your Honor's okay with

7    it, I'm fine -- I thought I had discussed with counsel that we

8    would try to do it in the next day -- he had said thirty days,

9    I had said sixty days.  So November 23rd was not what we had

10   previously discussed.  But --

11             THE COURT:  Okay.

12             MR. COHEN:  -- earlier in the case, Your Honor, we

13   advised the Court and the parties that the committee

14   intentionally did not retain a financial advisor earlier in the

15   case 'cause it wasn't necessary to mirror the efforts of the

16   debtors' financial advisor and investment banker for the sale

17   process but that we would ultimately want to retain someone for

18   the investigative phase of this case which would happen post-

19   sale.  So it's at this time the committee's going to decide and

20   will likely retain somebody.  And while we've gotten a

21   headstart  on those efforts by collecting much of the raw data

22   that will be necessary, we do need to retain that individual or

23   that firm and do the proper analysis including the appropriate

24   solvency analyses at the times of the transfers.

25             So we believe -- if I'm being honest, Your Honor, I

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER GALLO HOLDINGS, LLC, et al.
Pg 26 of 56

Page 26

1    think thirty to forty-five days is ample.  But given that, we

2    have to retain somebody.  And that we have Thanksgiving and the

3    holidays, we think sixty days makes sense.

4              THE COURT:  Have you completed your examination of

5    the -- you had a specific period of time to examine into the

6    perfection of the first and second lien lenders.  Have you

7    completed that?

8              MR. COHEN:  We have, Your Honor.  There'll be no

9    challenge.

10             THE COURT:  There's no challenge.  All right.  That

11   simplifies matters.

12             MR. COHEN:  This is -- and, in fact, Your Honor, there

13   were four insiders listed on the schedule.  And the carve-out

14   only applies to two.  So we've narrowed the issues greatly.

15   But the information we received on those two individuals we

16   have only received recently and we haven't had the assistance

17   of --

18             THE COURT:  And the debtors propose to release a lot

19   of potential avoidance claims or at least to transfer them.  I

20   gather they're being transferred to be released.  Is that

21   correct, Mr. Sage?

22             MR. SAGE:  Yes, Your Honor.

23             THE COURT:  And I haven't heard any separate objection

24   to that.

25             MR. SAGE:  That's correct, Your Honor.

1        THE COURT:  Except that I would hope that since it

2   appears that the debtors are rejecting a lot of employment

3   agreements, setting aside the agreements of Mr. Gallo and Mr.

4   Sims, I would hope that if the debtors are going to release

5   claims against these same officers or employees that the

6   officers and employees, if they're going to get a release, will

7   release the company --

8        MR. CALIFANO:  Yes, Your Honor.

9        THE COURT:  -- as well from claims --

10       MR. CALIFANO:  Yes, Your Honor.

11       THE COURT:  -- under their employment agreement.

12       MR. CALIFANO:  And one thing, Your Honor.  There is a

13   significant number of avoidance actions that remain.  And that

14   will be available for the committee, several million dollars of

15   avoidance actions.

16       I would just like to -- I don't know if Mr. Cohen is

17   finished or not but there's a couple of things he said I just

18   would like to address, Your Honor.

19       THE COURT:  All right.

20       MR. CALIFANO:  Mr. Cohen said something telling to me,

21   Your Honor.  And I think we can dispose of this issue very

22   quickly.  He said if it would change the outcome of today's

23   hearing.  If a deal would change the outcome of today's

24   hearing.  Now my understanding -- and if I'm wrong, Your Honor

25   -- my understanding is the only time it would be an issue in a

1    sale if there is a deal with insiders if a deal existed and we

2    didn't disclose it or if we favored one purchaser who provided

3    a deal to insiders as opposed to a purchaser who did not.  Now

4    we know that didn't happen here because there was no other

5    purchaser.

6            Now, Your Honor, it was my belief, as Your Honor set

7    forth in the Granite case, that while we have this marketing

8    period, there shouldn't be active discussions between

9    management.  I can't compel that but that -- you know, I can't

10   tell people not to talk but --

11           THE COURT:  Sure you can.

12           MR. CALIFANO:  Well, I can't make them not talk.  But

13   I can advise them not to talk.

14           THE COURT:  Well, hopefully, they're following your

15   legal advice.

16           MR. CALIFANO:  But I didn't think it was appropriate,

17   Your Honor.  I didn't think it was appropriate.  And I thought

18   that management and the buyer did the right thing by saying we

19   intend to have employment agreements, we intend to offer

20   employment but there's no deal.

21           Now it goes both ways.  The buyer doesn't know that

22   they're going to have this management team.  The management

23   team doesn't know that they're going to have a job.  There's an

24   understanding; nobody knows what the terms are.  And they're

25   not compelled to make an offer for employment.

1          So, Your Honor, none exists.  And we can have the

2    testimony from both Bayside and from Mr. Gallo that no deal

3    exists.  Your Honor, we agreed that any deal that existed at

4    the auction would be disclosed to the committee and all

5    qualified bidders.  But I think what Mr. Cohen said is the most

6    important thing.  And the fact is if it would change the

7    outcome of today's hearing.  And we've cited cases that say

8    there's no pro se prohibition.  Everyone knows in these sales

9    when a financial buyer comes in, they usually keep management

10   on because a financial buyer doesn't have the management in

11   place.

12          THE COURT:  Well, they may or may not.  But --

13          MR. CALIFANO:  They may or may not.  But if there

14   was -- I submit, Your Honor, if a deal was struck between now

15   and the closing, after the closing, it's irrelevant, Your

16   Honor.  What is happening here is no one is hiding the ball.

17   We're being completely open.  There is no deal today.

18          Now the committee could have avoided this because they

19   could have deposed Bayside's representative.  They could have

20   deposed the debtors' representative.  We have depositions

21   scheduled --

22          THE COURT:  Are you regretting a lack of depositions?

23          MR. CALIFANO:  No.  We scheduled them.  They canceled

24   them, Your Honor.  We had an interesting deposition of the

25   committee which we can talk about, Your Honor.  It was a very

Page 30

1   interesting deposition at which the chair of the committee who

2   was on the witness list but is the proverbial empty chair

3   today.  But he said the committee has no evidence of a deal.

4          THE COURT:  Well --

5          MR. CALIFANO:  So we've had this --

6          THE COURT:  -- I haven't heard the committee assert

7   that there is a deal.  Committee has asserted that there were

8   discussions before the filing date.

9          MR. CALIFANO:  Which we disclosed.

10          THE COURT:  And I will, I think -- perhaps we are

11   getting to the question of what testimony you think we should

12   have for the record and what testimony the committee believes

13   we should have, what issues are -- what factual issues --

14          MR. CALIFANO:  I agree, Your Honor.

15          THE COURT:  -- are in dispute.

16          MR. CALIFANO:  And Mr. Gallo is prepared to get on the

17   stand and say there's no deal.  I understand from Mr. Sage his

18   client is prepared to get on the stand and say there's no deal.

19   But I think what's really important here, Your Honor, is that

20   it doesn't matter because even if a deal existed, as long as it

21   was not a hidden deal, as long as it's not an undisclosed deal,

22   it wouldn't give rise to an objection to the sale.

23          THE COURT:  Perhaps you've answered your own question

24   in that -- or made your own point.  If there was a deal, it was

25   hidden because it's been asserted by everyone that there wasn't

11-14220-alg    Doc 293    Filed 11/11/11    Entered 11/21/11 16:34:18    Main Document
Pg 31 of 56
ALEXANDER Capital of HOLDINGS, LLC, et al.

Page 31

```
 1    a deal.  But I'll accept that as a proffer unless parties want
 2    it confirmed under oath, which is perfectly fine.  And maybe we
 3    should have it confirmed --
 4            MR. CALIFANO:  Your Honor, I'd like to have it
 5    confirmed.
 6            THE COURT:  -- under oath.  All right, and that's not
 7    the on -- that may not be the only issue.  Maybe you want to
 8    put on some testimony with regard to the sale process, although
 9    I'm not sure there are any issues.
10            MR. CALIFANO:  There are no issues --
11            THE COURT:  Certainly no one has raised an issue that
12    the process wasn't open, wasn't professionally administered,
13    parties other than the buyer, the so-called stalking horse
14    buyer weren't given a fair opportunity and enough time to
15    examine the company and make a determination as to whether or
16    not they would submit a competing bid.
17            MR. CALIFANO:  Well, Your Honor, it's not at issue,
18    but we could proffer the testimony of Mr. Kaufman who is here
19    from the Gordian Group, and he would testify that the debtors
20    and their professionals followed the marketing process as laid
21    out in Your Honor's bid procedures, that also the committee was
22    given regular updates on who was in the data room and who was
23    doing due diligence.
24            Additionally, Mr. Kaufman would testify that parties
25    that were brought to his attention by the committee were given
```

Page 32

1    access to the data room and given an opportunity to determine

2    whether they wanted to make a bid.

3            He would also testify, Your Honor, that no bids were

4    received, qualified or unqualified, and that when contacted,

5    all of the parties who had conducted due diligence stated that

6    they declined to go forward.

7            So I don't believe we need testimony because it's not

8    at issue, but we can proffer the testimony of Mr. --

9            THE COURT:  Well, let me ask the committee or any

10   party, does anyone object to receiving the proffer, and does

11   anyone wish to cross-examine Mr. Kaufman?

12           MR. COHEN:  Your Honor, the committee indicated to Mr.

13   Califano yesterday we would stipulate to that testimony.

14           THE COURT:  All right.  Thank you.  All right.  I

15   think we already have testimony in the record with regard to

16   the bidding procedures hearing on the need for a quick sale and

17   on the debtors' business judgment in going forward with the

18   sale rather than with the plan, and I'll incorporate that

19   testimony in the record today, if there's no objection.

20           MR. CALIFANO:  And I would believe then, Your Honor,

21   the only testimony that would be appropriate is Mr. Gallo's

22   testimony and Mr. Schimel's testimony that no deal exists and

23   also the basis for the good faith finding.

24           THE COURT:  Yes.  All right.  Shall we do that?  Let's

25   have Mr. Gallo come forward.  Please state your name for the

1    record.

2         (Witness sworn)

3              THE COURT:  Please be seated.  Proceed.

4    DIRECT EXAMINATION

5    BY MR. CALIFANO:

6    Q.   Mr. Gallo, what is your relationship to these debtors?

7    A.   I'm the CEO of the company.

8    Q.   You need to speak a little more clearly so the recorder

9    can pick it up.

10   A.   Sure.  The CEO of the company.

11   Q.   That's something you should be --

12   A.   Yeah.  I should be.  Yes.  I'm sorry.

13   Q.   Let me ask you directly, have you negotiated a deal with

14   the purchasing entity for any interest in the entity post

15   closing?

16   A.   I have not.

17   Q.   Okay.  Was there a pre-petition term sheet for

18   participation in the post-reorganized debtor?

19   A.   As a plan of reorganization there was, yes.

20   Q.   Okay.  And what happened to that deal?

21   A.   The terms of that deal went away when we went to a 363

22   sale.

23   Q.   And how was that communicated to you?

24   A.   Through Peter Kaufman with Gordian.

25   Q.   And what were you told by Mr. Kaufman?

Page 34

1   A.   That the original deal is off the table, the economics

2   have changed.

3   Q.   Okay.  And since that time has anybody indicated to you

4   that the original deal is back on the table?

5   A.   Absolutely not.

6   Q.   Okay.  And what is your expectation post closing?

7   A.   I expect to be working with the company for HIG.

8   Q.   Okay.  Do you have -- have you been told the terms of that

9   appointment?

10  A.   No.

11  Q.   Okay.

12       MR. CALIFANO:  Thank you, Your Honor.  No further

13  questions.

14       THE COURT:  Anyone else?  Any cross-examination?

15       MR. SAGE:  No, Your Honor.

16       THE COURT:  All right.  Thank you, Mr. Gallo.  You may

17  step down.

18       MR. CALIFANO:  Mr. Schimel.

19       THE COURT:  Please state your name for the record.

20       MR. SCHIMEL:  Adam Schimel.

21       (Witness sworn)

22       THE COURT:  Please be seated.

23  DIRECT EXAMINATION

24  BY MR. SAGE:

25  Q.   Mr. Schimel, where do you work?

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER KATZ & HOLDINGS, LLC, et al.
Pg 35 of 56

Page 35

1   A.   Bayside Capital.

2   Q.   What's your -- what are your responsibilities regarding

3   Gallo investment banking?

4   A.   I manage the investment on a day-to-day basis.  I work on

5   a team of four people, I report to Jackson Craig who's the

6   senior partner on the transaction.

7   Q.   And why isn't Jackson Craig here today?

8   A.   His wife is in surgery.

9   Q.   Other than the DIP loan and the second lien loan, does

10   Bayside have any interest in the Gallo Companies?

11   A.   No.

12   Q.   Was any employment arrangement negotiated with Mr. Simms

13   or Mr. Gallo since the petition date?

14   A.   No.

15   Q.   Was any equity, promise or arrangement negotiated between

16   Gallo -- between Bayside on the one hand and Mr. Simms and Mr.

17   Gallo on the other hand, since the petition date?

18   A.   No.

19   Q.   Is it possible -- do you believe, based on your course of

20   conduct at Bayside, that anyone other than you could have

21   negotiated such an arrangement for equity or employment?

22   A.   No.

23   Q.   And if someone had negotiated something from Bayside,

24   would they have talked to you about it?

25   A.   Yes.

11-14220-alg    Doc 293    Filed 11/11/11    Entered 11/21/11 16:34:18    Main Document
Pg 36 of 56
ALEXANDER GALLO HOLDINGS, LLC, et al.

Page 36

1   Q.   In short, is there any kind of secret deal between Bayside

2   and Gallo?

3   A.   No.

4   Q.   Were the negotiations with respect to the APA, schedules

5   and the bid procedures before that hard-fought negotiations?

6   A.   Yes.

7              MR. SAGE:  No further questions.

8              THE COURT:  Anyone else?  Any other questions with

9   regard to the finding of good faith under 363(m)?

10  FURTHER DIRECT EXAMINATION

11  BY MR. SAGE:

12  Q.   Did -- did Bayside have any discussions, whatsoever, with

13  any other potential buyers of the company during the bidding

14  period?

15  A.   No.

16  Q.   Or before?

17  A.   No.

18             MR. SAGE:  Thank you.

19             THE COURT:  I take it, Mr. Schimel, that the

20  negotiations for the purchase were on an arm's-length basis and

21  there are no side deals that have not been disclosed?

22             THE WITNESS:  That's correct.

23             THE COURT:  Okay.  Anyone else?  All right.  You may

24  step down.  Thank you.  Any other testimony?

25             MR. CALIFANO:  No, Your Honor.  Your Honor, I would

1    just state that the debtors believe that the marketing process

2    that was agreed to by the committee that they've attained fair

3    value of the assets.  The sale, as currently constituted with

4    the components as described to the Court, is the best possible

5    result for these estates.

6          There is no allegation or evidence of any improper

7    conduct.  Your Honor, the bidder, we believe -- the buyer, the

8    proposed buyer, satisfies the requirements of 363(n) and we

9    would ask that Your Honor authorize the sale and authorize the

10   debtor to expeditiously move towards closing.

11         THE COURT:  Okay.  Anyone else?  Any further argument?

12         MR. COHEN:  No further argument, Your Honor.  Just the

13   only open issue, subject to Your Honor's comments, is the

14   timing on the carved out portion.

15         THE COURT:  Let me make sure, Mr. Califano, that I

16   understand some of the terms, I haven't been in the middle of

17   this.  I gather that you have until tomorrow to decide which

18   employment contracts to assume, is that correct?

19         MR. CALIFANO:  Well, the debtor has -- I'm sorry, the

20   debtor has granted to the buyer certain designation rights so

21   contracts can move from the assumption to the designated, sort

22   of, holding pattern agreement.  Then a period of time, post

23   closing to determine which agreements they will assume and

24   which they will reject.

25         THE COURT:  How does that work?

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER Read & HOLDINGS, LLC, et al.
Pg 38 of 56

Page 38

1          MR. CALIFANO:  Well Your Honor, as we stated at the

2     bid procedures hearing, we have agreed that certain executory

3     contracts, for a period post closing, so long as the buyer

4     agrees to pick up the administrative expense liability with

5     respect to those contracts, the decision to assume or rejected

6     will be abated for that period of time.

7          THE COURT:  For how long?

8          MR. CALIFANO:  It's, I believe, Your Honor -- it's

9     until confirmation of a plan, Your Honor.  And we, just so that

10    Your Honor -- just to close the loop, we anticipate filing the

11    plan by the end of this week.  We'll have drafts out to the

12    committee and to the purchaser hopefully within the next

13    twenty-four hours.

14         THE COURT:  I'm not sure the purchaser has a very

15    great interest but I'm sure their comments would be -- would be

16    welcome.  All right.  I've already commented that it would seem

17    to me, if you're going to be releasing avoidance actions

18    against parties, before you do that you should be pretty sure

19    that those parties aren't going to be filing claims against the

20    company.

21         MR. CALIFANO:  Yes, Your Honor.

22         THE COURT:  That would include employment arrangements

23    as well.

24         MR. CALIFANO:  Yes, Your Honor.

25         THE COURT:  And I gather that although there were

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER REALM HOLDINGS, LLC, et al.
Pg 39 of 56

Page 39

1   four -- there's only one -- in the new schedules it's only the

2   Gallo avoidance action that is excluded, but I gather that

3   would be true for Mr. Simms if there is one as well.

4          MR. CALIFANO:  Yes, Your Honor.

5          THE COURT:  But only Mr. Simms?

6          MR. CALIFANO:  Yes.

7          THE COURT:  All right.  Now cure amounts, I gather we

8   have procedures for determining cure amounts, if necessary, at

9   a hearing on the 16th at 2:30, is that right?

10         MR. CALIFANO:  Yes, Your Honor.

11         THE COURT:  Who pays for the cure amounts?

12         MR. CALIFANO:  The buyer.

13         THE COURT:  The buyer.  All right.  And it's hard for

14  me to tell, with all the changes made with regard to employment

15  benefit plans, are they -- are they going to create a series of

16  damage claims against the debtor or are they, in effect, either

17  going to expire or are they going to be assumed?

18         THE COURT:  They will not -- they will not create

19  claims.

20      (Pause)

21         THE COURT:  All right.  I assume that what you've told

22  me with regard to employment contracts is basically what's

23  meant by 1.1(d)(xii) of the asset purchase agreement on page 8.

24         MR. CALIFANO:  I'm sorry, Your Honor.  I'm looking

25  at -- I must be looking a different version.

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER GALLO HOLDINGS, LLC, et al.
Pg 40 of 56

Page 40

1          THE COURT:  Looking at the blackline, which may be

2     different, this is the section called "Excluded Liabilities"

3     (d)(xii).

4          MR. CALIFANO:  Yes, Your Honor.  I'm sorry.  What was

5     the question?

6          THE COURT:  Well, I guess I could just ask you a

7     simple question, what does that mean?  What does this paragraph

8     mean?  You may want to consult with some of your colleagues.

9          MR. CALIFANO:  Right.

10          MR. JOHNSON:  Your Honor, if I may.  Jeremy Johnson.

11     If -- this is a little bit confusing here because we refer to

12     employment contracts in two different senses.  There are

13     employment contracts with -- most of them are being rejected

14     that are actual employment agreements with the other people.

15          THE COURT:  Right.  I see there's a list and it

16     includes --

17          MR. JOHNSON:  And then -- but every employee signs

18     another type of employment contract, which is being assumed,

19     which is the confidentiality -- employment and confidentiality

20     agreement, that's not an executory agreement, that's not a

21     traditional employment contract.  It just says you're employed

22     by us and you have to keep everything confidential.  So that --

23     those contracts are being not assumed so much as acquired as

24     part of the process.

25          THE COURT:  They're being reinstated.

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER CAPITAL HOLDINGS, LLC, et al.
Pg 41 of 56

Page 41

1          MR. JOHNSON:  They're being reinstated, exactly.

2          THE COURT:  If the employee is reinstated.

3          MR. JOHNSON:  Exactly.  So it's a little confusing

4     when you speak of employment contracts.  They're not

5     traditional employment contracts that are going to give rise to

6     claims at some point.

7          There are some that are being rejected, including

8     those for the insiders and a number of other people, but those

9     are being rejected.

10          THE COURT:  Now while we're on it, what does 4.9 mean?

11     That's new.  KEIP contracts, on or prior to November 9th,

12     that's tomorrow, the seller shall deliver the buyer a list

13     setting forth each current customer contract.

14          MR. JOHNSON:  That's correct.  Your Honor --

15          THE COURT:  Which the debtor -- the seller believes

16     will generate revenue.  That I understand.

17          MR. JOHNSON:  Right.

18          THE COURT:  And each written employment agreement,

19     each a key contract.  And then the buyer has a period of time

20     to decide whether to assume or reject and that's what Mr.

21     Califano is referring to as the time between tomorrow and

22     confirmation.

23          MR. CALIFANO:  Well, with these -- with these

24     particular contracts, Your Honor, they -- this is within three

25     days prior to closing.  So -- no, I'm sorry; they can assume or

ALEXANDER WARD HOLDINGS, LLC, et al.

1    reject up to the plan confirmation, we just have to finalize

2    the list three days prior.

3              MR. JOHNSON:  That's correct.  That's just a -- that

4    section, Your Honor, is just a statement saying that we've

5    given them all the contracts that we need.  When we refer to

6    those, sort of, customer contracts it's -- again, it's not an

7    executory contract it's an arrangement we have, the debtors

8    have, with a customer whereby they agree on certain pricing

9    terms.  But it doesn't -- there are no obligations to provide.

10   In other words, the customer is not obligated to use Gallo,

11   it's just a negotiation therefore they're designated as revenue

12   producing and they're being acquired.

13             THE COURT:  Okay.

14        (Pause)

15             THE COURT:  All right.  Anything -- those were my

16   questions, as best I could piece them together.  Anything

17   further from any party?  All right.  And the question is

18   whether to approve the sale, the extent objection is a very

19   narrow one if there is an extent objection on the part of the

20   committee.  It would seem to me that to the extent the

21   committee continues to object to the possibility of future

22   negotiations between the two top insiders of the debtor and the

23   purchaser, the objection should be overruled in that there's no

24   prohibition against the retention by a buyer, at 363 sale or

25   otherwise, in retaining some or all of the employees of the

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER WOOD & HOLDINGS, LLC, et al.
Pg 43 of 56

Page 43

1   prior entity, including the top management.

2           Obviously there are possible appearances that parties

3   need to be sensitive to.  In a plan of reorganization, under

4   Section 1129, there's no prohibition or limitation on payments

5   made in connection with the case, but a requirement of

6   disclosure.  If there are no such payments promised or agreed

7   to, then it would seem to me, even under 1129 there is no

8   issue.

9           Under 363, it would seem to me, that the issues can be

10  treated similarly but that the debtors acted appropriately in

11  postponing until after the completion of the sale process, any

12  discussions with top management and I'll cite my own decision

13  In re Granite Broadcasting Corp., again 369 B.R. 120.

14          The matter is a matter of sensitivity and I have no

15  complaint at all that the committee has raised it and the

16  committee is doing its job in investigating possible claims and

17  possible assets that this debtor may have in terms of

18  recovering amounts from insiders.  But, it does not appear that

19  the sale process was at all adversely affected by any of these

20  matters.

21          I recognize the disappointment of the committee in the

22  current situation, which involves payment of everybody above

23  the unsecured creditors, but no definite recovery, at this

24  point, for the unsecured creditors.  However, there is no

25  evidence that the difference would have been any different had

1    the same terms been incorporated in a plan of reorganization.

2    And the results may have been worse because, according to the

3    record, the company, in light of its business and client

4    relationships, might well lose business as the bankruptcy

5    continued and as clients of the company began to have greater

6    concern over the company's ability to perform and to perform in

7    a timely fashion.

8            So I will approve the sale, under Section 363.  We

9    need to set a date for the committee to complete its

10   investigation of the open issues.  I'm told, by Mr. Califano

11   that that will not hold up closing of the sale.  The committee

12   is looking for thirty to -- forty-five days, if I recall.

13           MR. COHEN:  Yeah, Your Honor.  I think it'll take the

14   committee a week to two weeks to get an advisor on board and

15   actively working.  So I think sixty days would be the

16   appropriate time frame --

17           THE COURT:  Sixty days?

18           MR. COHEN:  -- given the holidays and the time to

19   retain somebody.

20           MR. CALIFANO:  Your Honor, I do want to set the record

21   straight.  I mean, they make it appear that we gave them this

22   information late.  We gave them the information on the schedule

23   that they agreed to and we gave it to them timely.

24           Also, all this information, and we had our advisors

25   put together a compilation of information that was already in

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER Record of HOLDINGS, LLC, et al.
Pg 45 of 56

Page 45

1    the data room.  So they could have, with some digging, found

2    it.

3              That being said, I understand what they want to do and

4    I -- we have done an investigation and I know there are no

5    significant claims here.  I want them to come to the same

6    conclusion, Your Honor.  So I have to consult with Ms. Levine,

7    who represents Mr. Gallo.  So what I would suggest, Your Honor,

8    is that rather than doing this in open court we try and work a

9    three-way scheduling order.  And I'm sensitive to their needs,

10   I also do think it's not -- it's not accurate for them to say

11   they were jammed with this at the last minute.  But I would

12   suggest that --

13             THE COURT:  I didn't hear that.

14             MR. CALIFANO:  But I would suggest we have a three-way

15   conversation, since Ms. Gallo (sic); I'm sorry, Ms. Levine

16   represents Mr. Gallo and Mr. Simms and we can submit an agreed

17   upon scheduling order.  And if we can't reach something within

18   the next forty-eight hours, then maybe we could have a

19   conference call with the Court.

20             THE COURT:  All right.

21             MR. SAGE:  One question.  The DIP budget has an agreed

22   amount for committee professionals and I just want to make sure

23   that this new financial advisor isn't become part of my

24   purchase price.

25             THE COURT:  Well, I -- I wondered myself how the new

ALEXANDER Read & HOLDINGS, LLC, et al.

Page 46

1    advisor was going to get paid but that's the committee's

2    business at this point and if they want to spend money in that

3    fashion or get an advisor who is willing to work pro bono, that

4    remains to be seen.

5              MR. COHEN:  Your Honor, actually when we reached our

6    accord with the purchaser and the debtor at the bid procedures

7    hearing, the budget was split up into pre-sale and post-sale

8    phases, and there's more than adequate cushion in both phases

9    to accommodate the additional professional.

10             MR. SAGE:  And to the extent they're coming within the

11   agreed upon buckets, that's agreed.  We agree.  But it -- I

12   just was -- I was expecting that between the firm fees and what

13   the advisor would we may exceed that, but they won't and we

14   have no problem with it.

15             THE COURT:  All right.  I think I'll take Mr.

16   Califano's suggestion that we do this either by subsequent

17   order or perhaps we need a paragraph in this order excluding

18   out certain matters.

19             MR. CALIFANO:  Yes, Your Honor.

20             THE COURT:  We could put the dates in there; we could

21   put the dates in a scheduling order.

22             MR. CALIFANO:  Yes.  I think we should have -- for the

23   sale order to move quickly we'll add that paragraph and then

24   have a separate scheduling order that will be agreed upon by

25   the parties.

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER GALLO HOLDINGS, LLC, et al.
Pg 47 of 56

Page 47

1          THE COURT:  All right.  All right.  Shall we take a

2     look at the sale order?

3          MR. CALIFANO:  Sure, Your Honor.

4          THE COURT:  Page 3, paragraph C.  "This order is

5     intended to constitute a final order."  I can't tell an

6     appellate court that it's a final order or it isn't.  You've

7     probably heard me say that before.

8          MR. CALIFANO:  Yes I have, Your Honor.

9          THE COURT:  All right.  At least I try to be

10    consistent.

11         MR. CALIFANO:  You are.

12         THE COURT:  And then in the last line of that order:

13    "especially directs the entry of the order as set forth

14    herein".

15         Page 5, paragraph L, third line, "The committee has

16    said that they have no avoidance or similar claims against the

17    second lien lenders" but I think that we should keep this

18    limited to the sale and so we should just strike everything

19    after, on the third line, "And otherwise has proceeded in good

20    faith in all respects".  I don't imply that they haven't but --

21         Paragraph D, down below, there is no evidence in the

22    record that the buyer induced or caused the Chapter 11 filings.

23    Paragraph N, on page 6, the fifth line, strike any state

24    territory, possession or the District of Columbia or any

25    foreign country.

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER WEAK & HOLDINGS, LLC, et al.
Pg 48 of 56

Page 48

1          My hope is that by excluding these things maybe it

2    will get onto your computer and the next one will omit some of

3    this.  Or Mr. -- or the Dechert computer.  Dechert's been

4    through this before.

5          Page 7, Q, I think we can say the APA was not entered

6    into for the purpose of hindering, delaying or defrauding

7    creditors, period.

8          Then the definition of claims.  Liability, and I'm in

9    the middle of paragraph R, in the middle of "Liabilities,

10   obligations, demands, guarantees,"  I think options -- and then

11   I think we should strike the words options, rights, contractual

12   commitments and restrictions from that list.  I don't think I

13   can deal with contractual restrictions.  This is, I think, --

14   this is, I think, a general point.

15         And similarly, at the bottom of that page, "Or in

16   respect of taxes".  This is pre-closing taxes but restrictions,

17   rights of first refusal, restrictions on use, voting transfer,

18   I can't -- if it's in the contract and you're assuming the

19   contract, it's in the contract.  If it runs with the land --

20   well, I don't think you're getting any land in this case, but

21   if it's in the lease and you're assuming the lease, you're

22   stuck with it.  So that -- I would strike all of that after

23   taxes.

24         Page 9 -- I gather that the cure notice has been

25   served, is that right?  Or it will be?  Has been served?

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER McCOY HOLDINGS, LLC, et al.
Pg 49 of 56

Page 49

1            MR. CALIFANO:  Has been served, Your Honor.

2            THE COURT:  Okay.  And then at the top of page 10, the

3      proposed hearing date is not November 17th but November 16th.

4            MR. CALIFANO:  That is correct, Your Honor.

5            THE COURT:  At 2:30 p.m.  Then I think we should have

6      a hearing on that anyway.  You have a hearing, it's an omnibus

7      anyway so W, paragraph W should be revised.

8            Page 11, paragraph 2, strike the parenthetical

9      incorporating the record by reference.  Page  -- paragraph 3,

10     also on page 11, am I extinguishing avoidance and preference

11     actions?  Is that what you want me to do?  I just ask you to

12     look at that, maybe that's what I'm doing but it be subject to

13     the release by the putative defendant of its or his or her

14     claims against the debtor.

15           Page 13 --

16           MS. HERSHCOPF:  Your Honor, it would seem like in that

17     paragraph 3, as well, we should cross reference the retention

18     of Gallo and Simms.

19           THE COURT:  All right.  That would be one place too.

20           MS. HERSHCOPF:  A good place to put it.

21           MR. SAGE:  Your Honor, I'm not clear on the

22     suggestion.

23           MR. CALIFANO:  I think the suggestion is that we put

24     appropriate language, because we're not modifying the schedule

25     1.1(a)(9) that would put language in here relating to the

1     future hearing.

2              THE COURT:  Okay.

3              MR. CALIFANO:  And we'll work out language.

4              THE COURT:  All right.  Page 13, last line after the

5     word closing, just add after "request", "therefore".

6         (Pause)

7              THE COURT:  We're on page 15, paragraph 13.    The

8     language is awfully broad in the second paragraph.  Can we add,

9     in the second sentence, fifth line down from the top of the

10    paragraph, to the greatest extent available under applicable

11    law.

12             MR. CALIFANO:  Yes.

13             THE COURT:  And then just take a look at the use of

14    the word warranties.  Do you want to -- are you rejecting or

15    warranties --

16             MR. CALIFANO:  We've actually already assumed them.

17             THE COURT:  I thought you already assumed them?

18             MR. CALIFANO:  We did, Your Honor.

19             THE COURT:  Maybe you want to take out the word

20    warranties or look at it.  Warranties to the extent not

21    assumed.

22             MR. SAGE:  I'm willing, if you want, me to -- going to

23    the prior suggestion, I'm just a little bit concerned that that

24    gives third parties the right to argue it's not permissible.

25             THE COURT:  Well, in fact, I think under applicable

11-14220-alg   Doc 293   Filed 11/11/11   Entered 11/21/11 16:34:18   Main Document
ALEXANDER Read & HOLDINGS, LLC, et al.
Pg 51 of 56

Page 51

1    law the extent to which I can cut off any successor liability

2    is -- is doubtful.  We're certainly not warranting -- the

3    estate is not warranting that I'm able to do it in an order

4    like this.

5            It just seemed to me this sentence, the buyer shall

6    not be liable for any claims against the debtors or any of its

7    predecessor's affiliates for actions taken or liabilities

8    incurred prior to the closing.  I think it needs some

9    qualification.

10           MR. SAGE:  I would prefer to do that than to be set

11   out from the language.

12           THE COURT:  All right.  Then, I think, in the next

13   paragraph, on page 16, line 3; I think we should strike the

14   words the acquired assets.  It's all right relating to the

15   debtors, the operation of the debtors' business but the

16   acquired assets are something different.  You're acquiring

17   them.  If they have -- if you're acquiring land, and I don't

18   believe you are, you're acquiring land with any environmental

19   problems that are on the land and we can't do anything about

20   that.  But you're not acquiring any land so I'm not sure that

21   that's an issue.  But I would strike the words "The acquired

22   assets".

23           MR. SAGE:  I'm sorry.  I was taking a note and I'm not

24   exactly sure where you are.

25           THE COURT:  I'm on page 16, line 3.

ALEXANDER Reed & HOLDINGS, LLC, et al.

Page 52

1            MR. SAGE:  Paragraph 14?

2            THE COURT:  Yeah.

3            MR. SAGE:  I was confused.  Okay.

4            THE COURT:  And then two lines down, I'm willing to

5     say are forever barred and estopped.  I'm not enjoining anyone.

6     So just strike and permanently enjoined.  And then two lines

7     down from there, we've defined liens and claims but now we've

8     got interests thrown in.  So why don't we say liens or claims

9     and strike this new word, interests.  Maybe this is -- just ask

10    the parties to look at the rest of this because I'm not sure

11    the sentence holds together.

12           Page 17, take a look at paragraph 16 as to whether or

13    not it requires modification based on what we've done today.

14    There's a reference to releases of potential claims and liens,

15    I don't think we're -- I'm not sure we're releasing anything.

16    So maybe if we just got rid of the "Constitute valid

17    consideration for the sale or the sale agreement and the

18    provisions thereof".  The last sentence is a repetition but

19    I -- we'll leave it in because if we say it twice the corporate

20    lawyers feel better.

21           Page 18, paragraph 20, we've got an open issue between

22    the first lien and the second lien, or do we, there's an amount

23    in brackets.

24           MR. SAGE:  That's been resolved, Your Honor.  I

25    apologize.  The final number is 10,000 dollars.

1          THE COURT:  It is.  All right.  We'll take the

2    brackets out here.  That's good.  That simplifies things.

3          A hearing on the contracts -- we're on page 19, the

4    hearing is on the 16th at 2:30, okay.  Then paragraph 23 should

5    be revised.  I think we need the hearing but parties don't --

6    obviously no one needs to show up but the debtor.

7          Page 20, paragraph 24 is a -- you already have that in

8    there several times, why don't you just take out the paragraph.

9    Page 21, paragraph 30 -- and we're almost done, modifications

10   at the end of that paragraph I would add, comma, reasonable

11   advance notice is provided to the creditors' committee and

12   posted on the docket.

13         Paragraph 30 -- pardon me, 31, three lines up from the

14   bottom, let's say liens or claims and get rid of the "Or other

15   interest".

16         And finally, tell me what paragraph 32 is supposed to

17   mean.  Shall we ask one of the corporate lawyers what it means?

18         MR. CALIFANO:  I think we should take it to Mr. Sage.

19         MR. SAGE:  Let's read it.  Your Honor, we're just --

20   we're making payments --

21         THE COURT:  Mr. Sage, go ahead.

22         MR. SAGE:  Perhaps they crafted this offline and I

23   don't actually like the paragraph very much.

24         THE COURT:  I think what you're trying to say is that

25   if we're paying administrative expenses, under the asset

1   purchase agreement, they're deemed to be appropriate and actual

2   administrative expenses --

3           MR. SAGE:  Correct.

4           THE COURT:  -- under the circumstances.  But perhaps

5   this language can be improved.

6           MR. SAGE:  Agreed.

7           THE COURT:  All right.  So you'll revise the order and

8   provide the committee and us with a revised order and I'll get

9   it entered.

10          MR. CALIFANO:  Yes, Your Honor.  Thank you.

11          THE COURT:  All right.  Now you have your motion to

12  pay amounts under the --

13          MR. CALIFANO:  PPN.

14          THE COURT:  -- PPN.  No objection.  Payments will be

15  by the purchaser?

16          MR. CALIFANO:  Yes, Your Honor.

17          THE COURT:  And I'll approve -- I'll approve the

18  motion without objection.

19          MR. CALIFANO:  Thank you, Your Honor.

20          THE COURT:  Anything else today?

21          MR. CALIFANO:  No, Your Honor.

22          THE COURT:  Anything from any other party?  All right.

23  Thank you very much.

24          MR. CALIFANO:  Thank you, Your Honor.

25          (Whereupon these proceedings were concluded at 4:03 p.m.)

1

2                          I N D E X

3

4    WITNESS                EXAM BY              PAGE

5    Alexander Gallo        Mr. Califano         33

6    Adam Schimel           Mr. Sage             34

7    Adam Schimel           Mr. Sage             36

8

9                          R U L I N G S

10   DESCRIPTION                            PAGE      LINE

11   Debtors' motion for an order seeking    44         8

12   Approval of Section 363 sale granted

13   Debtors' motion to pay amounts under    54        17

14   preferred provider network approved

15

16

17

18

19

20

21

22

23

24

25

Page 56

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6
     Lisa Bar-          Digitally signed by Lisa Bar-Leib
                        DN: cn=Lisa Bar-Leib, o, ou,
7    Leib               email=digital1@veritext.com,
                        c=US
                        Date: 2011.11.11 14:26:30 -05'00'
8    _____

9    LISA BAR-LEIB (CET**D-486)

10   AAERT Electronic Certified Transcriber

11

12   Also transcribed by:    Pnina Eilberg (CET**D-488)

13                           Dena Page

14

15   Veritext

16   200 Old Country Road

17   Suite 580

18   Mineola, NY 11501

19

20   Date:  November 11, 2011

21

22

23

24

25